# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **IN RE WILLIAMS SECURITIES** | ) | Case No. 02-cv-072-SPF-FHM |
| **LITIGATION** | ) | 02-cv-077-SPF-FHM |
| | ) | 02-cv-078-SPF-FHM |
| **This Document Pertains To:** | ) | 02-cv-080-SPF-FHM |
| **WCG Subclass** | ) | 02-cv-081-SPF-FHM |
| | ) | 02-cv-083-SPF-FHM |
| | ) | 02-cv-093-SPF-FHM |
| | ) | 02-cv-095-SPF-FHM |
| | ) | 02-cv-097-SPF-FHM |
| | ) | 02-cv-107-SPF-FHM |
| | ) | 02-cv-113-SPF-FHM |
| | ) | 02-cv-120-SPF-FHM |
| | ) | 02-cv-124-SPF-FHM |
| | ) | 02-cv-130-SPF-FHM |
| | ) | 02-cv-132-SPF-FHM |
| | ) | 02-cv-135-SPF-FHM |
| | ) | 02-cv-139-SPF-FHM |
| | ) | 02-cv-161-SPF-FHM |
| | ) | 02-cv-162-SPF-FHM |
| | ) | 02-cv-184-SPF-FHM |
| | ) | 02-cv-189-SPF-FHM |
| | ) | 02-cv-190-SPF-FHM |
| | ) | 02-cv-204-SPF-FHM |
| | ) | 02-cv-205-SPF-FHM |
| | ) | 02-cv-206-SPF-FHM |
| | ) | 02-cv-218-SPF-FHM |
| | ) | 02-cv-231-SPF-FHM |
| | ) | 02-cv-235-SPF-FHM |
| | ) | 02-cv-303-SPF-FHM |
| | ) | 02-cv-319-SPF-FHM |
| | ) | |
| | ) | Honorable Stephen P. Friot |

## MEMORANDUM OPINION AND ORDER

1

Table of Contents

I.   Introduction ................................................................. 3
     A.   Preliminary matters ................................................. 3
     B.   The *Daubert* and summary judgment record ..................... 7
II.  Factual Background ..................................................... 8
III. Procedural History ..................................................... 49
IV.  Summary of the claims of the WCG Subclass ........................... 51
     A.   Rule 10(b) and Rule 10b-5 Claims – Basic Elements ................. 52
     B.   Section 20(a) Claims – Basic Elements ......................... 53
V.   The *Daubert* Motions ................................................. 53
     A.   The general framework for *Daubert* analysis
          in this case ....................................................... 53
     B.   Qualifications ..................................................... 56
     C.   Reliability ....................................................... 58
     D.   The *Daubert* challenges with respect to Messrs.
          Mathis and Mintzer ................................................. 62
          1.   The division of labor between Messrs. Mathis
               and Mintzer with respect to FAS 121 impairment
               analysis ..................................................... 67
          2.   The experts' methodology vs. the methodology
               the accountants were required to employ in their
               audit-related work ........................................... 69
          3.   *Daubert* analysis - proposed expert testimony
               of H. Sean Mathis ........................................... 74
               a.   Qualifications ......................................... 74
               b.   Reliability ........................................... 78
          4.   *Daubert* analysis - proposed expert testimony of
               Andrew M. Mintzer ........................................... 84
               a.   Qualifications ......................................... 85
               b.   Reliability ........................................... 86
     E.   *Daubert* analysis - proposed expert testimony of
          Dr. Blaine Nye ..................................................... 90
          1.   Dr. Nye's three damage scenarios ........................... 92
               a.   Scenario 1 ............................................. 92
                    (i)   General description of Scenario 1 ............... 92
                    (ii)  Corrective disclosures - Scenario 1 ............. 96
               b.   Scenario 2 ............................................. 100
               c.   Alternative Scenario 2 ................................. 103
          2.   Qualifications ................................................. 105

3.    Reliability ........................................................... 106
      a.    The loss causation requirement .................................. 106
            (i)    Loss causation - basic rules ............................. 106
            (ii)   Loss causation - limits of the doctrine ............. 111
            (iii)  Loss causation - materialization of
                   the risk ................................................ 112
      b.    The *Daubert* challenge as to Dr. Nye's
            Scenario 1 (common stock) ......................................... 113
      c.    The *Daubert* challenge as to Dr. Nye's
            Scenario 2 (common stock) ......................................... 115
            (i)    Corrective disclosures on or after
                   January 29, 2002 .............................................. 115
            (ii)   The constant percentage inflation
                   approach ............................................ 119
      d.    The *Daubert* challenge as to Dr. Nye's
            Alternative Scenario 2 (common stock) .................... 120
      e.    The *Daubert* challenge with respect to
            the notes ..................................................... 121
VI.   The Motions for Summary Judgment ........................................ 129
      A.    The Williams Companies, Inc. and Keith E. Bailey's Motion
            for Partial Summary Judgment on Alleged Misstatements
            and Omissions Made *Before* WCG's Spin-Off from Williams ...... 130
      B.    Motion of the Williams Companies, Inc. and Keith E. Bailey
            for Partial Summary Judgment on Alleged Misstatements or
            Omissions Made *After* WCG's Spin-Off from Williams ............... 143
      C.    Defendant Ernst & Young LLP's Motion for Summary
            Judgment ........................................................ 146
            1.    Material misstatements or omissions ................................... 146
            2.    Scienter as to E&Y ............................................... 152
      D.    WCG Defendants' Motion for Summary Judgment ...................... 154
            1.    WCG's contentions ..................................... 154
            2.    Plaintiffs' response to WCG's motion ................................ 158
VII.  Conclusion ........................................................... 163

_____

# I.   Introduction.

A.   Preliminary matters.   These thirty consolidated securities fraud actions involve two subclasses of plaintiffs.  One of the subclasses (the WMB Subclass) consists of purchasers of securities issued by Williams Companies, Inc.  The other

subclass (the WCG Subclass) consists of purchasers of common stock and notes issued by Williams Communications Group, Inc.  The claims of the WMB Subclass have been settled.  The remaining claims, asserted by the WCG Subclass, are traceable to the rise and fall of Williams Communications Group, Inc., and arise under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5, promulgated thereunder.  *See, generally,* In re Williams Securities Litigation, 339 F.Supp.2d 1206 (N.D. Okla. 2003).

Investors who bought WCG[1] stock during the class period bought into an industry meltdown of historic proportions.  The defendants maintain, correctly, that the plaintiffs are not entitled to insurance against improvident investment choices.  The plaintiffs, having convincingly demonstrated that the views expressed privately by members of senior management of WMB and WCG belied their rosy public statements about WCG's prospects, maintain, correctly, that they are entitled to present their claims to a jury if they can make a threshold showing of triable issues with respect to the contested elements of their securities fraud claims.  The task now before the court is to determine whether plaintiffs have marshaled record evidence and expert testimony sufficient to survive (i) the defendants' Daubert challenges to the proposed testimony of plaintiffs' expert witnesses, and (ii) the defendants' related motions for summary judgment.

The following motions are before the court:

Motion of Defendant Ernst & Young LLP for Summary Judgment, filed  April 14, 2006 (doc. no. 1027);

---

[1]  In this Memorandum Opinion, The Williams Companies, Inc. is referred to as WMB. WMB and defendant Keith E. Bailey are referred to as the WMB defendants.  Williams Communications Group, Inc. is referred to as WCG.  The defendants (Howard E. Janzen et al.) who are former officers or directors of WCG are referred to as the WCG defendants.  The defendant Ernst & Young LLP is referred to as E&Y.

Motion of The Williams Companies, Inc. and Keith E. Bailey for Partial Summary Judgment on Alleged Misstatements or Omissions Made *After* WCG's Spin-off from Williams, filed April 14, 2006 (doc. no. 1050);

The Williams Companies, Inc. and Keith E. Bailey's Motion for Partial Summary Judgment on Alleged Misstatements and Omissions Made *Before* WCG's Spin-off from Williams, filed April 14, 2006 (doc. no. 1060);

WCG Defendants' Motion for Summary Judgment, filed April 14, 2006 (doc. no. 1092);

WCG Defendants' Motion to Exclude the Report and Testimony of Plaintiffs' Expert Blaine F. Nye, filed April 14, 2006 (doc. no. 1103);

Defendant Ernst & Young's Motion to Exclude the Testimony and Report of Plaintiffs' Expert Blaine F. Nye, filed May 16, 2006 (doc. no. 1297);

Motion of The Williams Companies, Inc. and Keith E. Bailey to Exclude Testimony of Plaintiffs' Proposed Expert Witness Blaine F. Nye (doc. no. 1316), and Joinder in WCG Defendants' Motion to Exclude the Report and Testimony of Plaintiffs' Expert Blaine F. Nye (doc. no. 1317), filed May 18, 2006;

Defendant Ernst & Young LLP's Motion to Exclude H. Sean Mathis's Testimony and Evidence Under the Standards Established in Daubert and Kumho Tire, filed August 4, 2006 (doc. no. 1433);

Defendant Ernst & Young LLP's Motion to Exclude Portions of the Testimony and Report of Plaintiffs' Expert Andrew Mintzer Under the Standards Established in Daubert and Kumho Tire, filed August 4, 2006 (doc. no. 1436);

WCG Individual Defendants' Motion to Exclude Portions of Andrew Mintzer's Expert Testimony and Report, filed August 4, 2006 (doc. no. 1437);

Motion of The Williams Companies, Inc. and Keith E. Bailey to Exclude Portions of the Testimony and Report of Plaintiffs' Expert Andrew Mintzer, filed August 4, 2006 (doc. no. 1445);

Defendant Ernst & Young LLP's Joinder in WCG Defendants' Motion to Exclude the Report and Testimony of Plaintiffs' Expert Rick Lawrence, filed August 4, 2006 (doc. no. 1447);

WCG Plaintiffs' Motion to Exclude the Reports and Testimony of Defendants' Expert Eric P. Evans, filed August 4, 2006 (doc. no. 1448);

WCG Plaintiffs' Motion to Exclude the Reports and Testimony of Defendants' Expert William W. Holder, filed August 4, 2006 (doc. no. 1450);

WCG Individual Defendants' Motion to Exclude the Report and Testimony of Plaintiffs' Expert H. Sean Mathis, filed August 4, 2006 (doc. no. 1451);

Joinder of The Williams Defendants to Motions and Supporting Briefs Filed by Ernst & Young LLP and the WCG Individual Defendants, filed August 4, 2006 (doc. no. 1453);

WCG Plaintiffs' Motion to Exclude the Reports and Testimony of Defendants' Expert Thomas J. Mangold, filed August 4, 2006 (doc. no. 1455);

WCG Defendants' Motion to Exclude Certain Portions of the Report and Testimony of Plaintiffs' Expert Rick Lawrence, filed August 4, 2006 (doc. no. 1456);

WCG Plaintiffs' Motion to Exclude the Reports and Testimony of Defendants' Expert Paul A. Gompers, filed August 4, 2006 (doc. no. 1457);

Joinder of The Williams Defendants to Reply Briefs Filed by Ernst & Young LLP and The WCG Individual Defendants, filed September 8, 2006 (doc. no. 1529);

Defendant Ernst & Young LLP's Motion in Limine to Exclude Evidence and Argument Relating to the Audit Quality Review Program, filed November 7, 2006 (doc. no. 1561);

Defendant Ernst & Young LLP's Motion in Limine to Exclude Evidence and Argument Relating to Dismissed, Abandoned and Unpled Claims, filed November 7, 2006 (doc. no. 1563);

Defendant Ernst & Young LLP, WCG Defendants, and Williams Defendants' Motion in Limine to Exclude Certain Irrelevant or Overly Prejudicial Evidence, filed November 7, 2006 (doc. no. 1566);

Defendant Ernst & Young's Motion in Limine to Exclude Plaintiffs' Use of Trading Models to Estimate Aggregate Damages, filed November 7, 2006 (doc. no. 1567);

WCG Defendants' Motion in Limine to Exclude References to Executive Loan Forgiveness, Key Employee Retention Program, filed November 7, 2006 (doc. no. 1569);

Motion in Limine No. 1 of The Williams Companies and Keith E. Bailey to Exclude Improper Expert Testimony, filed November 7, 2006 (doc. no. 1570);

Motion in Limine No. 2 of The Williams Companies, Inc., Keith E. Bailey and Ernst & Young LLP to Exclude Evidence or Reference to "Corrective Disclosures" on Dates Where the Stock Price Did Not Move in a Statistically Significant Fashion, filed November 7, 2006 (doc. no. 1571);

Motion in Limine No. 3 of The Williams Companies, Inc., Keith E. Bailey and Ernst & Young LLP to Preclude Evidence or Argument Regarding The Williams Companies, Inc.'s Financial Statements, filed November 7, 2006 (doc. no. 1575);

Motion in Limine No. 4 of The Williams Companies, Inc., Keith E. Bailey and Ernst & Young LLP to Preclude Evidence or Argument Regarding Alleged Uses of the Word "Junk" to Describe WCG, filed November 7, 2006 (doc. no. 1577);

Motion in Limine of the WCG Defendants and Ernst & Young LLP to Exclude References to Directed Shares Transactions and Related Issues, filed November 7, 2006 (doc. no. 1578);

Motion in Limine of the WCG Defendants and Ernst & Young to Exclude Plaintiffs' Inadmissible Lay Witness Testimony, filed November 7, 2006 (doc. no. 1583);

The WCG Subclass's Amended Omnibus Motion in Limine, filed November 7, 2006 (doc. no. 1585); and

Joinder of The Williams Defendants to Motions and Supporting Materials Filed by Ernst & Young LLP and the WCG Individual Defendants, filed November 10, 2006 (doc. no. 1590).

B.   The *Daubert* and summary judgment record.

The Daubert motions, briefs, exhibits and appendices consist of 119 filings, totaling more than 13,750 pages. The summary judgment motions, briefs, exhibits and appendices consist of 93 filings, totaling more than 22,900 pages. The briefs which are before the court with respect to these motions demonstrate outstanding advocacy. They have met the court's highest expectations.

As will be seen, with respect to the Daubert motions, the court's attention has primarily been addressed to the defendants' challenges to the proposed expert testimony of Messrs. H. Sean Mathis and Andrew M. Mintzer and Dr. Blaine F. Nye.

II.    <u>Factual Background</u>.

For summary judgment purposes, the court views the facts and draws reasonable inferences from those facts in a light most favorable to the non-moving party.  <u>Piercy v. Maketa</u>, 480 F.3d 1192, 1197 (10th Cir. 2007).  The following facts are either undisputed or viewed in a light most favorable to plaintiffs.

Following the breakup of AT&T in the early 1980's, WMB, an energy company, developed a strategy to run fiber-optic cables through some of its decommissioned pipelines, planning, under the original strategy, to provide services solely to other communications providers.  After WMB secured adequate assurances of demand for its service, it authorized the initial $26 million build. WMB formed a subsidiary called Williams Telecommunications Company ("WilTel I") in 1985, which eventually built a nationwide digital fiber-optic network, consisting of approximately 9,700 route miles.  Bailey Aff., ¶ 8-11; Ex. 1 at EY-WCG-00-000005, Caroline L. Marshall Declaration ("CM Decl.").

In 1995, WMB sold the WilTel I network business to LDDS Communications (thereafter WorldCom, Inc.) for approximately $2.5 billion.  The sale included the nationwide fiber-optic network, together with the associated relationships with consumers and business and carrier customers.  WMB excluded from the sale an approximately 9,700 route-mile single fiber network, comprised of a single fiber-optic strand and associated equipment along the original nationwide network, as well as WilTel I's telecommunications equipment distribution business, and Vyvx Services, a provider of multimedia fiber transmission for the broadcast industry.  WMB agreed with LDDS that it would not reenter the telecommunications business for three years. WMB incorporated the WilTel I businesses that it did not sell, including Vyvx Services, under the name of WilTel Technology Ventures, Inc.  That name later changed to Williams Communications Group, Inc. in 1997.  Bailey Aff., ¶¶ 11, 12; Ex. 1 at EY-WCG-00-000005, CM Decl.

The NASDAQ U.S. Telecommunications Index ("Telecom Index") began the 1997 year at 215.71.  Ex. 10 at 45, Joint Appendix of WCG Defendants ("JA").  By the end of 1997, the Telecom Index had increased to 306.60, an increase of 42%.  *Id.* at 41.

In January 1998, the non-compete agreement with LDDS Communications expired and WMB reentered the network communications market through WCG.  The objective of WCG was to own or lease, operate and extend a nationwide fiber-optic network and to provide services exclusively to communications service providers.  Bailey Aff., ¶ 13; Ex. 1 at EY-WCG-00-000005, EY-WCG-00-000007, CM Decl.

Prior to 2001, WCG had four business units: Network, Broadband Media, Solutions and Strategic Investments.  The Network unit offered Internet, data, voice and video services, as well as rights of use of dark fiber (fiber that WCG installed but for which it did not provide communications transmission services), on WCG's fiber-optic network.  The Broadband Media unit provided worldwide transmission of live and non-live media content through integrated fiber-optic, satellite and teleport services.  The Solutions unit provided professional and maintenance services and distributed communications equipment from leading vendors for the voice and data communications needs of businesses of all sizes, as well as for governmental, educational and non-profit institutions.  Through the Strategic Investments unit, WCG invested strategically in communications businesses which WCG believed would increase revenue opportunities for the Network and other business units.  Ex. 30 at LB 066319, Ex. 88 at WMB.00003044, Kent A. Bronson Declaration ("KB Decl.").

In a February 11, 1998 press release, WMB announced that it was "accelerating the expansion of its national fiber-optic network with plans for a $2.7 billion investment in a 32,000-mile system by year-end 2001."  According to the press release, "[t]he network is projected to reach nearly 22,000 miles by year-end

1999 – doubling its current size.  It will stretch to more than 25,000 miles by year-end 2000 and some 32,000 by the end of 2001." *See*, Ex. 2, CM Decl.

In 1998, WCG established an Asset Defeasance Program ("ADP"), in the form of an operating lease agreement covering a portion of the fiber-optic network, with a group of financial institutions.  The total estimated cost of the network assets to be covered by the lease agreement was $750 million.  The lease term included an interim term, during which the covered network assets were to be constructed, and a base term.  The interim and base terms were expected to total five years, and, if renewed, could total seven years.  WCG had an option to purchase the covered network assets during the lease term.  WMB provided a residual value guarantee equal to a maximum of 89.9% of the transaction.  Ex. 12 at 143, JA.  Under a subsequent agreement, if WCG exercised its option to purchase the covered network assets during the lease term, WMB was obligated to fund the purchase price of the ADP assets in exchange for debt or equity from WCG.  Ex. 60 at WTL 0282528, CM Decl.

By the end of 1998, the Telecom Index closed at 500.91, an increase of 63% during the course of the year.  Ex. 10 at 36, JA.

On February 9, 1999, WCG and SBC Communications, Inc. entered into a 20-year business relationship in which each agreed to be the other's preferred provider of network services.  Ex. 1 at EY-WCG-00-000022, Ex. 60 at WTL 0282526, CM Decl.

Two days later, in a February 11, 1999 press release, WCG announced a "$4.7 billion expanded and accelerated construction plan that nearly doubles its original $2.7 billion financial commitment and advances its target network completion date by a full year."  According to the press release, WCG planned "to finish its 32,000-mile network in 2000."  "Under the 'turbo-charged plan,'" WCG's "current 19,000-mile network will expand to 26,000 miles by year-end and to 32,000 miles in 2000, ultimately connecting 125 cities."  The press release quoted defendant, Howard

Janzen, WCG's president and chief executive officer, as stating "'[t]he funds to support this "turbo-charged" plan will come from a variety of sources . . . [t]hese include [WCG's] planned initial public offering, a related high-yield bond offering, a separate equity investment by SBC Communications, revenue from fiber transactions and network services, and the additional traffic we will generate by completing the network more rapidly.'" Ex. 2, Robert J. Malionek Declaration ("RM Decl.")

In September 1999, WCG established a $1.05 billion credit facility with a group of banks. Bank of America was the administrative agent. The credit facility consisted of $525 million seven-year senior multi-draw amortizing term loan facility and a $525 million six-year senior reducing revolving credit facility. WCG could borrow under the term loan facility during a one-year period beginning on the credit facility's commencement date and could borrow under the revolving credit facility throughout the six-year term. WCG's credit agreement included a minimum EBITDA (earnings before interest, taxes, depreciation and amortization) covenant and a Total Leverage Ratio covenant. Under the credit facility, E&Y, WMB and WCG's outside auditor, was required to provide to WCG's board of directors and Bank of America an annual debt covenant compliance report stating whether E&Y had obtained any knowledge of a default during its annual audit. Ex. 1 at EY-WCG-00-000080, CM Decl.; Ex. 62, KB Decl.

WCG, then a wholly owned subsidiary of WMB, received capital contributions and interest-bearing advances from WMB in order to fund its operations. In September 1999, previous non-capital borrowings from WMB were converted into a seven-year note bearing interest at an annual rate based upon WCG's credit rating. Although the intercompany note ranked equal with the credit facility note, WMB agreed that the intercompany note would be subordinated to the rights of the credit facility lenders in any bankruptcy, insolvency, liquidation or dissolution of WCG and

in the event of default under the credit facility.  Ex. 1 at EY-WCG-00-000079, CM Decl.

To raise funds for operations, including network construction, WCG conducted an initial public offering ("IPO") in October, 1999.  The IPO offered for sale 29,600,000 shares of Class A common stock.  The underwriters for the IPO exercised their options and purchased 4,440,000 additional shares to cover over-allotments.  In separate private placements, SBC Communications, Intel Corporation and Telefonos de Mexico, S.A. de C.V., respectively acquired 20,226,812, 9,225,093 and 4,612,546 shares of WCG's Class A common stock.[2]  The financing effort also included the issuance of high yield notes in addition to the equity.  The total amount raised from the IPO, private placement and high yield notes was approximately $3.4 billion.  Ex. 1at EY-WCG-00-000005, CM Decl.; Ex. 12 at 4,6, JA; Ex. 1 at WCG 00650, KB Decl.

Following the IPO, shares of WCG stock began to trade on the New York Stock Exchange.  Shares of WCG closed on October 1, 1999, the first day of trading, at $28.06 per share.  Ex. 11 at 1, JA.  The Telecom Index closed on October 1, 1999 at 616.80, representing growth of 23% from the end of 1998.  Ex. 10 at 32, JA.

WMB and WCG anticipated that the amount raised from the IPO would be sufficient to fund completion of WCG's network buildout and other capital requirements and enable WCG to generate a positive cash flow without the need for further outside financing.  Bailey Aff., ¶ 14; Ex. 1 at WCG 001650, Ex. 2 at WMB.00064219, KB Decl.  However, six months later, WCG internally updated its capital expenditure plans to show that capital expenditures in 2000-2001 would be

---

[2]WMB owned 100% of WCG's Class B common stock.  Through its ownership of Class B common stock, WMB retained an approximate 85% economic interest and an approximate 98% voting interest in WCG.  WCG continued to be included in WMB's consolidated financial statements.  Ex. 1 at EY-WCG-00-000005, CM Decl.; Ex. 2 at WMB.00064220, KB Decl.

more than $1 billion higher than WCG's internal forecast for that time period at year-end 1999. Ex. 4 at WTL 0090117, Ex. 5at 35-38, KB Decl.

In a memorandum dated January 24, 2000, John Williamson ("Williamson"), E&Y's engagement partner for the YE 2000 audit of WCG, set forth his reasons for designating WCG as a "close monitoring engagement." One such reason was:

> With the IPO in October 1999, the management of WCG will be under significant pressure to manage operating results to those included in the forecasts presented in connection with the Initial Public Offering process. The company has historically experienced significant net losses . . . . The expectation is that losses in and of themselves are not a significant issue to WCG's investors so long as WCG is able to meet the expectations included in the IPO model.

Ex. 9 at EY-WMB-E-01302453, CM Decl.[3]

In his memorandum, Williamson also noted a "key area" for partner review being "[i]mpairment analysis on assets or investments identified as having impairment indicators - WCG." Ex. 9 at EY-WMB-E-01302454, CM Decl.

WCG's Financial Outlook for February 2000, distributed to defendant, Keith E. Bailey ("Bailey"),WMB's chief executive officer and then chairman of WCG's board of directors, as well as to other WMB executives, stated, as to WCG's network business unit: "[R]evenues continue to fall short of plan due to service delivery and provisioning issues." Ex. 4 at WTL 0090087, KB Decl. It also stated that "Network capital spending expected to be above plan due to carryover spending projects from 1999." Ex. 4 at WTL 0090088, KB Decl.

WCG's  Financial Outlook for March 2000, distributed to Bailey and other WMB executives, stated: "Network quarterly revenue of $130MM is 14% below plan

---

[3]WCG was ultimately identified as a "close-monitoring client." According to an E&Y December 31, 2000 memorandum, this status was "[d]ue to the significance of losses, liquidity concerns, rapid expansion of operations, rate of change in [WCG] and industry, accounts receivable collection problems at Solutions and the presence of material weakness in the prior year." Ex. 54 at EY-WCG-00-002254, CM Decl.

due to service delivery and provisioning problems.  We expect these issues to continue throughout 2000 resulting in significantly lower EBITDA targets."  Ex. 38 at WTL 0027923, KB Decl.  It also said: "We expect [capital] spending to exceed plan by year-end due to the additional carryover spending from 1999 and the authorization of new projects."  Ex. 38 at WTL 0027924, KB Decl.

The price of WCG's stock generally climbed from October 1, 1999 until March 7, 2000, when it reached $61.81 per share, the highest level at which WCG's common shares would ever trade.  Ex. 11 at 3, JA.  The Telecom Index also continued to rise during this period, closing at 1170.64 on March 7, 2000.  Ex. 10 at 30, JA.  The Telecom Index reached its own zenith of 1248.06 on March 10, 2000, three days after WCG's stock peaked.  *Id.*

During and after WCG's IPO process, WMB considered a spin-off of WCG, to make it an independent company.  Bailey Aff. ¶15.  In a letter dated March 7, 2000, Lehman Brothers, an investment banking firm, at the request of WMB, provided its view, from a financial and debt capital markets perspective, "of a distribution to public stockholders of all of the Class B common stock in [WCG]."  Ex. 24 at LB101808, KB Decl.  Lehman Brothers understood that "[the] transaction would be effected via a pro rata distribution of the Class B common stock of [WCG] to the stockholders of [WMB] and would constitute 100 percent of the Class B common shares outstanding" and that it "would result in two unaffiliated publicly held companies."  *Id.*  Lehman Brothers also understood "[the] letter [would] be used in connection with a request for ruling that [WMB had] filed with the Internal Revenue Service concerning the Federal income tax consequences of the Distribution."  Ex. 24 at LB101809, KB Decl.

As reported in the letter, Lehman Brothers viewed "the Distribution [to] provide [WMB] with the optimal capital structure to achieve its business objectives."  Ex. 24 at LB 101809, KB Decl.  In arriving at its view, Lehman Brothers stated:

Prior to the Offerings [WCG's IPO, private placement and high yield notes], [WMB] had been under ratings pressure due to funding its own aggressive business plan while simultaneously funding WCG's business plan. The Offerings were necessary for [WMB] to fund [WCG's] business plan through 2000 and retain its investment grade rating. From a credit ratings perspective, [WMB] and [WCG] are now considered separate credits by the credit rating agencies due to the non-recourse nature of the Notes Offerings [high yield bonds]. However, [WMB] continues to carry the burden of having funded [WCG] prior to the Offerings . . . . WMB continues to fully consolidate [WCG's] $2.0 billion of debt . . . . And, since WMB owns a substantial portion of [WCG], we believe [WMB's] lenders do not fully appreciate the separation of the higher risk profile [WCG] business from the lower risk energy businesses. *The result is that [WMB's] balance sheet, while currently investment grade, is stretched with limited future debt capacity.*

\* \* \* \*

[WMB] needs to retain, and possibly improve, its credit rating to continue to be competitive among its industry peers.

\* \* \* \*

The continued deterioration of [WMB's] credit quality would affect its cost of financing, ability to compete among its peers and ultimately execute on its business objectives. *The Distribution would incrementally reduce [WMB's] current balance sheet pressure, increase [WMB's] future financing capacity and provide the opportunity to improve its competitive profile.*

Ex. 24 at LB101813, KB Decl. (emphasis added).

On April 11, 2000, defendant, Howard Janzen ("Janzen"), WCG's chief executive officer, sent an e-mail to defendant, Scott Schubert ("Schubert"), WCG's chief financial officer, stating "We need to get a solid handle on capital spending . . . ." Ex. 6, KB Decl. On that day, Janzen also issued a memorandum announcing a policy "prohibit[ing] future participation by WCG employees in directed share programs ["friends and family stock"] offered by other companies that do business, or are likely to do business, with [WCG]." Ex. 77, Sarah Jane Gillett Declaration

15

("SJG Decl."). WCG had previously allowed its employees to receive directed shares or friends and family stock in the IPO's of companies with which WCG had invested and had strategic alliances. One such company was Sycamore Networks. Shortly before the Janzen memorandum, *Fortune* magazine had published an article discussing the sale of friends and family stock to defendant Matthew Bross ("Bross"), WCG's chief technology officer, from Sycamore Networks. The article reported that Bross had been given the opportunity to buy Sycamore Networks' stock at the IPO price of $38 per share, which he could immediately sell in the open market for a substantial profit. The article reported that Sycamore Networks' stock commenced trading on opening day at $270 per share and that the value of Bross' stock surged to $1 million dollars. Bross and a group of employees under him had specifically recruited Sycamore Networks to develop products that WCG wanted to deploy on its network.[4] Approximately seven months before the IPO, WCG had announced that it would buy $400 million of Sycamore Networks products for its network. After WCG decided to award a contract to Sycamore Networks, the company offered the friends and family stock to Bross. The *Fortune* magazine article noted that while the offering of friends and family stock was not illegal, it might not be "100% ethically sound." Ex. LLLLL, SJG Decl.

On May 18, 2000, WCG obtained approval from WMB for another $1 billion of capital expenditures on "transport, switching and colocation facilities and equipment." Ex. 7 at WMB.00429828, KB Decl. The minutes of the WMB's May

---

[4]Bross was overseer of WCG's "technology farm system." Bross and a group of employees under him would scout out technology talent across the country to develop products that WCG wanted to employ on its network. Bross worked with established companies but also recruited start-up companies like Sycamore Networks to develop products. Ex. 69 at 17-18, 27-30, SJG Decl. In addition to Sycamore Networks, Bross received directed shares, or friends and family stock, in other start-up companies. He also received seats on the board of directors and advisory boards of start-up companies under arrangements that included awards of stock or options. Ex. LLLLL, Ex. MMMMM, SJG Decl.

board of directors meeting stated that Janzen "discussed results for the first quarter and issues that had caused revenues to fall short of plan, including challenges associated with service delivery, SBC's delay in obtaining Section 271 relief from the Federal Communications Commission,[5] and the fact that [the] Solutions [unit] suffered a revenue decline in the first quarter."  Ex. 7 at WMB.00429827.

Following the May board meeting, Bailey wrote to Janzen:

I think it is probably *an exercise in understatement to observe that both boards were very uncomfortable with the rate which we are driving spending at [WCG] and had a concern that we not overreach either from a capital or organizational perspective . . . .*  I think with the clear view on the part of the Board[] that we need to move further away from the brink in terms of credit rating and the willingness to sell common equity to do it we would be well advised to push that lever hard this year assuming the markets don't tank in the next few months . . . .  *Given the number of folks who heard the Williams Board view that it is inevitable that we will need to separate the companies . . . it is unlikely that will remain a secret.*

Ex. 9, KB Decl. (emphasis added).

A June 2000 Network Business Review report for May 2000 results for WCG showed a negative revenue variance of $127.7 million and noted: "Unfavorable revenues caused by service delivery concerns."  Ex. 40 at WTL 0206653, KB Decl.

In a June 21, 2000 e-mail to Janzen and others, Bailey suggested that WCG seek immediate board approval for the issuance of WCG equity.  Ex. 10, KB Decl. However, in order to maintain tax consolidation benefits, WMB placed limits on the amount of additional equity that WCG could issue to fund its still-growing capital requirements.  Ex. 11, KB Decl.

---

[5]Section 271 of the 1996 Telecommunications Act sets forth certain requirements that regional Bell operating companies must satisfy "before they can be approved by the Federal Communications Commission to enter [the various state] long distance markets."  Ex. 3 at 22, n. 57, RM Decl., Ex. 1 at EY-WCG-00-000028, CM Decl.

On June 26, 2000, WCG issued a press release announcing that WCG's board of directors had "approved expenditure of nearly $1 billion over the next several years to build data centers, expand its network colocation facilities and to scale up its Internet Protocal (IP) network."  Ex. 12, KB Decl.  WCG also held a conference call to discuss the new initiatives and expenditures.  During the call, Schubert, the CFO, also discussed certain revenue delays related to service delivery problems and SBC Communications-related delays.  Ex. 13 at TWC-018449, KB Decl.

The market reacted unfavorably to WCG's announcement of additional capital expenditures and deferred revenue expectations, and the price of WCG's common stock fell 14% in response to the news.  Ex. 14 at ¶ 32, KB Decl.

On June 27, 2000, Bailey sent an e-mail to Janzen and others which stated:

Obviously with the negative reaction of the market to the conference call and the down grading of our near term financial expectations [for WCG] we are getting a lot of calls and will need to do a fair amount of handholding with unhappy investors at both levels . . . . *Our "bet" is approaching $7 billion with the announced spend and right now the market is beginning to think we are going to spend into the future without any sense of the need to be profitable.*  Some of the stronger than expected reaction is due to the fact that the market tone has changed dramatically.

In another e-mail to Janzen later that day, Bailey stated:

I would hope with the next several days we are able to sell the merits of the investments and to talk back down some of the over reaction that has taken place but my experience tells me that until you string a few quarters together that fully meet the market expectations for performance without any more downward adjustments you will be selling into a very skeptical marketplace.  It is also clear that the $1 billion of equity is out of reach within the tax consolidation limits today and you may need to back off of capital spending just to manage that dynamic as a practical matter.

Ex. 15, KB Decl. (emphasis added).

In an e-mail exchange on July 7, 2000, Janzen and Bailey agreed to delay any WCG equity offering to fund WCG's increased capital needs after Bailey noted that "[WCG's] stock is weak and I am concerned filing into a weak and declining stock price sends the wrong message to the market about our confidence in the future." *See,* Ex. 16, KB Decl.

By July 12, 2000, WCG projected spending a total of $5.4 billion on WCG's network in 2000-2001, compared to the $1.9 billion projected for the same time period at the time of WCG's IPO. Ex. 17, KB Decl.

On July 13, 2000, Bailey sent an e-mail to the WMB board of directors in which he explained that following the June 27, 2000 conference call, WCG's stock had gone into "something of a funk" and "the bad news far outweighs the good." He also explained that WCG had developed a "credibility problem," "impair[ing] WCG's ability to raise capital at least in the short term" and that WCG "[was] adjusting [its] appetite for capital to meet that reduced capacity." *See*, Ex. 23, KB Decl. In that e-mail, Bailey noted "the pressure on the [WMB] balance sheet which comes from funding [WCG's] needs and trying to respond to the opportunities in the energy business." *Id.* Bailey, clearly beginning to chafe under what he felt to be a hair shirt in the form of WCG, stated that the upcoming WMB board meeting would be designed to answer "one question," whether WCG should be spun off from WMB. *Id.* Bailey further stated:

> I think the decision [of whether to stay the course] would be relatively easy if we come away with a very high confidence level regarding [WCG's] ability to deliver that [revenue] ramp within the capital it identified in May. *The more that promise is deferred and the less confidence you have in it the more difficult the decision to stay the course, particularly given the robust real time performance and expansion opportunities in the energy area.*

*Id. (*emphasis added).

Between March 7, 2000 and July 21, 2000, the price of WCG's stock declined by more than 50%, closing on July 21, 2000 at $29.38 per share.  Ex. 11 at 5, JA. From March 10, 2000 to July 21, 2000, Telecom Index declined 28% to 904.71.  Ex. 10 at 28, JA.

On July 22, 2000, Lehman Brothers made a presentation to the WMB board of directors about the current structure of WMB and WCG, maintaining status quo, separation alternatives and recapitalization.  Ex. 184, KB Decl.  According to Lehman Brothers, maintaining the status quo "could have negative implications for WMB's ratings."  Ex. 184 at WMB.00264690, KB Decl.

On July 24, 2000, the first day of the class period in the case at bar, WMB issued a press release stating that the WMB board of directors had "authorized management to pursue a course of action that, if successful and approved by the board, would lead to the complete separation of [WMB and WCG].  The press release quoted Bailey as stating about the spin off:

> We believe these steps [leading to a separation of WMB and WCG] are *the best way to ensure that both our energy and communications businesses have the efficient and effective access to the capital necessary to pursue the substantial growth that each enjoys* . . . .  Obviously, the ability to do that is consistent with the best long-term interest of our shareholders.

Ex. 27, KB Decl.

WCG's stock price dropped slightly following this announcement, declining 2.98% on July 24, 2000 to close at $28.50.  Ex. 11 at 5, JA.  On that day, the Telecom Index closed at 873.96.  Ex. 10 at 28, JA.

On July 27, 2000, WCG issued a press release announcing financial results for the second quarter of 2000.  In the press release, Janzen was quoted as stating: "We have continued to see a dramatic ramp-up in overall industry demand for bandwidth." Consolidated Amended Class Action Complaint ("Complaint"), ¶ 61.

In a conference call the next day, July 28, 2000, Bailey remarked:

As stated in the press release, we believe this course of action, if successful, *is the best way to assure that every part of our company can enjoy optimal growth as a result of the opportunities that are available to us* and that continue to become available to us and *it enables us to fund those opportunities in an efficient and an effective way*.

Ex. 28 at 1-2, KB Decl. (emphasis added).

On August 8, 2000, WMB announced that it had received approval from the IRS for a proposed tax-free distribution of WCG to shareholders. Ex. 33 at EY-WCG-DF-001565, KB Decl.

WCG completed the sale of $1 billion of high yield bonds on August 3, 2000. In a September 11, 2000 memorandum to the WMB board of directors, Janzen stated: "Although the bond offering raised more capital than originally forecast, we are still approximately $800 million under-funded through the end of 2001. [W]e are planning to return to the capital markets with a $250 million convertible preferred stock offering in a private placement transaction by mid-September. . . . We expect to bridge the remainder of the cash shortfall through a combination of asset sales, dark fiber sales and utilization of the bank credit facility as well as further debt and equity offerings." Ex. 44 at WTL 0077116, KB Decl. However, he also stated: "we anticipate a need to request additional capital to offset cost overruns associated with the core network build out." He anticipated "advancing a request for capital at the November [WMB board of directors] meeting." *Id.*

Approximately $240.5 million in preferred stock was issued in a private placement in September, 2000. In that month, WCG also drew $525 million under its credit facility. Ex. 7, Robert Malionek Declaration ("RM Decl."), Ex. 1 at EY-WCG-00-000080, CM Decl.

In September of 2000, E&Y conducted a meeting to discuss WCG's audit for 2000. One of the overall goals of E&Y for the audit, noted by Williamson, was "[a]t

separation [of WCG and WMB], there should be no thoughts about switching audit firms." Ex. 13 at EY-WCG-DOC2-004108, CM Decl.  Shortly before the September meeting, Williamson had sent an e-mail to the E&Y engagement team detailing discussions he had had with Schubert.  He had questioned Schubert about "key areas to focus on to ensure [that E&Y] continue[s] as [auditor] of [WCG] post spin-off" and relayed those areas to the team.  Williamson further wrote:

> Regarding areas to focus over the next 6 months [Schubert] commented on the following: [WCG] will do something with . . . [the] Solutions [unit] and we need to make sure we are not a roadblock to whatever they do.  I asked him what this might mean, but he did not have further clarification other than to be ready, whatever they do.

Ex. 15 at EY-WCG-DOC2-000071, CM Decl.

On September 20, 2000, Bailey sent two e-mails to Janzen on the subject of WCG's capital.  In the first e-mail, Bailey stated:

> With the latest pressure on stock price I think it is fair to say [you] are out of capital capacity . . . .  I don't think you have any choice at this point other than going on a rigid, essential need only capital diet while you restore capital capacity through operating performance and selling non core assets like [the] Solutions [unit] and ATL and some of the technology investments.  My hope is that we can turn things around in a couple of quarters of good performance but the market is clearly running away from us . . . .

Ex. 35, KB Decl.

In the second e-mail, Bailey observed:

> For whatever reason, the market has lost confidence in the company and the cost of funds has spiraled upwards . . . .  I suspect our Board would be amazed if we told them we were on a capital diet at WCG.

Ex. 34, KB Decl.

On September 22, 2000, Bailey instructed John Bumgarner ("Bumgarner"), who served as a senior officer for both WMB and WCG, to prepare a report for WMB showing that WCG has:

> a point of view in advance of our priorities and what we would do to ensure the funding for the highest of those under the most difficult scenarios *as post spin the ultimate safety blanket of [WMB] financial backstops will no longer be available* . . . . Obviously the current view of the next year has a funding gap.  It also shows a number of possible ways to close that gap, but, at today['s] stock price and credit market condition, *I believe only those that involve the sale of existing assets would be practical answers and that is not entirely within our control* . . . .  The bottom line is we need to know before a funding crisis hits what gives first and how much flexibility we have in delaying capital to manage around the need . . . .

Ex. 45, KB Decl. (emphasis added).

Bumgarner took responsibility for preparing the report, internally referred to as the "White Paper."  Although Boston Consulting Group, an outside consulting firm, ostensibly authored the White Paper, the details of the White Paper were principally the work product of WCG's network finance team of Mardi De Verges, T.J. Gallagher and Bill Cornog, with Bumgarner acting as editor in chief.  The White Paper was presented to the WMB board of directors at its November 16, 2000 meeting.

A September 2000 Financial Outlook for WCG discussed a "Negative 3Q operating EBITDA variance from plan driven primarily by 34% shortfall in data revenues due to provisioning issues and higher than anticipated credits/billing adjustments . . . ."  Ex. 46 at WTL 0094619, KB Decl.

In an October 9, 200 e-mail from defendant Bob McCoy ("McCoy"), WMB vice president of law, to Jack McCarthy ("McCarthy"), WMB's chief financial officer (and copied to WMB and WCG executives), McCoy revealed his concerns about the proposed spinoff:

> [T]he capital market landscape has changed dramatically since the [WMB] board started examining separation as a strategy.  What was possible for WCG on a stand alone basis last spring and early summer may not be possible today.

Ex. 36, KB Decl.

In an October 12, 2000 e-mail to Bailey, Janzen stated: "Our $500 million gap has grown because of decline of our strategic investments and the network cost overrun (which isn't known yet outside the company)."  He also stated that analysts "believe[d] this gap is a major issue for [WCG]."  Ex. 47, KB Decl.

On October 25, 2000, Bailey, during a WMB conference call with analysts to discuss WMB's and WCG's financial results for the third quarter of 2000, stated that WCG expected to achieve EBITDA positive numbers by the end of 2001 and that WCG was "*pre-funded for their capital needs in this time of more unsettled capital markets, to carry them to that point of EBITDA positive*."  Ex. 53 at WMB.00227224, KB Decl. (emphasis added).  At his deposition, Bailey admitted that as he told investors WCG was prefunded, WMB had not yet put in place a plan to fill WCG's funding gap.  Ex 3 at 130-131, 134, 144-46, KB Decl.

On the same day, October 25, WCG issued a press release announcing its financial results for third quarter of 2000.  Bross was quoted as stating:

> Through our unique Technology Farm System, [WCG] continues to test and deploy leading-edge optical technologies that split the spectrum of light to increase capacity and improve quality of service . . . . By combining these emerging technology [sic] with our industry-leading ability to expand and provision customer demand for recurring capacity, [WCG] is executing on its stated strategy to drive network utilization and accelerate the decline in unit costs.

Complaint, ¶ 62.

In a November 8, 2000 e-mail to Bailey and others, Schubert stated: "We have worked hard to eliminate the $700MM gap through a combination of capital

reductions, capital deferral, cost reductions and additional dark fiber sales.  Practical side however is that we have set in motion a series of events, all of which need to occur, in order to just be able to say that we are prefunded [for] 12 months." Ex. 56, KB Decl.

> In a November 12, 2000 e-mail to Bailey and others, Schubert wrote:

> To WCG, the capital markets are closed and should be expected to remain that way.  Our accessing the debt markets will be very costly . . . . Several of the banks in our commercial facility have stated they want out.  They indicated that they only got in due to the insistence of WMB, as part of their energy relationship and have no desire to hold telecom paper.

Ex. 79, KB Decl.

As has been noted, the White Paper was presented to the WMB board at its November 16, 2000 meeting.[6]  The White Paper contained an Executive Summary which included the following observations:

> [To] date the near-term returns on the investment have fallen short of the original expectations.  Much lower prices than expected have hurt margin realization.  Higher volumes at these lower prices have driven up total costs and consumed much more of the network than anticipated at the time of approval of the original and turbo plans.  Without any further capital expenditure beyond that originally envisioned, the cash generating potential of the existing lit network is much lower than originally expected.

---

[6]In July of 2000, Bailey told Janzen he wanted a:

very straightforward graphic presentation that shows expected NPV of our overall financial commitment to WCG with the original Turbocharge plan as the base case and then our current case . . . and we need to answer the question as to what our current assessment is of the economics of the money we have now exposed.

The White Paper indicated that the net present value of WMB's and WCG's spending on the network was negative $4.7 billion if no further capital was invested and prices continued to fall.  Ex. 62, KB Decl.

> More broadly, there has been a "train wreck" in the telecommunications industry in 2000. Beginning in the spring of this year and accelerating this fall, the equity and fixed income security prices of all sectors of the industry are down considerably. The falling prices have and will prevent many players from reaching operations that are cash flow positive. Many investors have lost confidence, and an industry credit crunch has ensued. Many smaller players are bankrupting, and many larger players are fundamentally and immediately shifting their strategies.

Ex. 62 at WMB.00400436, KB Decl.

The White Paper identified WCG's repeated failures to meet its previous forecasts and attributed those "disappointments" to increased demand and falling prices:

> [F]inancial performance has significantly missed expectations. The October 1999 IPO projection showed the Network achieving positive EBITDA from operations by 2Q 2000 with $29M for the total year. The latest forecast projects EBITDA turning positive by 4Q2001 with a negative $204M in 2000.
>
> Perhaps more importantly, the same factors driving this year's financial performance also directly and negatively impact the cash producing potential of the existing investment.
>
> * * * *
>
> The assumptions about market development differed from actual experience on two main dimensions:
>
> • Demand greatly exceeded expectations
> • Prices fell much more quickly than expected
>
> The reality of these two factors has driven the differences between the planned and actual performance.

Ex. 62 at WMB.00400439-40.

As a result of these adverse circumstances, the White Paper described the situation then facing telecommunications industry companies as a "doom loop":

Of course, WCG is not the only company to be impacted by the unexpected demand and low prices. This dynamic has been a result of super-heated and irrational capital markets, low barriers-to-entry for small and niche players, and a misunderstanding by many players and analysts around what is a successful and sustainable business model.

In short, companies have been on a "capital treadmill." A market with easy capital resulted in a host of new players entering the market and building out networks. In order to generate revenue quickly, many players cut prices to fill their networks. To continue and expand these builds, additional capital was required . . . . [T]his quickly became a treadmill, but one that has ultimately proved unsustainable. In fact, the treadmill has turned into a "doom loop" for many of these companies.

\* \* \* \*

With the evolution from the treadmill to the doom loop, the bottom has dropped out of the equity and debt markets. Beginning in March 2000, technology stocks have plummeted. Since September 1st, the market has in particular begun punishing telecom stocks, with virtually all players across the value chain experiencing dramatic losses in valuations. Fiber players, networks, and hardware vendors have all been hurt.

\* \* \* \*

Creditors are also beginning to seriously question the ability of companies to meet their obligations.

\* \* \* \*

As a result, capital markets have become much more difficult to access for telecommunications companies.

Ex. 62 at WMB.00400444-46, KB Decl.

The White Paper offered some optimism for WCG's future position within the troubled telecom industry: "WCG is [] one of the best-positioned players to take advantage of a market recovery." But it specifically tempered any future expectations for WCG with a comment that the timing of any improvements could not be predicted and that, accordingly, concerns remained:

Of course, no one knows exactly how the competitive environment will shift or how prices will react.

* * * *

Of course, there is a possibility that all will not go according to plan in 2001.  There is potential for better than expected results but also the risk of a below plan outcome.  Chief concerns include:

Prices continue to decline at 1999/2000 pace
• Service delivery issues prevent meeting planned volumes because of:
        - vendor problems,
        - customer issues,
        - internal issues
• Capital markets for telecom do not reopen
• Alternative sources of funds are not available.

Ex. 62 at WMB.00400436, WMB.00400453, KB Decl.

Any expressions of positive expectations for WCG in White Paper assumed that WCG would perform in accordance with its latest projections.  Employees within WCG responsible for the projections testified that they were not certain that the projections had been fully developed or that WCG would be viable as a stand-alone company after the spin-off.  Ex. 71 at 638, 141-145, Ex. 72, Ex. 70 at 130-133, 137-140, 221-222; Ex. 41 at 475-478.

The White Paper was also distributed to the WCG board of directors and was described in the November 20, 2000 board minutes.  E&Y's working papers for the 2000 audit stated that all board minutes were reviewed.  Ex. 6 at 181-184, CM Decl.; Ex. 35 at WTL 0324757, CM Decl.; Ex. 36 at EY-WCG-00-001433, EY-WCG-00-001437.

In addition to receiving the White Paper, the WMB board of directors also received a November 16, 2000 report from Lehman Brothers.  The Lehman Brothers report stated that the energy markets were "strong" while the "equity, high yield and bank markets [were] currently closed" for WCG.  Ex. 81 at WCG 023252.  Lehman

Brothers noted that WCG's leverage ratios were "double its peers"and that WCG's bank covenants were "at risk." It also noted that WCG was "4 months funded before financings or asset sales" and "3.4B of new funds [were] required to fund plan through 1Q02." Ex. 81 at 023254.

On November 16, 2000, WMB issued a press release which announced that the WMB board of directors had authorized management to continue to pursue a tax-free spin-off of WCG. The press release quoted Bailey as stating:

> This important step continues a process that we believe remains in the best long-term interests of our shareholders. Our energy and communications businesses have tremendous opportunities before them. *Creating the most effective and efficient access to capital will help fuel that growth, and we believe that can best be achieved by creating two independent businesses.*

Ex. 84, KB Decl.

On that day, WCG also issued a press release touting the WMB board's authorization to continue the pursuit of the tax-free spin-off of WCG. This release stated, in pertinent part, that "WCG is superbly positioned to achieve our goals . . . ." Complaint, ¶ 65.

On November 28, 2000, WCG issued a press release announcing that "its 33,000 mile network is on schedule for year-end completion, with 31,000 miles installed and 27,500 lit." Ex. C, SJG Decl.

On December 6, 2000, at a WCG officers' meeting, a slide was presented demonstrating that WCG was "Not Delivering on the 2000 Financial Commitments" with "Revenues off by 24%;" "Gross Margin off 125%;" EBITDA lower by more than $200 million;" and "Capital up by 45%." Ex. 50 at WCG-HJ-E000010747, KB Decl.

An internal Lehman Brothers document dated December 11, 2000 stated:

> *The primary business purpose for the [spin-off] is to relieve WMB of the financing requirements from WCG and enable it to effectively pursue acquisition opportunities in its energy business . . . .* The proposed

capital plans of both WMB and WCG would continue to strain WMB's balance sheet and jeopardize its investment grade credit ratings, having a detrimental effect on its ability to execute its business objectives. Ultimately, the [spin-off] will improve WMB's competitive profile by reducing WMB's balance sheet pressure and increasing its future financing capacity.

Ex. 30 at LB 066320, KB Decl.

In a December 15, 2000 e-mail to Bailey, Janzen stated:

Our immediate crisis is largely a product of the market heading away from us and no doubt we are in for a battle where survival is by no means certain.

\* \* \* \*

To listen to Jack [McCarthy] talk about working with Bankers on other alternatives to *heave the junk called WCG overboard* as fast as possible is [ ] depressing.

Ex. 29, KB Decl. (emphasis added).

In a December 21, 2000 memorandum to Janzen, Bumgarner wrote:

One could go through every AFE [Authorization for Expenditure] or Board presentation or the 1999 IPO model or the 2000 Bond sale model and discover the same economic busts in forecasts and assumptions. *At no time has network come close to making FINANCIAL estimate – either long-term or short-term.*

Focusing on more than just Voice, the overall company's IPO model of October 1999 called for a year 2000 EBITDA of positive $56MM, and the latest estimate for the year is minus $279MM excluding Tech farm sales (a plus $277MM).  If you look at just Network, the IPO model called for Year 2000 EBITDA of plus $29MM and produced minus $178MM (excluding Tech Farm and Power Tel).

\* \* \* \*

In my opinion, the above financial results leave little room for the argument about the following conclusions:

30

1.  Our WCG management group has little to no financial credibility left in the financial markets.

2.  Our Voice strategy . . . so far . . . is a huge failure and when these revenues of $636MM in 2001 are added to Solutions[,] [unit] revenues $1,421MM in 2001 represent 66% of total revenues . . . on which we are breakeven or losing money.

* * * *

In addition, Bumgarner stated:

1. Our capital spending process is still not functioning, i.e.,
> (a) $500mm in overruns
> (b) low to no economies on $5.7 bil of spend
> (c) over counting; miscounting year 2001 capital requests numbers that were later worked out with BCG in October/November.

Has anyone seen the assumptions used in the projected spending for next year?  Are they consistent with current reality? Are they consistent with each project?  I, for one, have little confidence, and January 1 is ten days away.

Ex. 52, KB Decl.  (emphasis added).

In a December, 2000 memo from Deborah Stanford, of E&Y, to Debbie Fleming, of WMB, regarding the potential spin-off, E&Y noted:

We understand that losses in [WCG] hampered [WMB's] ability to secure debt financing, and that this endangered [WMB's] ability to grow its business.  The market began to punish [WMB's] stock for this inability to grow the business . . . .  A spin-off of [WCG] was attractive in that it offered a way to segregate the profitable pipeline business from the communications business and in so doing, better position the pipeline business for debt financing.

Ex. 11 at EY-WCG/DF-001564, CM Decl.

By the end of 2000, the price of WCG's stock declined to $11.75 per share.  Ex. 11 at 7, JA.  The Telecom Index closed on December 29, 2000 at 463.44.  Ex. 10 at 26, JA.

31

On January 26, 2001, at the request of WMB, Lehman Brothers issued another letter relating to the spin-off.  In the letter, Lehman Brothers set forth its view regarding certain "Restructuring Transactions" which WMB and WCG had identified to be accomplished in addition to the spin-off.  One of the identified transactions, which was to occur before the spin-off, would involve the transfer of a $975 million intercompany note (and other assets) from WMB to WCG in exchange for WCG's common stock, certain intangible assets, and WCG's release of certain claims.  Lehman Brothers commented that it viewed the identified transactions as necessary to permit WMB to proceed with the spin-off and to enable WMB to achieve its business purpose for the spin off, which according to Lehman Brothers was "to enable [WMB] to increase its borrowing capacity."   Ex. 2 at WMB.00064217, KB Decl.  Lehman Brothers specifically stated that "*Maintenance of [WMB's] investment grade credit [was] a business necessity in order [WMB] to participate in the highest growth and highest margin areas of its business equity market and trading.*"  Ex. 2 at WMB.00064220, KB Decl. (emphasis added).  It further concluded that "in order to reposition itself to successfully compete with its peers, [WMB] must definitively separate itself from [WCG] by effecting the [spin-off]."  Ex. 2 at WMB.00064228.

In an internal memorandum in January of 2001, E&Y set forth Lehman Brothers' argument for spin-off of WCG from WMB:

> The major argument (in a nutshell) was that the two divisions cannot achieve their goals by remaining combined.  In order for WCG to grow it must have capital investment.  Looking at it separately, it currently does not have an investment grade credit rating.  In contrast [WMB's] Energy division currently has this type of rating.  The Energy division sees its growth in the trading [sic] natural gas and electricity.  To do so it must keep its investment grade rating.  This means that it cannot finance [WCG's] growth without sacrificing [WMB's] investment grade rating and therefore its[] growth.

Ex. 12 at EY-WCG/DF-001557, CM Decl.

It also noted that in May 2000:

> Telecommunications and dot.com stock prices dropped sharply, followed by a downward spiral in debt markets as well. Analysts described the market for telecommunications stock and debt as a "train wreck."

Ex. 12 at EY-WCG/DF-001564, CM Decl.

On January 29, 2001, WCG announced that it had reached an agreement with Platinum Equity, LLC to sell the U.S., Mexican and Canadian operations of the Solutions unit.  Ex. 87, KB Decl.

In January of 2001, senior WMB executives, including Bailey, participated in a "roadshow" in connection with an anticipated WMB equity offering.  During the roadshow, Bailey and other WMB executives met in various cities with current and prospective investors and analysts and described the spin-off of WCG as something that "Better enables each company to execute its respective business plan"; "Optimizes access to capital"; "Facilitates pursuit of growth opportunities"; and "Creates a 'Win-Win'" for WMB and WCG shareholders."  Ex. 85 at ML 070978; Ex. 3 at 377-382, KB Decl.

On February 5, 2001, WCG announced earnings for the fourth quarter of 2000.  Ex. 87, KB Decl.  According to the press release, WCG "expects to be EBITDA-positive on operational basis by the end of 2001 . . . ."  *Id*.  The press release also portrayed WCG's business as continuing to be strong, as "Janzen cited [WCG's] success in both attracting new customers and meeting growing demand from established customers as proof of its broadband-enablement strategy and leadership in delivery of data, voice, Internet and media services."  *Id*.

On February 15, 2001, *TheStreet.com* reported on the statements made by WCG at a Wall Street analysts' conference.  Schubert was quoted as stating: "We believe we are on a clear path to profitability . . . .  We have a sound funding strategy in place."  Complaint, ¶ 68.

On February 26, 2001, WMB contributed the $975 million intercompany note and other assets in exchange for 24.3 million newly issued WCG shares. Ex. 1 at EY-WCG-00-000004, EY-WCG-00-000092, CM Decl.

In March 2001, WCG issued $1.4 billion in structured notes. WMB provided indirect credit support for the notes through a commitment to issue its preferred stock in the event of default under the notes. Ex. D at 10, SJG Decl.

In a letter dated March 9, 2001, WMB advised E&Y that WMB had announced a plan that may result in WCG being spun off and that "[w]hile WCG is a subsidiary of [WMB], WMB will ensure that WCG has funding for its operations and financing needs." Ex. 8, RM Decl. WMB also advised that "[WMB] will not spin off WCG to [WMB] shareholders unless management believes WCG possess sufficient liquidity through internal cash flows and external financing to enable it to fund its obligations through December 21, 2001." *Id.*

On March 12, 2001, WCG filed with the SEC its Form 10-K for the year-ended December 31, 2000, including financial statements purportedly presenting WCG's 2000 financial statements in accordance with Generally Accepted Accounting Principles. Ex. 88, KB Decl. In the Report of Independent Auditors at page F-15 of WCG's 2000 10-K, E&Y stated that "We conducted our audits in accordance with auditing standards generally accepted in the United States" and that, in its opinion, "the financial statements . . . present fairly, in all material respects, the consolidated financial position of [WCG] at December 31, 2000 . . . in conformity with accounting principles generally accepted in the United States." *Id.*

The Form 10-K did not report material impairments of long-lived assets as of December 31, 2000. Ex. 88, KB Decl. The February 5, 2001 press release announcing fourth quarter earnings did not announce the recording of material impairments of long-lived assets as of December 31, 2000. Ex. 87, KB Decl.

E&Y's work papers for the YE 2000 WCG audit totaled 17,000 pages. However, only two sentences were included regarding network impairment. Specifically, E&Y noted that "We did not identify any impairment indicators w/f/r [waive further review]."  It also noted that "Since the majority of in-service assets have been added within the past 2 years as the construction of the network has been underway, we determined that there are no impairment indicators which would warrant a write-down of PP&E [Property, Plant and Equipment]."  Ex. 18 at EY-WCG-AWS-00-165, EY-WCG-AWS-00-164, RM Decl.

An E&Y internal quality control review performed on E&Y's 2000 audit of WCG shortly after it issued its audit opinion on WCG's 2000 financial statements stated:

> Network and dark - fourth quarter market changes, overall decline in market cap to book value, and potential technological changes. *Could have considered impairment issues in 2000*.  Client has not yet defined specific indicators of impairment.  This issue will be addressed this year.

Ex. 56 at EY-WCG/DF-007293, CM Decl. (emphasis added).

E&Y audited WCG's debt covenant calculations and concluded that at YE 2000 it had no reason to believe that WCG was in violation of its debt covenants, as defined by the credit agreement.  Ex. 2, Ex. 6, Dan Neale Declaration "DN Decl").  WCG was required to maintain a Leverage Ratio of no more than 18:1 as of December 31, 2000. According to WCG's Debt Compliance Certificate for year-end 2000, approved by E&Y, WCG's Leverage Ratio was 17.07.  Ex. 36 at EY-WCG-00-001532, CM Decl. WCG was also required to comply with a minimum annual 2000 EBITDA covenant of $120 million.  According to WCG's Debt Compliance Certificate, WCG's EBITDA was $160 million.  Ex. 36 at EY-WCG-00-001532-33, CM Decl.

E&Y considered whether WCG would continue as a going concern for 12 months beyond the date of the financial statements and concluded that there was no

substantial doubt about WCG's ability to continue as a going concern.  Ex. 11, p. 92, ll. 15-25, Christopher R. Harris Declaration ("CH Decl.").

WMB paid E&Y $25.8 million for work performed in 2000.  Of that amount, $4.4 million was for the annual audit.  Ex. 16 at LP-WCG-010105, CM Decl.

Janzen, in a press release dated March 15, 2001, announcing the private placement of $1.4 billion in structured notes, was quoted as stating: "Closing this transaction enhances our overall liquidity and positions us well in anticipation of the proposed spinoff."  Complaint, ¶ 73.

In a March 17, 2001 e-mail to Schubert and defendant, Howard Kalika, a Vice President of WCG, regarding WCG's viability, Lehman Brothers stated that "we believe we can give the viability opinion, *but have serious concerns for your funding position going forward*."  Lehman Brothers advised that it had said the same to McCarthy, WMB's CFO.  Ex. 96, KB Decl. (emphasis added).  In an e-mail to Bailey and others that same day, McCarthy wrote: "Lehman is now marginally comfortable with [WCG's] 'financial viability'. . . . They are struggling with . . . what will happen in the near term to the share price of WCG.  They can see as much as 50% decline following the spin due to their review of WMB shareholders who would be likely to sell and also their view that the market for WCG is weak at this time."  Ex. 95, KB Decl.

In a March 20, 2001 e-mail from Schubert to Janzen, Schubert stated:

[T]he note offering is struggling to get up to the full $1.4 b and we had to reduce the b traunche bank offering to $300 mm from $500 mm. These items plus the fall in tech farm values and the ATL sale deferral is putting pressure on the Lehman viability opinion.

Ex. 98, KB Decl.

Despite WMB's credit support for the $1.4 billion structured notes, Lehman Brothers and CSFB, as joint bookrunners for the offering, were unable to sell off the final $200 million in notes, a point they worked to keep secret, as indicated by a

March 22, 2001 e-mail from Spencer Cutter of Lehman Brothers to Kenny Gunderman, also of Lehman Brothers :

> [T]he fact that Lehman and CSFB will be left holding bonds is TOP SECRET - though the company is aware of it, if other firms or investors catch wind that we are sitting on $200 million – it will be BAD.

Ex. 99, KB Decl.

On March 30, 2001, Lehman Brothers made a presentation to the WMB board of directors about the spin-off, discussing WCG's performance in comparison to its peers in the telecommunications industry.  It outlined the key business risks faced by WCG, including customer concentration risk, industry risk with market conditions deteriorating, market risk of supply and demand and WCG's ability to perform in accordance with its business plan.  Lehman Brothers stated that WCG was adequately capitalized and forward funded for 15 months.  However, it disclosed that WCG's peers were forward funded for 18 to 24 months.  Lehman Brothers discussed the key financial risks related to the spin-off, including the fact that WCG's business plan was not fully funded for 18 months, its balance sheet was highly leveraged and that WCG would have a strong need to access equity capital markets to de-leverage the balance sheet and fund its business plan.  It revealed that WCG would need $450 million for 18 months' funding and $1.5 billion to be fully funded.  It further observed that the equity capital markets were closed for WCG's peer group and that the market was not likely to open before 4Q 2001.  Ex.102, WMB.00550045, Ex.101, WMB/WC. 00047022,  WMB/WC.00047023,  WMB/WC.00047024,  WMB/WC.00047033, WMB/WC.00047035,  KB Decl.

Lehman Brothers' actual opinion letter to WMB in connection with the spin-off of WCG neither "opined whether [WCG was] going to survive after the spin-off" nor stated "whether or not WCG [was] going to be a viable stand-alone company after the spin-off."  Ex. 83 at 68-71; Ex. 67, CM Decl.  Lehman Brothers opined only that the

spin-off "[would] not materially impair the ability of [WCG] to fund in the future, from external sources or through internally generated funds, its currently anticipated operating and capital requirements as currently projected in the financial forecasts prepared by the management of [WCG]."  Ex. 67 at WMB/WC.00047066, CM Decl.

In its opinion letter, Lehman Brothers also informed WMB and its board of directors that:

> With respect to the financial forecasts of [WCG], upon advice of managements of [WMB] and [WCG], *we have assumed that such forecasts have been reasonably prepared on a basis reflecting the best currently available estimates and judgments of the management of [WCG] as to the future financial performance of [WCG] and that [WCG] will perform in accordance with such forecasts*.

Ex. 67 at WMB/WC.00047065, CM Decl. (emphasis added).

On March 30, 2001, WMB issued a press release announcing that WMB had approved the spin-off of WCG.  In the press release, Bailey was quoted as stating:

> Today's decision brings to a conclusion an effort that began last summer. That is when our board began analysis of whether separating [WMB] and [WCG] *would best enable each to reach its full potential and to most efficiently access capital markets* . . . . With sufficient capital in hand to meet its needs well into 2002 and its next-generation network completed and open for business, we believe [WCG] is poised to deliver on its great potential.

Ex. 92 at LB 066355, KB Decl.

On that day, WCG issued a press release about the spin-off.  Janzen was quoted as stating:

> "[T]his spinoff is the natural evolution of a business strategy begun in 1998, when we re-entered the telecommunications space . . . . The spinoff gives [WCG] the best opportunity to strengthen its industry leadership and the ability to attract investors who value the vast potential of broadband."

CAC, ¶ 75.

In a letter dated April 10, 2001 to a U.S. Treasury Department official, McCarthy stated: "The objective of the [spin-off] is to maintain [WMB's] credit rating and increase its borrowing capacity so that it can efficiently fund the capital needs of its growing business." Ex. 188, KB Decl.

In April, 2001, senior WMB executives also participated in a roadshow in connection with the spin-off. Ex. 93, Ex. 94, KB Decl. During the roadshow, the executives described the spin-off as something that "Better enables each company to execute its business plan"; "Optimizes access to capital"; "Facilitates pursuit of growth opportunities" and "Creates a 'Win-Win' for WMB and WCG shareholders." Ex. 94 at WCG-HJ-E000015845, KB Decl.

On April 18, 2001, Winstar Communications, a significant customer of WCG, announced that it had filed for protection under Chapter 11 of the Bankruptcy Code. WCG had entered into an agreement with Winstar Communications in 1998 for a 25-year indefeasible right to use of approximately 2% of the wireless local capacity of Winstar Communications. Ex. D, at 12, SJG Decl.; Ex. 49 at EY-WCG-01-005034, CM Decl.

On April 23, 2001, WMB spun off WCG. WMB distributed approximately 400 million shares, or 95 percent of WCG common stock held by WMB, to WMB shareholders in a tax-free distribution. Following the distribution, WMB retained approximately 5% of WCG's common stock. As a result of the spin, WCG's business was completely separated from WMB. Bailey resigned as chairman of WCG's board of directors. Ex. D, SJG Decl.; Bailey Aff. ¶ 33.

On April 26, 2001, during WMB's first quarter 2001 analyst conference call, Bailey stated the following regarding WCG:

> We also have been pleased with the way the [WCG] stock has traded since the spin. While we obviously were disappointed that the combination of the market conditions in that sector and the overhang of the shares that came onto the market as a result of our dividend put

> continued pressure on that stock, it appears that the market pretty fully
> discounted it, it's found a hard bottom and because their financing is in
> place and their performance we believe is good and will continue to be
> good, we think that there's significant upside in that stock as well[,] as
> soon as it reaches a new ownership equilibrium.

Ex. 115 at WMB.00032222, KB Decl.

Shortly after the spin-off, The Blackstone Group began working with WCG to restructure its balance sheet or find an investor to infuse more capital into WCG.  On or about April 30, 2001, Bumgarner requested certain WCG employees "to evaluate the potential of repurchasing up to $1 billion of WCG bonds," which were then trading at a steep discount.  Ex. 118, Ex. 119, KB Decl.

On May 17, 2001, during a WMB shareholder meeting, Bailey commented as follows:

> [W]e were ultimately successful, and in a way that we believe best
> assures the long-term health and prosperity of both companies . . . .
> [WCG] is strongly positioned for success.  Its core network asset is in
> place.  It has demonstrated history of technical performance.  And, it has
> the financial resources in place to enable it to deliver on the promise of
> a very bright future.

Ex. 116 at WMSE005813519, KB Decl.

On June 17, 2001, Janzen forwarded to Bumgarner an e-mail written by T.J. Gallagher announcing a freeze on capital spending.  Ex. 120, KB Decl.  In late June 2001, WCG announced that it would lay off up to 10% of its work force.  Ex. 74 at EY-WCG-01-006032, CM Decl.

In a July 18, 2001 Preliminary Restructuring Proposal, The Blackstone Group outlined two proposed restructuring transactions, both of which contemplated purchase by SBC of WCG's notes on the open market and SBC's tender of the notes to WCG in exchange for prepayment of services and additional new securities.  Ex. 121, KB Decl.  In its July proposal, The Blackstone Group stated:

> [WCG's] liquidity position seems viable in the very short term, but WCG will need future funding to meet its business plan. [WCG] will need to (i) undergo a restructuring to alleviate cash flow until it can reach cash flow neutral, and/or (ii) raise further capital from an investor to fund future cash funding needs. *[WCG] should not use cash to repurchase debt because it will adversely affect future liquidity and hinder achieving business plan.*

Ex. 121 at WTL 0023210, KB Decl. (emphasis added).

At a special meeting on July 30, 2001, WCG's board of directors authorized WCG's officers to proceed with evaluation of, and initial steps to implement, a proposal to restructure [WCG's] balance sheet by acquiring [WCG's] outstanding high-yield bonds.  Ex. 126, KB Decl.

In July and August of 2001, WCG approached SBC for financial assistance but SBC decided against making any investment.  Ex. 123 at WTL 0250417, KB Decl.

An August 23, 2001 presentation to the WCG board of directors stated:

> From a financial standpoint we realize the cash generated from our business plan is insufficient to service our debt.  The action we are recommending is to buy back $1.5-2 B of our bonds in their discounted condition to reduce debt payments.

The presentation further stated:

> WCG is very close to falling into a chasm of the red "danger" zone - we are hampered by a weak financial structure and disappointing operational performance.

Ex. 124 at WTL 0093794, 0093745, KB Decl.

After unsuccessful attempts to get help to buy back its notes on the open market, WCG set up a subsidiary, CG Investments, to purchase its notes.  WCG elected to go forward with the repurchase of the notes despite advice that the banks would view it  "as contrary to the spirit, if not the language, of the credit agreement."  Ex. 126 at WTL 0023330, Ex. 127, KB Decl., Ex. 23, Ex. 24, MK Decl.

In October 2001, WCG prepared for discussions with lending banks about debt covenants for 2002 and beyond.  It informed Bank of America, the administrative agent of the lending banks, of its use of cash to repurchase the notes.  Ex. 60 at WTL 0282531, CM Decl.  On October 12, 2001, counsel for WCG's lending banks advised WCG of  concerns that the bond repurchases violated WCG's credit agreement.  Ex. 128, KB Decl.

At the beginning of a meeting with lending banks on October 19, 2001, WCG received a letter from Bank of America informing it that WCG's buy-back of the publicly-traded notes violated certain provisions of the credit agreement and that the administrative agent was reserving all of its rights under the credit agreement, including termination.  The letter acknowledged that WCG disputed the validity of Bank of America's position.  Ex. 60 at WTL 0282531; Ex. 129, KB Decl.  During the meeting, WCG presented an overview of its current business plan.  It indicated that its strong cash position eliminated the need to raise new capital by year-end 2001 under one of its covenants and also suggested covenant revisions for the next year and thereafter.  Ex. 60 at WTL 0282531.

During the October 19 meeting, WCG agreed to allow PricewaterhouseCoopers LLP ("PWC"), on behalf of the lending banks, to perform an evaluation of WCG's business plan.  It was agreed that the review would be completed by January 15, 2002, and that WCG would not continue the bond buy-back program until completion of the review.  Ex. 60 at WTL 0282532; Ex. 130, KB Decl.

On October 31, 2001, WCG announced in a press release that it had "amended the company's bank credit facility covenant that required the company to raise additional capital by the end of [2001]."  Before the amendment, WCG had to raise additional debt and equity in the amount of $225 million by December 1, 2001. Under the amendment, which had been agreed to by the lending banks the day before, October 30, 2001, WCG was not required to raise any additional capital until July 1,

2003.  Ex. 25, MK Decl.; Ex. 60 at WTL 0282532, CM Decl.  WCG's press release also revealed WCG's buy back of "approximately 18.3% of its outstanding publicly traded senior notes at a total cost of about 43 cents per dollar of face value."  It also quoted Schubert as stating:

> As the company continues to optimize its capital structure and position itself for long-term success, we will be working jointly with our bank group to perform a more comprehensive review of the existing credit agreement . . . .  This review will ensure that the existing credit agreement remains consistent with our current capital structure, our reduced capital expenditure requirements and the overall market environment.  During this review period, which may require 60-90 days to compete, the company will not make any additional cash purchases of its publicly traded debt.

Ex. 25, KM Decl.

> In an October 31, 2001 e-mail to Janzen, Bailey stated:

> I gave a fire breathing endorsement of WCG and the strategy that underpinned it (a bandwidth machine-low cost-high quality) during our analysts meetings yesterday.

Ex. 117, KB Decl.

After his fire breathing endorsement and at a time when he possessed undisclosed adverse information about WCG, Bailey (without any public reporting or disclosure) sold nearly 400,000 shares of WCG stock, for a profit of approximately $500,000.  Ex. 138 at WMDC007752, Ex. 141, Ex. 142, KB Decl.

In November 2001, PWC began its review of WCG.  During November and December of 2001, WCG began to explore other restructuring alternatives.  Ex. 60 at WTL 0282532, CM Decl.

In the third and fourth quarters of 2001, WCG took impairment charges on excess network equipment.  Specifically, WCG took charges of $150 million in the third quarter and $186 million in the fourth quarter on excess equipment.  Ex. 11 at EY-WCG-01-003946, RM Decl.  In the third quarter of 2001, WCG wrote down

100% of its $35 million in Sycamore Networks equipment on hand.  Ex. 167, Ex. 71 at 353-56, KB Decl.

By the end of 2001, WCG's stock declined to $2.35 per share. Ex. 11 at 12, JA. At that point, WCG's stock had lost 96% of its value since its high on March 7, 2000 and 92% of its value since the beginning of the class period on July 24, 2000.  The Telecom Index closed on December 31, 2001 at 236.63.  Ex. 10 at 21, JA.  This was down 81% from its high on March 10, 2000 and 73% from the beginning of the class period.

On January 11, 2002, WCG presented its business plan to the lending banks. At the meeting, it was indicated that, as a prerequisite to amendment of the covenants, WCG should restructure all of its debt.  The meeting concluded with an agreement to extend the negotiation period until January 24, 2002.  The negotiation period was subsequently extended to February 28, 2002.  WCG was required to develop a comprehensive plan for the financial restructuring and de-leveraging of its balance sheet.  Ex. 60 at WTL 0282533, CM Decl.

On January 23, 2002, PWC formally reported to WCG's bank group that it was uncertain whether WCG would achieve the cash flows projected in its business plan as WCG was forecasting "very aggressive growth rates in revenue drivers" and "projecting huge increases in its market share in all major products."  Ex. 132, KB Decl.

On January 28, 2002, Global Crossing, a competitor of WCG, filed for Chapter 11 bankruptcy protection.  Ex. 60 at WTL 0282534, CM Decl.

On January 28, 2002, WCG's stock closed at $1.63 per share. Ex. 11 at 64, JA. At that time, WCG's stock had lost 97% of its value since March 7, 2000 and 94% of its value since the outset of the class period.  On that day, the Telecom Index closed at 217.06, a decline of 83% from its high on March 10, 2000 and of 75% since the outset of the class period.  Ex. 10 at 21, JA.

Because the credit facility provided for an interest rate that was reset on a periodic basis, WCG, on January 28, 2002, issued an interest rate reset request.  The request required the reaffirmation of certain representations and warranties in the credit facility.  In response to the request, Bank of America informed WCG that due to negative developments in the telecommunications industry, WCG may have been in default of its representations and warranties.  On January 29, 2002, the Bank of America sent WCG a reservation of rights letter concerning the possible default.  Ex. 60 at WTL 0282533, CM Decl.

WMB, in a January 29, 2002 press release,  announced that "Today's planned release of complete unaudited 2001 earnings has been delayed pending an internal assessment of [WMB's] contingent obligations related to [WCG]."  *See*, Ex. 14, JA.  On the same  day, WCG issued a press release stating that "the assessment WMB is undertaking has no direct impact on WCG's operations, WCG's financial performance or the contingent guarantees WMB provided in support of WCG's $750 million network lease agreement (ADP facility) and the $1.4 billion of WCG senior notes issued in March of 2001."  *See*, Ex. 15, JA.

On the same day, January 29, the first of the present class actions was filed by the Milberg, Weiss law firm on behalf of these plaintiffs. (Cali, et al. v. Williams Companies, Inc, et al No. 02-CV-072, N.D. Okla., Doc. No 1.)  The January 29 Cali complaint is discussed in more detail later in this memorandum.

The price of WCG's stock closed on January 29, 2002 at $1.34 per share, down 11.6% (net of market and industry effects) from the previous day's closing price.  Ex. 11, JA; Ex. 1 at ¶ 88, MK Decl.  The weighted average price of WCG's notes fell 8.6% on January 29, 2002 and fell an additional 13.9% on the following day.  Ex. 1 at ¶ 91, MK Decl.

On January 29, 2002, another WCG competitor, Level 3 Communications, Inc., announced that it was taking a $3.2 billion impairment charge for its long-lived assets. Ex. 15, MK Decl.

On February 1, 2002, shares of WCG's stock closed at $1.42, down 98% from the stock's high on March 7, 2000 and 95% from the outset of the class period.  Ex. 11 at 12, JA.

On the next trading day, February 4, 2002, WCG issued a press release announcing that its preliminary fourth quarter results did not include "any impairment related to [WCG's] long-lived assets" and that bankruptcy announcements by other telecom companies and impairment charges taken by competitors had "resulted in a continuing analysis of this assessment."  *See*, Ex. 16, JA.  WCG also announced that "On January 29, the banks, through their administrative agent, had informed [WCG] that, in their view, the Company may be in default under its credit agreement, and have reserved their rights accordingly."  According to the press release, "The possible default relates to the fact that, due to recent negative developments in the telecommunications industry, the banks are questioning whether the Company can confirm the representations and warranties included in the credit agreement . . . .  The banks have also reserved their right to claim that the purchase by [WCG] of certain of its redeemable notes in 2001 previously reported by the Company may violate the credit agreement."   WCG announced that it had agreed to submit to the banks by February 25, 2002, "a comprehensive plan for restructuring and de-leveraging its balance sheet."   In developing this plan, it was "considering various possible restructuring alternatives" but that "successful execution of the options currently envisioned does not include seeking bankruptcy protection or the substantial dilution of equity security holders."  *See*, Ex. 16, JA.

In response to the February 4, 2002 press release, WCG's stock fell by 22.8% (net of market and industry effects); trading volume was 26.0 shares, 3.9 times the

average post-spin off daily volume.  The stock closed at $1.00.  On the following day, WCG's stock price declined another 11.6%.  WCG notes fell by an average of 23.6% on February 4, 2002 in response to WCG's announcement.   Ex.1 at ¶ 94, MK Decl.

On February 13, 2002, WCG held a conference call with analysts.  During this call Schubert said:

> To re-summarize, last week WCG agreed to submit a comprehensive plan for restructuring and de-levering the balance sheet to our bank group by February 23.  We continue to work with our financial and legal advisors on the development of this plan.  Our previously stated goal remains.  That is to successfully execute a plan without needing to seek bankruptcy court protection or requiring substantial dilution of our current equity shareholders.
>
> However, based on the number of questions we have received, I must remind everyone that the ultimate outcome will be influenced by stakeholders outside of the company.  As a result we cannot ensure success regarding our stated goal.

Ex. 17 at 2-3, JA.

Shares of WCG closed on February 12, 2002 at $.067, down $.01 from the previous day's close.  Ex. 11 at 12, JA.

At the same time WCG was negotiating with its lending banks, it was in discussions with WMB and SBC, seeking substantial cash infusions.   These discussions ultimately proved to be unsuccessful and ended in late February 2002.  Ex. 63 at EY-WCG-01-000514, CM Decl.

On February 25, 2002, WCG issued a press release which announced that "The company, along with its bank group, is pursuing a comprehensive resolution to restructure its balance sheet" and  "discussions are being expanded to include multiple restructuring options."   According to WCG, "As part of evaluating the expanded options, the company is considering the potential benefits of a negotiated Chapter 11 reorganization process."  *See*, Ex. 18, JA.

In response to the February 25, 2002 press release, WCG's stock price fell by 61.6% (net of industry and market effects).  Ex. 1 at ¶ 95, MK Decl.  The price of WCG's stock closed at $0.22 per share.  Ex. 11 at 13, JA.  The next day, February 26, Moody's lowered its credit ratings for WCG, and WCG's stock price was down another 16.2% (net of industry and market effects) on that day.  Ex. 1 at ¶ 95, MK Decl.  The WCG notes declined by 16.6% and 15.8% on February 25 and February 26, 2002, respectively.  Ex. 1 at ¶ 96, MK Decl.

On March 5, 2002, WCG and the bank group agreed to extend the negotiating period to March 27, 2002.  Ex. 60 at WTL 0282535, CM Decl.

On March 8, 2002, WCG exercised its option to purchase the ADP assets in accordance with the terms of the ADP.  Under a prior agreement, WMB was obligated to fund the purchase price of the ADP assets in exchange for debt or equity from WCG.  Ex. 60 at WTL 0282536, CM Decl.

By March 28, 2002, the price of WCG's stock had declined further, to close at $0.14 per share.  Ex. 11 at 13, JA.  The Telecom Index closed on March 28, 2002 at 173.76, a decline of 86% from its high on March 10, 2000 and 80% from the outset of the class period.  Ex. 10 at 20, JA.

On April 1, 2002, WCG filed its Form 10-K for the year 2001.  Ex. 19, JA.  This filing disclosed that WCG had taken a total of $2.9 billion in impairment charges with respect to long-lived assets.  *Id*. at F-11, F-12.  It further stated that "Among the [restructuring] options is reorganization under Chapter 11 of the U.S. Bankruptcy Code."  Ex. 19 at V-3, JA.  E&Y included a "going concern" statement in its opinion, based on the potential for default claimed by WCG's creditors:

> The accompanying financial statements have been prepared assuming that [WCG] will continue as a going concern.  As more fully described in Note 1, certain of the Company's creditors have informed WCG that in their view WCG may be in default under the terms of its credit facility.  This condition raises substantial doubt about the Company's ability to continue as a going concern.  The financial statements do not

> include any adjustments to reflect the possible future effects on the recoverability and classification of assets or the amounts and classification of liabilities that may result from the outcome of this uncertainty.

E&Y did not issue an annual debt covenant compliance report for YE 2001.  E&Y's issuance of the going concern explanatory paragraph constituted an event of default under WCG's credit agreement.  Ex. 12, RM Decl.

The price of WCG's stock on April 1, 2002 closed at $0.13 per share.  Ex. 11 at 13, JA.

On April 22, 2002, the price of WCG's stock closed at $0.17 per share.  Ex. 11 at 13, JA.  This was down 99% from the March 7, 2002 high and down 99.4% from the outset of the class period.

After the market close on April 22, 2002, WCG filed for Chapter 11 bankruptcy protection.  Ex. 20, JA.  The next trading day, April 23, 2002, WCG's stock price fell by 67.3% (net of industry and market effects).  Ex. 1 at ¶ 98, MK Decl.  The price of WCG's stock closed at $0.06, representing a total class period decline of 99.8%.  Ex. 11 at 13, JA.  Trading volume in WCG common stock on April 23, 2002 was 46.8 million shares, 7.1 times the daily average trading volume for WCG stock during the period following WCG's spin-off from WMB.  The average price of WCG notes was down 17.6% on April 23, 2002.  Ex. 1 at ¶ 98, MK Decl.  The Telecom Index closed on April 23, 2002, at 148.94.  Ex. 10 at 20, JA.  At that point, the Telecom Index had declined approximately 83% from its high on March 10, 2000.

III.   Procedural History

Beginning on January 29, 2002, the date of WMB's press release  announcing the delay of the release of the 2001 earnings pending an internal assessment of WMB's contingent obligations related to WCG, thirty separate class actions were filed in this judicial district against WMB and other defendants.  By orders dated April 15, 2002 and June 21, 2002, the actions were consolidated and by order dated July 15,

2002, the consolidated action was styled, <u>In re Williams Securities Litigation</u>, Case No. 02-CV-72-F(M), Lead Case.[7]  In the June 21, 2002 order, the court bifurcated the consolidated action in the two subclasses of plaintiffs: (i) the WMB Subclass and (ii) the WCG Subclass.[8]  On July 8, 2002, the court appointed Alex Meruelo ("Meruelo") as lead plaintiff of the WCG Subclass.  The 143-page Consolidated Amended Class Action Complaint was filed by lead plaintiff on behalf of the WCG Subclass on September 27, 2002.  The Consolidated Amended Class Action Complaint alleged claims against (i) all defendants under § 10(b) of the Exchange Act, 15 U.S.C. § 78(b), and SEC Rule 10(b) promulgated thereunder, 17 C.F.R. § 240.10b-5, and (ii) the individual defendants and WMB as controlling persons under § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).  More specifically, the amended complaint alleged that during the class period, as a result of defendants' materially false and misleading statements, members of the WCG Subclass purchased or acquired WCG equity and debt securities at prices that were artificially inflated.  Motions to dismiss the complaint were filed by the WCG defendants and E&Y on November 25, 2002.  By order dated December 12, 2003, the motion of the WCG defendants was denied and the motion of E&Y was granted in part and denied in part.  *See*, <u>In re Williams Securities Litigation</u>, 339 F.Supp.2d at 1242.

On January 12, 2005, Meruelo filed a motion to certify the WCG Subclass and to appoint himself and Norman Kirkendoll ("Kirkendoll") as representatives of the

---

[7]The consolidated action was originally assigned to Judge Sven Erik Holmes.  The matter was reassigned to Judge Terence C. Kern on March 15, 2005.  Subsequently, on November 3, 2005, the action was reassigned to the undersigned.

[8]As previously stated, the claims of the WMB Subclass plaintiffs have been settled.  A stipulation of settlement was executed on August 28, 2006.  The court granted preliminary approval of the settlement and granted certification of the settlement class for settlement purposes on October 5, 2006.  The court granted final approval of the settlement on February 9, 2007.  Judgment was entered on February 12, 2007.

WCG Subclass. As previously noted, on November 11, 2005, the case was reassigned to the undersigned.

In an order dated June 12, 2006, this court certified the WCG Subclass and designated Mereulo and Kirkendoll as representatives for the WCG Subclass. Pursuant to the court's June 12, 2006 order and a subsequent order of August 8, 2006, the WCG Subclass consists of all persons who purchased or otherwise acquired the securities of WCG between July 24, 2000 and April 22, 2002, inclusive (the class period), and who were damaged thereby.[9]

On August 16, 2006, the court entered an order approving the Notice of Pendency of Class Action, Summary Notice and Notice Dissemination Program. In that order, the court specifically ordered that all members of the WCG Subclass "who do not timely request exclusion from the Class by October 18, 2006 . . . will be bound by any judgment or determination of the Court affecting the Class."

On October 31, 2006 and November 1, 2006, the court heard arguments on Daubert and summary judgment motions. Shortly thereafter, on November 14, 2006, the court entered an order staying proceedings in this case as related to the WCG Subclass pending the entry of an order on the Daubert and summary judgment motions.

IV. Summary of the claims of the WCG Subclass

The WCG Subclass plaintiffs allege that the WMB defendants and WCG defendants made materially false and misleading statements or omitted to disclose

---

[9]Excluded from the subclass are defendants, officers and directors of WCG and/or any of its subsidiaries, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which defendants have or have had a controlling interest; holders of an Allowed Claim in Class 5 or 6 under WCG's Second Amended Joint Chapter 11 Plan of Reorganization, acting in such capacity; and WCG common stock in the April 2001 spin-off of WCG from The Williams Companies, Inc. ("WMB") with respect to the WCG common stock they received as a result of the spin-off.

material facts as to the reasons for the April 2001 spin-off and as to WCG's financial condition and operating results both before and after the April 2001 spin-off.

The WCG Subclass alleges that E&Y issued a clean audit opinion that falsely stated that WCG's financial statements for YE 2000 complied with generally accepted accounting principles.  It also alleges that E&Y's audit opinion falsely stated that the audit complied with generally accepted auditing principles.  Specifically, the WCG Subclass contends that WCG's network assets and other fixed assets were materially impaired under Statement of Financial Accounting Standards No. 121 (FAS 121) in 2000 and that WCG failed to disclose these impairments in the financial statements. Additionally, the WCG Subclass alleges that WCG improperly recognized revenue on certain indefeasible right of use ("IRU") fiber transactions.  It also contends that WCG failed to disclose debt covenant violations.  The WCG Subclass contends that E&Y knew or recklessly disregarded facts showing that the assets were impaired, that WCG improperly recognized revenue with respect to the IRU transaction, and that WCG had violated its debt covenants.  The WCG Subclass further alleges that E&Y failed to disclose "going concern" doubts in the audit report even though E&Y knew or recklessly disregarded facts showing that there was substantial doubt about WCG's ability to continue as a going concern.

A.    Rule 10(b) and Rule 10b-5 Claims  –  Basic Elements.

Section 10(b) of the Exchange Act forbids (1) the "use or employ[ment] . . . of any . . . deceptive device," (2) "in connection with the purchase or sale of any security," and (3) "in contravention of" the SEC "rules and regulations."  15 U.S.C. § 78j(b).  SEC Rule 10(b)-5 forbids, among other things, the making of any "untrue statement of material fact" or the omission of any material fact "necessary in order to make the statements made . . . not misleading."  17 C.F.R. § 240.10b-5.  In cases involving publicly traded securities and purchases or sales in public securities markets, the basic elements of a securities fraud claim under § 10(b) and Rule 10b-5

include: (1) a material misrepresentation (or omission); (2) scienter, *i.e.*, a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation, *i.e.* a causal connection between the material misrepresentation and the loss.  <u>Dura Pharmaceuticals, Inc. v. Broudo</u>, 544 U.S. 336 (2005).

> B.    <u>Section 20(a) Claims  – Basic Elements</u>.

Under § 20(a) of the Exchange Act, "[e]very person who, directly or indirectly, controls any person liable" under Section 10(b) and Rule 10(b)-5 "shall also be liable jointly severally with and to the same extent as such controlled person is liable. . . ." 15 U.S.C. § 78t.  The basic elements of a control person liability claim under § 20(a) are (1) a primary violation of the securities laws and (2) "control" over the primary violator by the alleged controlling person.  <u>City of Philadelphia v. Fleming Companies, Inc.</u>, 264 F.3d 1245, 1270-71 (10th Cir. 2001) (citing <u>Maher v. Durango Metals, Inc.</u>, 144 F.3d 1302 (10th Cir. 1998)).

V.    <u>The Daubert Motions</u>.

> A.    <u>The general framework for *Daubert* analysis in this case</u>.

The basic principles which govern the resolution of a challenge to the admissibility of proposed expert testimony are nearly rote, but bear repeating with an eye to the context of the issues now before the court.  Those principles are discussed in broad terms at this point.  Further, more specific, discussion and analysis will be found later in this memorandum opinion.

The Supreme Court's decisions in <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993) and <u>Kumho Tire Company, Ltd. v. Carmichael</u>, 526 U.S. 137 (1999) establish a "gatekeeper" function for trial judges under Rule 702, Fed.R.Evid.  *See also*, <u>Goebel v. Denver and Rio Grande Western R. Co.</u>, 215 F.3d 1083 at 1087 (10th Cir. 2000) (<u>Goebel I</u>).  The gatekeeper function "requires the judge to assess the reasoning and methodology underlying the expert's opinion, and

determine whether it is scientifically valid and applicable to a particular set of facts." *Id.*

The question of *how* to perform its gatekeeping function is a discretionary matter for the trial court.  The court may conduct a hearing, it may perform its gatekeeping obligation by ruling on a motion in limine or on an objection at trial, or even by ruling on a post-trial motion.  *Id.*  When faced with a Daubert objection to proposed expert testimony, the court must adequately demonstrate by specific findings on the record that it has performed its duty as gatekeeper.  Goebel I, 215 F.3d at 1088.  The Court of Appeals has left no room for doubt on this point, *e.g.*, Dodge v. Cotter Corp., 328 F.3d 1212, 1227 (10th Cir. 2003), *cert. denied*, 540 U.S. 1003 (2003) ("Again, we lack specific, detailed findings about [the expert's] reasoning or the reliability of his methodology in arriving at his conclusions.").

When the proposed testimony of an expert is challenged under Daubert and its progeny, Rule 104 of the Federal Rules of Evidence applies to the court's consideration and determination of the issues raised by the Daubert challenge.  Daubert, at 592, n. 10.  Rule 104(a) casts upon the proponent of the testimony the burden of establishing the admissibility of the testimony by a preponderance of the evidence.  *Id.  See also*, Ralston  v. Smith & Nephew Richards, Inc., 275 F.3d 965, 970, n. 4 (10th Cir. 2001) and the Advisory Committee notes to the 2000 Amendment to Rule 702 ("[T]he admissibility of all expert testimony is governed by the principles of Rule 104(a).  Under that Rule, the proponent has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence.").

It is in that light, and with that burden[10] in mind, that the court considers the pending Daubert motions.

Even though the court may delve deeply into the minutiae of the proposed expert's opinions while conducting the Daubert analysis, the court must always remain mindful that its focus "must be solely on principles and methodology, not on the conclusions that they generate," Daubert, 509 U.S. at 595, except that a Daubert challenge may succeed if the court "conclude[s] that there is simply too great an analytical gap between the data and the opinion proffered," General Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997).  Thus, the ultimate objective of Daubert scrutiny is to ascertain whether the proffered expert testimony is "not only relevant, but reliable," Daubert 509 U.S. at 589.

An essential component of the relevance evaluation is the determination of whether the proposed expert testimony fits the issues in the case.  In assessing "fit," as the Supreme court called it, the court must determine whether the "expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute."  Daubert, 509 U.S. at 591 [internal quotation marks omitted].

As explained by the Court of Appeals:

> [I]n fulfilling its *Daubert* obligations a trial court must also conduct a further inquiry into whether proposed testimony is sufficiently "relevant to the task at hand."  Daubert, 509 U.S. at 597, 113 S.Ct. 2786.  Relevant evidence "means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed.R.Evid. 401.  The Supreme Court has described the consideration of relevant evidence as one of "fit."  Daubert, 509 U.S. at 591, 113 S.Ct.

---

[10]  The proponent's burden may not be an evidentiary burden in the strict sense, but it is clear that, under Rule 104(a), it falls to the proponent to establish, and not to the opponent to refute, the admissibility of the evidence proffered by the proponent. *See, e.g.*, United States v. Cherry, 217 F.3d 811, 815 (10th Cir. 2000) and United States v. Metropolitan Enterprises, Inc., 728 F.2d 444, 448-49 (10th Cir. 1984).

2786.  A trial court must look at the logical relationship between the evidence proffered and the material issue that evidence is supposed to support to determine if it advances the purpose of aiding the trier of fact. Even if an expert's proffered evidence is scientifically valid and follows appropriately reliable methodologies, it might not have sufficient bearing on the issue at hand to warrant a determination that it has relevant "fit."

Bitler v. A.O. Smith Corp., 400 F.3d 1227, 1234 (10th Cir. 2004)  *cert. denied sub nom.* White-Rodgers Co. v. Bitler, __ U.S. __, 126 S.Ct. 395 (2005).

In Kumho, the Court elaborated upon the Daubert gatekeeping function as applied to proposed expert testimony outside of the realm of classical scientific testimony.  The Court emphasized that even where the proposed expert testimony is not scientific, in the classical sense, the trial judge is nevertheless required to ascertain whether the expert "employs in the courtroom the same level of *intellectual rigor* that characterizes the practice of an expert in the relevant field."  Kumho, 526 U.S. at 152 (emphasis added).

It is clear that, in our circuit, the Daubert gatekeeping function is undertaken by means of a two-step analysis.  Ralston, 275 F.3d 965 at 969.  *First,* the court must determine whether the proposed expert is qualified.  This requires an assessment of his "knowledge, skill, experience, training or education."  *See* Rule 702 and Ralston at 969.  *Secondly*, if the proposed expert is determined to be sufficiently qualified, the court must determine whether his opinions are "reliable" in the sense required by Daubert and Kumho.  Ralston, 275 F.3d 965 at 969.

B.     Qualifications.

In Gardner v. General Motors Corporation, 507 F.2d 525 (10th Cir. 1974), our Court of Appeals noted that a proposed expert "should not be required to satisfy an overly narrow test of his own qualifications."  *Id.* at 528.  This self-evident admonition should be read in light of subsequent post-Daubert decisions.

The decision in Ralston, 275 F.3d 965, provides a good starting point, because that decision turned entirely on the expert's qualifications.  Plaintiff asserted that the

warnings accompanying an implanted orthopedic nail were inadequate. *Id.* at 967 - 68. The Court of Appeals affirmed the trial court's exclusion of the testimony of plaintiff's expert, a board-certified orthopedic surgeon who was also an associate professor of medicine at the University of Kansas Medical School. The expert's *general* credentials were clearly as good as could reasonably be expected, but she had done no research "specifically looking at this nail," *id.* at 969, and had not drafted a warning for a surgical device. *Id.* Her general credentials, though seemingly impressive as general credentials, were not good enough: "[M]erely possessing a medical degree is not sufficient to permit a physician to testify concerning any medical-related issue." *Id.* at 970. The board-certified orthopedic surgeon's "reliance upon general principles and concepts" did not suffice. *Id.* Accordingly, her proposed testimony about the adequacy of the warning was not within the "reasonable confines" of her expertise. *Id.* If her proposed expert testimony had been within those "reasonable confines," her lack of specialization would have gone to the weight, not the admissibility, of her proposed expert testimony. *Id. See also*, as to specialization, Broadcort Capital Corp. v. Summa Medical Corp., 972 F.2d 1183, 1194 - 95 (10th Cir. 1992) (affirming trial court determination that an attorney with "some education and training in the field" was not qualified "as an expert in the securities area").

In this case, as is discussed in Part V (D) and (E), below, the Daubert challenge, and the resultant Daubert scrutiny, focuses on some unusually specific and discrete matters which plaintiffs' experts propose to address in their testimony – and on the interrelationships between the conclusions of those experts. Consequently, it should be borne in mind that "[t]he issue with regard to expert testimony is not the qualifications of a witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question." Berry v. City of Detroit, 25 F.3d 1342, 1351 (6th Cir. 1994), *cert. denied*, 513 U.S. 1111 (1995). *See also,* Wheeling Pittsburgh Steel Corp. v. Beelman River Terminals, Inc., 254 F.3d 706, 715

(8th Cir. 2001) ("To begin with, we agree with the district court that Dr. Curtis . . . easily qualifies as an expert under Federal Rule of Evidence 702. The real question is, what is he an expert about?") and <u>Westfed Holdings, Inc. v. United States</u>, 55 Fed. Cl. 544, 571 (2003), *rev'd in part on other grounds*, 407 F.3d 1352 (Fed. Cir. 2005). Thus, on the issue of expert qualifications, <u>Ralston</u> and like cases establish that the qualifications of the proposed expert are to be assessed only after the specific matters he proposes to address have been identified.  The controlling Tenth Circuit cases, exemplified by <u>Ralston</u>, establish that the expert's qualifications must be both (i) adequate in a general, qualitative sense (*i.e.*, "knowledge, skill, experience, training or education" as required by Rule 702) and (ii) specific to the matters he proposes to address as an expert.[11]

    C.   <u>Reliability</u>.

Under Rule 702, an expert with the necessary qualifications in the relevant field may give expert testimony if (i) the testimony is based upon sufficient facts or data, (ii) the testimony is the product of reliable principles and methods, and (iii) the witness has applied the principles and methods reliably to the facts of the case.  Rule 702, Fed.R.Evid.  *See, generally,* <u>Goebel v. Denver and Rio Grande Western R. Co.</u>, 346 F.3d 987, 991 (10th Cir. 2003) (<u>Goebel II</u>).

The evaluation for reliability cannot be permitted to evolve into an assessment of the ultimate persuasiveness of the proffered expert testimony.  Faced with a

---

[11]  Plaintiffs have cited an unpublished Tenth Circuit decision, <u>Tingey v. Radionics</u>, 2006 WL 2258872 (10th Cir. Aug. 8, 2006) for the proposition that disputes as to the strength of the expert's credentials or as to his methodology "go to the weight, not the admissibility" of his testimony. Doc. No. 1498 at 4 (quoting <u>Tingey</u> at *17). The Tenth Circuit's unpublished decision says exactly that, without elaboration other than to cite and quote from a Second Circuit decision, <u>Zuchowicz v. United States</u>, 140 F.3d 381 (2nd Cir. 1998). It is unsurprising that <u>Tingey</u> cites <u>Zuchowicz</u>, from the Second Circuit, because the relevant passage from <u>Zuchowicz</u>, as quoted in <u>Tingey</u>, would be difficult to support with the Tenth Circuit's published decisions applying <u>Daubert</u> and its progeny.  The unvarnished declaration that disputes as to credentials and methodology go to weight rather than admissibility is irreconcilable with scores of Tenth Circuit decisions, to say nothing of <u>Daubert</u>, <u>Kumho</u>, <u>Joiner</u> and <u>Weisgram</u>.

Daubert challenge, expert testimony must meet "exacting standards of reliability," Weisgram v. Marley Company, 528 U.S. 440, 455 (2000), but those exacting standards are still applied within a well-defined framework, because Daubert scrutiny is neither a substitute for jury resolution of contested issues fairly presented by conflicting testimony from qualified experts nor a grant of uncabined discretion to district judges to reject expert testimony that rubs them the wrong way. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Daubert at 596.

Thus, the court's "focus generally should not be upon the precise conclusions reached by the expert, but on the methodology employed in reaching those conclusions." Bitler, 400 F.3d at 1233. As explained by Judge Becker for the Third Circuit, a challenge to proposed expert testimony "does not mean that plaintiffs have to prove their case twice – they do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are correct, they only have to demonstrate by a preponderance of evidence that their opinions are reliable." In re Paoli R.R. Yard PCB Litigation, 35 F.3d 717, 744 (3rd Cir. 1994), *cert. denied sub nom.* General Elec. Co. v. Ingram, 513 U.S. 1190 (1995). The reliability standard is "lower than the merits standard of correctness." *Id.* Thus, the trial court's determination of "reliability," in the Daubert sense, is not a determination as to whether the expert's proposed testimony is substantively correct – determinations of that kind would stretch most judges beyond their competence in most cases.[12]

The reliability determination must be made regardless of the subject of the proposed expert testimony:

_____

[12]  The relative competence of the trial judge and the expert is not a concern to the Supreme Court: "Of course, neither the difficulty of the task nor any comparative lack of expertise can excuse the judge from exercising the "gatekeeper" duties that the Federal Rules of Evidence impose . . . ." Joiner, 522 U.S. at 148.

We conclude that *Daubert's* general principles apply to the expert matters described in Rule 702. The Rule, in respect to all such matters, "establishes a standard of evidentiary reliability." 509 U.S., at 590, 113 S.Ct. 2786. It "requires a valid . . . connection to the pertinent inquiry as a precondition to admissibility." *Id.*, at 592, 113 S.Ct. 2786. And where such testimony's factual basis, data, principles, methods, or their application are called sufficiently into question, see Part III, *infra*, the trial judge must determine whether the testimony has "a reliable basis in the knowledge and experience of [the relevant] discipline." 509 U.S., at 592, 113 S.Ct. 2786.

Kumho, 526 U.S. at 149.

Daubert, of course, involved a proffer of expert testimony in a classical scientific discipline – epidemiology. Bearing that context in mind, it is nevertheless appropriate to review the non-exclusive list of five factors which were provided by the Daubert court to guide trial court determinations of reliability. The Court said that the trial judge should (1) assess whether the expert's technique or theory can be or has been tested – that is, whether the expert's theory can be challenged in some objective sense, or whether it is instead simply a subjective, conclusory approach that cannot reasonably be assessed for reliability, (2) determine whether the technique or theory has been subject to peer review and publication, (3) evaluate the known or potential rate of error of the technique or theory when applied, (4) ascertain the existence and maintenance of standards and controls and, (5) determine whether the technique or theory has been generally accepted in the scientific community. *See,* 509 U.S. at 590-94.

Kumho made it clear that the gatekeeper function applies even where the proposed expert testimony is outside the realm of science in the classical sense. Kumho involved a proffer of engineering testimony in a product liability case. The Kumho decision makes it clear that, although the ultimate task of the trial judge, as gatekeeper, remains the same, the factors which were included in the nonexclusive list in Daubert are to be used only to the extent that they are logically applicable. *See*

60

Kumho, 526 U.S. at 149.   Thus, for instance, it has been noted that the factors mentioned by the Court in Daubert do not neatly apply to expert testimony from a sociologist, Tyus v. Urban Search Management, 102 F.3d 256 (7th Cir. 1996), and that lack of peer review or publication is not dispositive where the expert's opinion is supported by "widely accepted scientific knowledge."   Kannankeril v. Terminix International, Inc., 128 F.3d 802, 809 (3rd Cir. 1997).   Moreover, as noted by the Advisory Committee in commenting on the 2000 amendments to Rule 702, courts both before and after Daubert have found other factors relevant in determining whether expert testimony is sufficiently reliable to be considered by the jury.   Those additional factors which may be relevant depending on the circumstances include (1) whether the expert proposes to testify about matters growing naturally and directly out of his research, independent of the litigation, or whether he has developed his opinion expressly for the purpose of testifying, (2) whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion, (3) whether the expert has adequately accounted for obvious alternative explanations, (4) whether the expert is being as careful as he would be in his regular professional work outside his paid litigation consulting, and (5) whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give.   See, Advisory Committee notes to 2002 amendments, and cases there cited.

In sum, to make the Daubert assessment of reliability, the court – having found that the expert possesses the requisite expertise (if challenged), and having determined that the proposed expert testimony fits the issues in the case – must determine whether the expert's conclusions are the product of (i) application of that expertise using recognized and supportable methodologies, (ii) on the basis of adequate data which is (iii) rationally tied to the opinions which purport to be based on that data.

"Under *Daubert*, any step that renders the analysis unreliable . . . renders the expert's testimony inadmissible. This is true whether the step completely changes a reliable methodology or merely misapplies that methodology." Goebel II, 346 F.3d at 992 (citations and internal quotations omitted); Mitchell v. Gencorp Inc., 165 F.3d 778, 782 (10th Cir. 1999).   If the challenged expert testimony is crucial to the proponent's case, the result of a successful Daubert challenge may be entry of judgment as a matter of law.  Joiner, 522 U.S. at 142 - 43; *cf.* Tellabs, Inc. v. Makor Issues & Rights, Ltd., __ U.S. __, 2007 WL 1773208 at *11, n. 8 (2007); Weisgram, 528 U.S. at 453.  *See, e.g.,* Truck Ins. Exchange v. Magnetek, Inc., 360 F.3d 1206, 1213 *et seq.* (10th Cir. 2004); Ralston, 275 F.3d at 974.  Although the standard of appellate review is no more stringent where the trial court's exclusion of expert testimony is outcome-determinative, Joiner, 522 U.S. at 142, it certainly would be – and is here – natural to proceed with great caution where the court's rulings may be dispositive with respect to all or major portions of the case before it.

      D.    The Daubert challenges with respect to Messrs. Mathis and Mintzer.

Plaintiffs' counsel retained H. Sean Mathis and Andrew M. Mintzer as two of their experts in this case.  Mr. Mathis is a Managing Director in Miller Mathis & Co., an investment banking firm which was founded by Mr. Mathis and another principal. Mathis Rpt. at 2.  Mr. Mintzer is a Certified Public Accountant.  The qualifications of Messrs. Mathis and Mintzer are discussed in more detail in parts 3(a) and 4(a), below.

The scope of Mr. Mathis's engagement as an expert in this case has been described in various ways, but it is clear that his work in this case relates entirely to an impairment analysis of WCG's dark fiber and spare conduit assets under Statement of Financial Accounting Standards No. 121 (FAS 121), a statement of accounting standards which was promulgated by the Financial Accounting Standards Board in 1995.  The joint efforts of Messrs. Mathis and Mintzer with respect to FAS 121 provided a major portion of the basis for Mr. Mintzer's opinion that the financial

statements of WCG as of December 31, 2000 and for the first three quarters of 2001 were not presented in conformity with generally accepted accounting principles (GAAP[13]).  Mintzer Rpt.,  ¶¶ 86 - 171, 269 - 280.  As is discussed in more detail below, in situations to which it applies,  FAS 121 generally governs accounting for the impairment of long-lived assets.  (FAS 121 has been superseded, but is the only impairment-related Statement of Financial Accounting Standards which is relevant to this case.)

Mr. Mintzer's work as an expert in this case covers more ground than Mr. Mathis's work (and thus, Mr. Mintzer's work involves matters in addition to application of FAS 121), but Mr. Mintzer's work is, in several significant respects, dependent on Mr. Mathis's work, and Dr. Nye's work is, in turn, predicated in part on the work of Messrs. Mathis and Mintzer.

As Mr. Mintzer wrote in his report, he was engaged in this case to render an opinion as to:

> a.   Whether or not the financial statements of Williams Communications Group, Inc. (WCG) were prepared in accordance with applicable Generally Accepted Accounting Principles (GAAP), and
>
> b.   Whether or not Ernst & Young LLP (E&Y) adhered to applicable professional standards in the performance of its audits of the fiscal 2000 financial statements of WCG.

---

[13]  Generally accepted accounting principles "are the conventions, rules, and procedures that define accepted accounting practices." United States v. Arthur Young & Co., 465 U.S. 805, 811, n. 7 (1984).  The Supreme Court has also observed that: "Far from a single-source accounting rulebook, GAAP 'encompasses the conventions, rules, and procedures that define accepted accounting practice at a particular point in time.' Kay & Searfoss [R. Kay & D. Searfoss, Handbook of Accounting and Auditing, ch. 5, p. 7 (2d ed. 1989)], ch. 5, at 7 (1994 Update). GAAP changes and, even at any one point, is often indeterminate.  '[T]he determination that a particular accounting principle is generally accepted may be difficult because no single source exists for all principles.' Ibid. There are 19 different GAAP sources, any number of which might present conflicting treatments of a particular accounting question. Id., ch. 5 at 6-7. When such conflicts arise, the accountant is directed to consult an elaborate hierarchy of GAAP sources to determine which treatment to follow." Shalala v. Guernsey Memorial Hosp., 514 U.S. 87, 101 (1995).

Mintzer Rpt. at 5 (footnote omitted).

As a prerequisite to analysis of the Daubert challenges to the expert testimony of Messrs. Mathis and Mintzer, it is necessary, as discussed in Part V (B) and (C), above, to identify the specific matters they propose to address in their expert testimony.  That, in turn, requires at least a general familiarity with FAS 121.

FAS 121 "establishes accounting standards for the impairment of long-lived assets, certain identifiable intangibles, and goodwill related to those assets to be held and used and for long-lived assets and certain identifiable intangibles to be disposed of."  FAS 121, p. 4.[14]  As relevant to the issues in this case, and ignoring numerous details for the moment, FAS 121 essentially requires entities that report their financial condition on the basis of GAAP to review for, recognize, measure and report losses resulting from drops in the value of assets within the scope of the statement "whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable."  *Id.*  Under FAS 121, and asset is said to be "impaired" if application of FAS 121 indicates that the asset is not worth the value at which it is carried on the books of the company.  *Id.* at 6.  "FAS 121 anticipates and requires that managers, like the defendants, exercise considerable business judgment in performing an impairment review."  In re: Serologicals Securities Litigation, 2003 WL 24033694 at *14 (N.D. Ga. Feb. 20, 2003).  *See also*, involving FAS 121, In re K-Tel International, Inc. Securities Litigation, 300 F.3d 881 (8th Cir. 2002); Amalgamated Bank v. Coca-Cola Co,, 2006 WL 2818973 (N.D. Ga. Sept. 29, 2006); Rosen v. Textron, Inc., 321 F. Supp. 2d 308 (D.R.I. 2004) and Cutsforth v. Renschler, 235 F. Supp. 2d 1216 (M.D. Fla. 2002).

---

[14]  The copy of FAS 121 to which the court refers, ex. 1 to Doc No. 1451, is a copy of the Financial Accounting Standards Board's official print of the now-superseded document, and it is that version which is cited in this memorandum opinion.  Another source is http: //www.fasb.org/st/summary/stsum121.shtml.  (Last visited June 7, 2007.)

The determination as to whether an impairment loss must be recorded pursuant to FAS 121 involves three steps:

Step One:    *Review* long-lived assets for impairment whenever events or changes in circumstances (*i.e.,* a trigger) indicate that the carrying amount of an asset may not be recoverable.

Step Two:    *Estimate* the future cash flows expected to result from the use of the asset and its eventual disposition (undiscounted and without interest charges).   Impairment loss is to be recognized if this amount is less than the carrying amount of the asset.

Step Three:  *Measure* the amount of the impairment loss as the amount by which the carrying amount of the asset exceeds its fair value (determining fair value on the basis of market price, or, in the absence of a market price, on the basis of such measures as discounted future cash flows).

FAS 121 at ¶¶ 4 - 17, pp. 6 - 9.[15]

The short version of a description of the scope of the respective assignments of Messrs. Mathis and Mintzer with respect to FAS 121 analysis is that Mr. Mintzer performed Step 1 and Mr. Mathis performed Step 2 and Step 3 of the FAS 121 analysis. Doc. No. 1498 (Plaintiffs) at 5; Doc. No. 1499 (Plaintiffs) at 5.[16] That much is undisputed.   Thus, Mr. Mathis's description of his engagement is that he was retained to:

perform an impairment analysis, consistent with Financial Accounting Standards No. 121 [sic] ("FAS 121"), of (i) the excess dark fiber and spare conduit assets of WCG as of December 31, 2000, which is one year prior to the impairment analysis conducted by the Company as of

---

[15] The FAS 121 procedure differs somewhat as applied to assets which management intends to dispose of.  Those assets are to be reported at the lower of carrying amount or fair value less cost to sell.  *Id.* at 8, ¶ 15.  The resultant gain or loss is a component of income from continuing operations.  *Id.* at 9, ¶ 18.

[16] The pending Daubert and summary judgment motions involve 212 docketed documents. For the sake of brevity, they will generally be cited only by docket number and filing party, *e.g.* Plaintiffs or the WMB defendants or the WCG defendants or E&Y.

December 31, 2001 . . . and (ii) the excess dark fiber and spare conduit assets held by the Asset Defeasance Program (ADP") as of December 31, 2000.

Mathis Rpt. at 2.

As has been noted, closer analysis of the allocation of work as between Mr. Mathis and Mr. Mintzer is required, but that analysis should be undertaken in light of the gist of the Daubert challenges advanced by the defendants.

The WCG defendants argue that Mr. Mathis is "not qualified to testify as an expert regarding application of FAS 121" and that "numerous and substantial flaws in Mathis's methodology render his opinions wholly unreliable." Doc. No. 1451 (WCG defendants) at 2. Similarly, E&Y asserts that Mr. Mathis is not qualified to conduct an impairment analysis under FAS 121 because "he lacks the required experience and accounting knowledge." Doc. No. 1433 (E&Y) at 1. E&Y also asserts that Mr. Mathis's methodology is fatally deficient because his FAS 121 analysis "actually contradicts FAS 121" and uses a method that "is not allowed under FAS 121." *Id.* at 2. The defendants seek to exclude Mr. Mathis's proposed expert testimony *in toto*.

The Daubert challenges as to Mr. Mintzer are narrower. The defendants seek to exclude everything Mr. Mintzer has to say about FAS 121, but not everything he has to say on other subjects. E&Y seeks to exclude Mr. Mintzer's opinions that WCG should have taken an impairment charge as of December 31, 2000 as to (i) the fiber network and (ii) the equipment inventory.[17] Doc. No. 1436 (E&Y) at 1. E&Y argues that Mr. Mintzer lacks sufficient knowledge and experience with respect to application of FAS 121, that his reliance on the work of Mr. Mathis as to impairment of the fiber

---

[17]   Under the court's order on E&Y's Motion to Dismiss Consolidated Amended Class Action Complaint (motion at Doc. No. 198), plaintiffs' claims against E&Y were dismissed to the extent that they were premised on WCG's 10-Q filings, press releases and other public statements not made by E&Y. In re Williams Securities Litigation, 339 F.Supp.2d at 1239.

network is fatal to his own opinion as to impairment, and that Mr. Mintzer's opinion that WCG should have taken an impairment charge with respect to unspecified equipment inventory as of December 31, 2000 is fatally nonspecific and unreliable. *Id*. at 1 - 2.

The WCG defendants seek to exclude Mr. Mintzer's opinions as to violation of debt covenants and as to whether FAS 121 Step 1 triggering events occurred in 2001. Doc. No. 1437 (WCG defendants) at 3.  Those defendants assert that Mr. Mintzer's opinion as to violation of the debt covenants is inadmissible because it lies outside his area of expertise.  *Id.* at 4.  The challenge to Mr. Mintzer's opinion as to FAS 121 triggering events in 2001 is premised on arguments as to methodology, not as to qualifications.  *Id.* at 7.    The WCG defendants also adopt E&Y's motion as to Mr. Mintzer.  *Id.*

The WMB defendants attack only the opinions expressed in the last four paragraphs of Mr. Mintzer's 305-paragraph report, those being the paragraphs in which Mr. Mintzer opines that the financial statements of Williams Companies, Inc. were misstated as a result of WCG's failure to write down its assets under FAS 121. Doc. No. 1446-1 (WMB defendants) at 1.  The challenge is based on the substance of, and the support for, the opinions, rather than on Mr. Mintzer's qualifications.  *Id.* at 4 - 14.  (The WMB defendants also adopt the motions of E&Y and the WCG defendants as to Mr. Mintzer.  *Id.* at 6, n. 3.)

      1.    The division of labor between Messrs. Mathis and Mintzer with respect to FAS 121 impairment analysis.

Viewing the Daubert challenges to the proposed expert testimony of Messrs. Mathis and Mintzer with respect to application of FAS 121 in light of the complexity of the accounting issues as to which they opine, in light of the reliance Mr. Mintzer necessarily places on Mr. Mathis's work, and in light of the bases for the defendants' challenges to the opinions of the two experts, closer analysis of the division of labor

between the two experts with respect to application of FAS 121 is required.   The determination of the existence of an impairment loss under FAS 121 as of (or at any time after) December 31, 2000 plainly required (whether made contemporaneously or by Messrs. Mathis and Minter as retained experts) several separately identifiable analyses and judgments.   The following is a non-exhaustive summary of the analyses and judgments which application of FAS 121 entailed and of the division of labor between Messrs. Mathis and Mintzer with respect to those tasks:

| | |
|---|---|
| STEP 1<br>FAS 121, ¶¶ 4, 5<br>Determine whether impairment indicators exist. | |
| Identify triggers of impairment analysis.  FAS 121, ¶ ¶ 4, 5 | Mintzer |
| STEP 2<br>FAS 121, ¶ 6<br>Determine whether an impairment must be recognized.<br>("undiscounted future cash flows" vs. "carrying amount") | |
| Estimate undiscounted future cash flow from asset and its disposition and compare to carrying amount of the asset. FAS 121, ¶ 6 | Mathis |
| 2.1  Classify assets for grouping purposes. FAS 121, ¶¶ 8, 98 | Mathis |
| 2.2  Determine amount of "excess" dark fiber. FAS 121, ¶ 8 | Mathis |
| 2.2 (a) Determine extent of reliance on management's grouping.  FAS 121, ¶ 98 | Mathis |
| 2.2 (b) Determine number of fiber strands to be retained. | Mathis |
| 2.2 (c) Determine extent of reliance on management's budgets and projections. FAS 121, ¶ 142 | Mathis |
| 2.3  Identify "reasonable and supportable assumptions" re: expected future cash flows from excess dark fiber FAS 121, ¶ 9 | Mathis |
| 2.3 (a) Estimate future prices  – *market factors.* | Mathis |
| 2.3 (b) Estimate future prices  – *technology factors.* | Mathis |
| 2.3 (c) Estimate future bandwidth volumes  – market factors. | Mathis |
| 2.3 (d) Determine number of years (*i.e.* useful life) for which "future cash flows [are] expected to be generated by [the] asset."  FAS 121, ¶ ¶ 6, 9 | Mathis |
| 2.4  Determine "likelihood of possible outcomes" re: estimate of future cash flow. FAS 121, ¶ 9 | Mathis |

| | |
|---|---|
| STEP 3<br>FAS 121, ¶ 7<br>Determine amount of impairment loss to be recognized. | |
| 3.1  Determine "the fair value of the asset."  FAS 121, ¶ 7 | Mathis |
| 3.1 (a) Select dark fiber valuation approach.  FAS 121, ¶ 7 | Mathis |
| 3.1 (b) Select appropriate discount rate [if discounted cash flow approach is used].  FAS 121, ¶ 7 | Mathis |
| Ancillary steps: | |
| Judgment as to qualifications of Mathis to perform Steps 2 and 3 | Mintzer |

> 2.     The experts' methodology vs. the methodology the accountants
>        were required to employ in their audit-related work.

One more matter should be addressed before applying the Daubert and Rule 702 standards to the challenges to the proposed expert testimony of Messrs. Mathis and Mintzer.  As has been noted, Mr. Mintzer is a Certified Public Accountant.  Mr. Mathis is not.  E&Y asserts, in essence, that in evaluating Mr. Mintzer's work as a retained expert in this case, the court should apply the standards that would have governed Mr. Mintzer's work (both substantively and with respect to methodology) if he were performing the audit of the financial statements of WMB and WCG in the first instance.  Thus, in support of its criticism of Mr. Mintzer's reliance on Mr. Mathis's performance of Steps 2 and 3 of the FAS 121 impairment analysis, E&Y argues that Auditing Standard 336 precluded Mr. Mintzer from adopting or otherwise relying on Mr. Mathis's work.  Doc. No. 1436 (E&Y) at 11; Doc. No. 1525 (E&Y) at 7.  In response, plaintiffs argue that "Mintzer, of course, was not conducting an audit. He was evaluating and opining on the methodologies employed by WCG and its auditors related to WCG's 2000 audit.  Thus, GAAS[18] does not define the standard

_____

[18] "GAAS" stands for generally accepted auditing standards.  "GAAS include 10 broadly phrased standards and general principles that guide the audit function. They are classified as general standards, standards of fieldwork, and . . . standards of reporting.  More specific guidance may be

to which he is held and AU 336 is not relevant to this case.  The applicable standard for his opinion is Fed. R. Evid. 703." Doc. No. 1499 (Plaintiffs) at 6.  Plaintiffs assert, instead, that the relevant professional standard is the Statement on Standards for Consulting Services, published by the American Institute of Certified Public Accountants (AICPA).  *Id.* at 7 (citing "SSCS § 100.06").  In reply, E&Y argues that "Plaintiffs also are wrong that SSCS § 100.06 applies because Mintzer was hired only as a 'consultant.'   Perhaps what Mintzer is doing <u>for plaintiffs</u> qualifies as 'consulting,' but what he is purporting to do <u>for the jury</u> is step into the shoes of an auditor and accountant performing a FAS 121 analysis." Doc. No. 1525 at 10 (citation omitted).

The court rejects E&Y's contention that the GAAP and GAAS standards that governed its audit work apply, of their own force, to Mr. Mintzer's work as a retained expert.  His work as a retained expert (and hence the court's evaluation of his work under <u>Daubert</u>) certainly must be informed by the relevant GAAP and GAAS standards.  But <u>Daubert</u> and Rules 702 and 703, as well as the relevant standards governing the public accounting profession, lead the court to the conclusion that Mr. Mintzer's work is not to be judged by wholesale application of the standards that would have governed his work (both methods and substantive principles) had he performed the WMB and WCG audits himself.

As a beginning point, the court will examine how the public accounting profession characterizes and defines Mr. Mintzer's engagement as a retained expert in this case.  The AICPA's standards and related interpretive materials provide valuable guidance.

---

found in the Statements on Auditing Standards (SAS), which are periodic interpretations of the standards issued by the Auditing Standards Board (ASB) of the American Institute of Certified Public Accountants (AICPA). See  AICPA, <u>Codification of Statements on Auditing Standards</u> (AU) §§ 110-901 (2005)."  <u>Deephaven Private Placement Trading, Ltd. v. Grant Thornton & Co.</u>, 454 F.3d 1168, 1170 (10th Cir. 2006).

The AICPA distinguishes between what it calls "attest services" and other types of service. "For years, attest services generally were limited to expressing a positive opinion on historical financial statements on the basis of an audit in accordance with generally accepted auditing standards (GAAS)." AICPA Professional Standards: Statements on Standards for Attestation Engagements, as amended (AICPA, 2001). Attest services now include services other than traditional audits, *id.*, but the common characteristic of all attest engagements is that the practitioner is attesting to, or providing assurance on, subject matter that is the responsibility of another party. Jane M. Mancino and Charles E. Landes, A New Look at the Attestation Standards, Journal of Accountancy, vol. 192, no. 1 (AICPA July 2001).[19]  *See also*, In re Computer Learning Centers, Inc., 285 B.R. 191, 215 (Bkrtcy.E.D.Va. 2002). Attest services are the gold  standard; expert opinions in litigation are more like base metal: "An expert opinion is not an attest opinion as the term is used in reference to a set or specified elements of financial statements.  On rare occasions, though, an expert opinion may relate to an examination of a financial presentation or to a judgment on whether financial statements are presented in accordance with generally accepted accounting principles (GAAP)."   Peter B. Frank and Michael Wagner, Providing Litigation Services, Consulting Services Practice Aid 93-1, at ¶70/110.03 (AICPA 1993).

Frank and Wagner go on to comment that: "In general, litigation services engagements are considered to be a form of consulting services as defined by the AICPA.  Therefore, the Statements on Standards for Consulting Services (SSCS) must be followed in a litigation services engagement."  *Id.* at 70/130.18.  As a consulting service:

> [Litigation work] excludes three general categories of services subject to AICPA Technical Standards.   These standards are Statements on Auditing Standards (SASs), Statements on Standards for Attestation

---

[19]  Available online at http://www.aicpa.org/PUBS/jofa/jul2001/mancino.htm (last visited January 23, 2007).

Engagements (SSAEs), or Statements on Standards for Accounting and Review Services (SSARSs).  The excluded services may be performed in conjunction with consulting services, but only the consulting services are subject to the SSCS.

Peter B. Frank, Michael Wagner and Roman L. Weil, <u>Litigation Services Handbook: The Role of the Accountant as Expert Witness</u>, at 3 (John Wiley & Sons, Inc. 1993 supp.) (hereinafter: <u>Handbook</u>).

Because of the sharp differentiation between attest services and consulting engagements (of which litigation services are one variety), the AICPA cautions that:

When the practitioner determines that an attest service is to be provided as part of a consulting service engagement, the practitioner should inform the client of the relevant differences between the two types of services and obtain concurrence that the attest service is to be performed in accordance with the appropriate professional requirements. The practitioner should take such actions *because the professional requirements for an attest service differ from those for a consulting service engagement.*

AICPA Professional Standards: <u>Statements on Standards for Attestation Engagements</u>, as amended, § 101, ¶110  (AICPA, 2001) (emphasis added).

In the case at bar, plaintiffs do not claim that Mr. Mintzer performed an audit conforming to GAAS.  He was not required by <u>Daubert</u> (or Rules 702 and 703) to do that.  This court agrees with the court in <u>United States v. Forbes</u>, 2006 WL 2792883 (D. Conn. Sept. 28, 2006) that an accountant may testify with respect to GAAS or GAAP violations on the basis of work done in compliance with the AICPA's standards for consulting work.  In <u>Forbes</u>, the court rejected the defendant's assertion that the expert's proposed testimony was:

deficient because he did not follow generally accepted auditing standards (GAAS) in formulating his opinions. [The expert] did not need to perform an audit in accordance with GAAS or attest to the accuracy under generally accepted auditing [sic] principles (GAAP) of CUC's and Cendant's financial statements in order to give his expert opinion that those financial statements violated GAAP . . . .  He also did not need to use GAAS to identify the fraudulent accounting practices or to explain how they violated GAAP and inflated those earnings. [The expert's]

72

work on this case is governed by the consulting standards of the American Institute of Certified Public Accountants ("AICPA"), and his testimony complied with those standards. Contrary to Forbes's contention, this does not mean that [the expert] did not employ the same level of intellectual rigor that characterizes the practice of an expert in his field.

*Id.* at *1.

As has been noted, E&Y's primary complaint as to Mr. Mintzer's asserted failure to comply with GAAS in his work as an expert in this case is that Mr. Mintzer's use of, and reliance on, the FAS 121 Step 2 and Step 3 conclusions of Mr. Mathis violated Auditing Standard 336. Pointing out that Messrs. Mathis and Mintzer have never even spoken with each other (Mathis deposition at 89), E&Y argues, in effect, that the asserted AU 336 violation, without more, requires rejection of Mr. Mintzer's proposed expert testimony. Doc. No. 1436 (E&Y) at 11; Doc. No. 1525 (E&Y) at 7.[20] Although the relationship between Mr. Mathis's work and that of Mr. Mintzer deserves, and will get, more detailed treatment later in this memorandum, the court, relying on the legal and accounting authorities set forth above, rejects E&Y's *per se* argument as to the impermissibility of Mr. Mintzer's reliance on Mr. Mathis's work.[21]

---

[20] E&Y also cites the Tenth Circuit's decision in <u>TK-7 Corp. v. Barbouti</u>, 993 F.2d 722 (10th Cir. 1993), for the proposition that the validity of the work of one expert may not be uncritically assumed by another expert if that assumption forms a necessary part component of his expert testimony. E&Y's reliance on that case is misplaced. In <u>TK-7</u>, the expert whose work was incorporated by another expert did not testify at trial. He was apparently not listed as an expert and his financial projections (the validity of which was assumed by the expert whose trial testimony was rejected) were not subject to testing and challenge in the usual ways. In the case at bar, Mr. Mathis is a testifying expert. His work has, of course, been subjected to the entire range of attacks permitted by the rules.

[21] On the subject of independence and objectivity, a CPA working on a litigation engagement has some latitude: "As a consultant, the CPA may resolve doubt in favor of the client, as long as the position can be supported." <u>Handbook</u>, *supra,* at 7. That, as a practical matter, is a fair characterization of the approach of most expert witnesses. In contrast, in an attest engagement, the requirement of stiff-necked independence prevails over other considerations: "Independence in

3.      <u>Daubert analysis – proposed expert testimony of H. Sean Mathis</u>.

a.      <u>Qualifications</u>.

Mr. Mathis's qualifications must be assessed in light of the demands of his specific undertaking in this case.  See the discussion in Part V (B) and (C), above.

The FAS 121 Step 2 and Step 3 analysis undertaken by Mr. Mathis represents the entirety of his expert work in this case, and forms an indispensable component of a significant portion of the expert work of Mr. Mintzer.  Mathis Rpt. at 2 - 4; Mintzer Rpt., ¶¶ 150 - 52, p. 52 - 53.[22]

Without repeating all of the task descriptions summarized in the chart in Part V(D)(1), above, Mr. Mathis's FAS 121 Step 2 and Step 3 analysis plainly required, on the basis of an understanding of the then-relatively new (but rapidly expanding)[23] fiber optic data transmission business (augmented by an understanding of competing data transmission technologies): judgments as to classification and grouping[24] of fiber optic assets and related equipment assets (with related judgments as to the present and future physical and commercial interrelationship between lit and dark fiber assets), judgments (on a retrospective as well as prospective basis) as to the extent and effect of increases in industry-wide capacity, judgments as to future retention of core fiber and associated assets (with related judgments as to the impact of existing and

---

mental attitude presumes an undeviating concern for an unbiased conclusion about the subject matter or an assertion no matter what the subject matter or the assertion may be." <u>Statements on Standards for Attestation Engagements</u>, as amended, § 101, ¶ 37 (AICPA, 2001).  Thus, an auditor must "be without bias" and apply "a judicial impartiality."  AICPA Professional Standards: <u>Independence</u>, AU § 220.0 (AICPA 1972).  Some expert witnesses would clear that bar; most (regardless of credentials) would not.

[22]  The nature and extent of Mr. Mintzer's reliance on Mr. Mathis is discussed in greater detail in Part V(D)(4)(b), below.

[23]  *See, e.g.,* WCG Form 10-K Annual Report for year ended December 31, 2000, at 2 - 4, 13.

[24]  Asset grouping is described in FAS 121 as requiring "significant management judgment within certain parameters." FAS 121, ¶98, p. 31.

foreseeable technology improvements[25] on capacity), judgments as to present and future domestic and international demand for internet, data, voice and video data transmission services and for rights of use of dark fiber, judgments as to the effect of market and technology factors on prices for data transmission services (and rights of use), as well as the costs of providing those services, judgments as to the remaining physical and technological useful life of the dark fiber assets, and judgments as to appropriate discount rates, as affected by both micro- and macroeconomic factors.[26]

The qualifications that Mr. Mathis brought to this undertaking are summarized as follows:  Mr. Mathis is a Managing Director in Miller Mathis & Co., an investment banking firm.  He was graduated from Allegheny College with a Bachelor of Arts degree and from the Wharton Graduate School of Business with a Master of Business Administration degree.  To put it mildly, he has substantial experience in the business world.  His career history is summarized in Appendix B to his report.

Mr. Mathis asserts, and there is no reason to doubt, that he has substantial experience in discounted cash flow analysis.  This is significant because, depending on the circumstances, a discounted cash flow analysis is a permissible valuation technique under FAS 121, Step 3.  FAS 121, ¶ 7.  In this respect, it is noteworthy that plaintiffs define Mr. Mathis's task in this case narrowly and then assert that he was qualified to perform that narrowly-defined task.  Although plaintiffs acknowledge that they "retained Mathis to evaluate Step 2 and Step 3 of the impairment analysis," Doc. No. 1498 (Plaintiffs) at 4, they favor a more limited description of what he actually did: they say that he was called upon to "opine on financial valuations based on cash

---

[25]  *E.g.*, fiber improvements such as Enhanced LEAF and TruWave products, transmission developments such as dense wave division multiplexing, and connectivity developments such as optically meshed SONET.

[26]  This partial listing is based on the text of FAS 121 and the record evidence as to the nature of WCG's business and of WCG's  operating assets.  This listing is substantially confirmed by the deposition testimony of Mr. Mathis.  Mathis deposition at 326 - 32.

flow analyses, an area well-within his expertise." *Id.* at 2. He has performed numerous "valuations based on discounted cash flow analyses," for which reason "he is entirely qualified to perform a discounted cash flow analysis in this case." *Id.* at 3.

Bearing in mind that Mr. Mathis, and Mr. Mathis alone, is on the hook for FAS 121 Steps 2 and 3 in this case, it is clear that his engagement to perform the Step 2 and 3 analyses necessarily entailed judgments (whether they are characterized as accounting judgments, business judgments, or financial judgments, or some combination of the three) substantially more complex and industry-specific than is suggested by the description of his task as, essentially, a discounted cash flow analysis. The FAS 121 Step 2 and Step 3 analyses in this case required numerous quantitative (see the chart in Part V(D)(1), above) inputs which, by their nature, could only be the product of qualitative judgments resulting from the application of industry-specific knowledge, augmented by professional experience in selecting and evaluating the relevant data and then pushing the masses of data through the FAS 121 analytical process.

Viewing the matter in this light, it is evident that Mr. Mathis's qualifications for his specific tasks in this case must be viewed both in light of his considerable business experience and in light of the credentials and experience that he does not possess.

Mr. Mathis is neither a certified public accountant nor "an accountant" nor an "auditor." Mathis Dep. 38, 45. That, in itself, is dispositive of nothing, but it is relevant. He has never performed a FAS 121 analysis. *Id.* at 46. This case is "the only time" he has ever been asked to render an opinion as to impairment of assets under FAS 121. *Id.* at 53. By his own description, he is "not a telecom expert." *Id.* at 60. He did not avail himself of the assistance of his firm's telecom expert. *Id.* Though he sat, "from the late '90s to the early 2000s" on the board of a wireless paging company (Arch Communications), he recalls no specific experience "working for or on behalf of a company that has a fiber network." *Id.* at 58 - 60.

The disjunctive language of Rule 702 makes it clear that experience can substitute for formal credentials. *E.g.*, Lifewise Master Funding v. Telebank, 374 F.3d 917, 928 (10th Cir. 2004). But regardless of the mix of formal credentials and experience that is proffered as establishing the requisite "qualifications" under the rule, those qualifications must be *specific* as well as *general*. See the discussion in Part V(B), above. In this case, as a practical matter, the requirement of *specific* qualifications means that, for the FAS 121 Step 2 and Step 3 work for which Mr. Mathis undertook sole responsibility in plaintiffs' lineup of experts, Mr. Mathis necessarily had to have *industry*-specific qualifications: "The real question is, what is he an expert about?" Wheeling Pittsburgh Steel Corp. 254 F.3d at 715.

The court concludes with no difficulty that, had Mr. Mathis been a member of a team of specialists collaborating on an FAS 121 analysis of WCG's dark fiber and related assets, he would have had much to offer with respect to those aspects of FAS 121 Step 3 that would have included a discounted cash flow analysis (if that valuation method were selected). It is equally clear, however, that the numerous financial, accounting and business judgments (correctly referred to by E&Y and the WCG defendants as "industry-dependent judgments," Doc. No. 1523 [E&Y and WCG] at 8) that are antecedent to a Step 3 discounted cash flow analysis are no more "within the reasonable confines of [Mr. Mathis's] subject area" than were the board-certified orthopedic surgeon's criticisms of the warnings accompanying the orthopedic nail in Ralston. Ralston, 275 F.3d at 970 (quoting Compton v. Subaru of America, Inc., 82 F.3d 1513, 1520 (10th Cir. 1996)). It should be noted, moreover, that the opinions expounded by Mr. Mathis as to FAS 121 Steps 2 and 3 are not undergirded by the work of Mr. Mintzer: "For purposes of evaluating Step 2 and Step 3 of the FAS 121 impairment calculation, I am relying on another expert retained by Plaintiffs with specialized knowledge and skills in the field of business valuation, Mr. Sean Mathis of the firm Miller Mathis. I am relying on Mr. Mathis in a similar fashion that an

auditor relies on a specialist in the conduct of an audit." Mintzer Rpt., ¶150, p. 52.[27] Although this is more relevant to an analysis of Mr. Mintzer's work than to that of Mr. Mathis, it is also worthy of note that Mr. Mathis's qualifications cannot be bolstered by any claim that he was selected by Mr. Mintzer.  Mr. Mintzer did not select Mr. Mathis, and had never worked with or even heard of him before they both were hired by plaintiffs' counsel in this case.  Mintzer deposition at 283. Mr. Mintzer undertook no investigation of Mr. Mathis other than to look for publicly available "negative citations."  *Id.* at 284.

The short of the matter is that Mr. Mathis, though clearly possessing the *general* qualifications required to perform a discounted cash flow analysis, does not possess the industry-specific expertise necessary to make the numerous judgments which had to be made in order to generate the inputs for a discounted cash flow analysis as applied to the dark fiber and related assets of WCG as of December 31, 2000.  His expert opinions as to the outcome of a FAS 121 Step 2 and Step 3 analysis as applied to those assets in this case, are, accordingly, inadmissible under Rule 702 and Daubert.

b.    Reliability.

The defendants attack the reliability of Mr. Mathis's proposed expert testimony on several bases.  Defendants assert that, in performing his FAS 121 analysis, Mr. Mathis improperly disregarded WCG's business plans.  They also assert that Mr. Mathis's approach to asset grouping was fatally flawed in several respects.  Because the court has determined that Mr. Mathis lacks the qualifications necessary to give the

---

[27] In paragraph 151 of his report, at p. 52, Mr. Mintzer refers to Mr. Mathis's grouping judgment and then proceeds, in paragraph 152, to say: "*Thus* it is my opinion that the decision by Plaintiff's valuation expert, Mr. Mathis, to separately evaluate excess dark fibers based on grouping fibers according to WCG's business plan is in conformity with FAS 121."  *Id.* (emphasis added). This declaration by Mr. Mintzer on the critical issue of asset grouping is not supported by any proffer of any analysis on his part.  For that reason, whether this declaration is dismissed as constituting a notable example of "ipse dixit," Joiner, 522 U.S. at 146, or as an expression by a retained expert without benefit of any semblance of compliance with Rule 26 (a)(2)(B), it is clear that it must be disregarded.

expert testimony he proposes to give, it would be sufficient to leave it at that, and forego analysis of any of the challenges to the reliability of that testimony.  The court has determined, however, that it is appropriate to address two aspects of the challenge to the reliability of Mr. Mathis's conclusions.

Methodology: Disregard for management's budgets and projections.  In considering a Daubert motion, it is usually important for the court to determine whether the methodology employed by an expert "is generally accepted in the relevant [professional] community," Kumho, 526 U.S. at 151, because a retained expert's adherence to an established and recognized methodology (if there is one) is important under Daubert and its progeny.  *See, e.g.*, 103 Investors I, L.P. v. Square D Co., 470 F.3d 985 (10th Cir. 2006).

Paragraph 142 of FAS 121 states that "information necessary to perform the recoverability test is generally available from budgets and projections used by management in the decision-making process."  As will be seen, Mr. Mathis acknowledged that, in performing his FAS 121 analysis, he disregarded WCG's business plan.  As a matter of methodology under paragraph 142, management's business plans clearly ought not to be rejected out of hand: those business plans may ultimately, for some reason, be disregarded, but the auditor who takes it upon himself to reject them plainly should have a reasoned basis for doing so.  Likewise, in this litigation context, the expert is one step removed from making professional auditing judgments in the first instance – his task is to provide expert testimony in aid of a determination of whether the others who came before him made judgments which were fraudulent or otherwise actionable.

As to whether he took management's business plans into account in reaching his judgments under FAS 121, Mr. Mathis testified as follows:

> Q.    Did you try to conduct your analysis to be consistent with WCG's business plan as of 12-31-2000?

A.     FAS 121 does not mention business plan[28] anywhere.  We wanted our analysis to be consistent with 121, and business plan is not mentioned, so business plan to us was irrelevant.

Q.     The company's business plan at 12-31-2000 was irrelevant to your analysis?
A.     In terms of doing the FAS 121 analysis, yes.
Q.     So you have no opinion whatsoever as to whether your analysis was consistent with the company's business plan as of 12-31-2000; is that right?
MR. VINIK:  I object to the form.
A.     Our analysis is independent of any business plan.

Mathis deposition at 102 - 03.

Mr. Mathis reinforced this point when he testified that "we did not conduct our analysis with regard to their business plan, as consistent with FAS 121." *Id.* at 104. Otherwise stated: "We did not, consistent with FAS 121, consider the company's business plan." *Id.* at 105.   Later in his deposition, when pressed on a related point, Mr. Mathis reminded counsel, somewhat petulantly, that: "I told you, I don't use company information." *Id.* at 264.

In response to defendants' arguments on this point, plaintiffs argue, first (and correctly) that: "Nothing in Paragraph 142 requires that budgets and projections used by management should be taken at face value, or that they should be the sole source of information relied on in an impairment analysis." Doc. No. 1498 at 9.  Plaintiffs also point out that Mr. Mathis testified as follows: "So would we look at management's projections?  The answer is we looked at some of management's projections." Mathis deposition at 113.  The problem is that plaintiffs point to nothing in Mr. Mathis's report or testimony reflecting consideration, analysis and reasoned

---

[28] Lest there be any doubt, Mr. Mathis agreed that "budgets and projections" would be part of a business plan: "Q: Would you call their budgets and projections part of their business plan?  A: I would think they would be." *Id.* at 104.

rejection of management's budgets and projections relevant to an FAS 121 impairment analysis. A fair reading of his testimony reliably indicates that Mr. Mathis made an *a priori* decision not to take management's business plan into account.

Under Rule 702, it behooves the retained expert to use "reliable principles and methods." Alteration of an established methodology is a "step that renders the analysis unreliable [and] renders the expert's testimony inadmissible." Goebel II, 346 F.3d at 992. *See also,* Mitchell v. Gencorp Inc., 165 F.3d at 782. In the case at bar, the parties and the court have, in FAS 121, guidance as to methodology of a quality and definitiveness that could only be aspired to in most of the areas in which expert witnesses ply their trade. Where, as here, the document that is the lodestar of the expert's endeavor spells out the method to be employed, the expert must either use that methodology or demonstrate that he has a reasoned basis for choosing to ignore it.[29] Mr. Mathis has done neither. In this very noticeable respect, his work was not "rooted in the principles and methodology of accountancy." Securities and Exchange Comm'n v. Lipson, 46 F. Supp. 2d 758, 764 (N.D. Ill. 1998).

Accounting for alternative explanations re: asset grouping: treatment of the network as a single asset. One of the factors to be considered by the court is "[w]hether the expert has adequately accounted for obvious alternative explanations." Rule 702, Fed. R. Evid., Adv. Committee note to 2000 Amendments.

---

[29] *See, generally,* Sofia Adroru and Alan Ratliff, Kicking the Tires after Kumho: the Bottom Line on Admitting Financial Expert Testimony, 37 Hous. L.Rev. 431, 492 (2000). "[T]he focus of the court's acceptance inquiry under *Daubert* is (1) whether the subject issue is specifically addressed by GAAP or other formal accounting guidance and, if not, whether there is their formal, informal, or court approved guidance that is analogous; (2) what particular authority or guidance controls; (3) whether the expert consulted or relied upon the controlling guidance; and (4) whether the expert applied the guidance. A "no" answer to (1) will likely cause exclusion of the testimony. There may be uncertainties in connection with (2) that the court will have to weigh under the circumstances. Concerning (3) and (4), to pass the acceptance test, the presumptive answers should be "yes," although the court should consider whether the facts and circumstances of a given case might justify deviation from those standards."

Asset grouping is central to the validity of Mr. Mathis's FAS 121 impairment analysis. The dispute as to network asset grouping for purposes of FAS 121 impairment analysis is, essentially, a dispute as to whether a year-end 2000 impairment analysis, if one had been performed, should have treated the entire fiber optic network as the relevant asset, or whether the dark fiber assets should have been separated out for impairment analysis, as was done by Mr. Mathis. Treatment of the fiber network as a unified asset for year-end 2000 impairment analysis is an "obvious alternative explanation" vis-a-vis the approach taken by Mr. Mathis. Mr. Mathis was invited – and declined – to express an opinion criticizing WCG's failure to perform an impairment analysis on the network as a whole as of year-end 2000. He disclaimed an opinion as to whether it would have been inappropriate to perform an analysis on the basis of that asset grouping. Mathis deposition at 43 - 45. He expressed his opinion that he thought the group of assets he selected "was the correct group of assets." *Id.* at 44. Thus, although it may well be that the reason Mr. Mathis performed an impairment analysis of only the dark fiber assets is that he "was asked [by plaintiffs counsel] to do an impairment analysis of the dark fiber assets," *id.* at 20, he did assert that his conclusion as to grouping of assets was an expression of *his* analytical conclusion. *Id.* at 44. For that reason, it is especially noteworthy that Mr. Mathis expressly disclaims an opinion that it would have been *inappropriate* under FAS 121 to have performed an analysis of WCG's network as a whole as of year end 2000. *Id.* at 43 - 45.[30] Moreover, this is not an issue that was handed off by Mr.

---

[30] Although, as noted, Mr. Mathis did assert that he formed an opinion that it would be appropriate for him to perform an impairment analysis on the dark fiber assets (Mathis deposition at 44), a fair reading of his report leaves one with the distinct impression that, from the very outset, his task, as he perceived it, was to perform an impairment analysis *only* on the dark fiber assets. *See, e.g.*, Mathis Rpt. at 3 (task was to conduct "an impairment analysis of WCG's excess dark fiber and spare conduit assets"), 10 (analysis was "of WCG's excess dark fiber and spare conduits"), 11 (Step 1 was to determine the "book value of WCG's excess dark fiber"). However, that matter need not be resolved in this memorandum, because it is plainly apparent that, in any event, Mr. Mathis disclaims an opinion as to whether it would have been inappropriate for a year-end 2000 impairment analysis to have treated the fiber network as a unified asset.

Mathis to Mr. Mintzer – Mr. Mintzer's proposed expert testimony does not close this gap. It is clear from Mr. Mintzer's report (¶¶ 147, et seq.) that, in expressing *his* opinion that WCG improperly failed to record an impairment charge at year end 2000, he relies entirely on Mr. Mathis as to FAS 121 Step 2 and Step 3. Otherwise stated, Mr. Mintzer's proposed expert testimony provides no independent analysis or expression of opinion on the issue of grouping of assets under FAS 121 for purposes of the year-end 2000 financial statements. Thus, on the issue of whether it would have been inappropriate for WCG to have treated the fiber network as a single asset for FAS 121 purposes as of year end 2000, Mr. Mintzer clearly does not pick up where Mr. Mathis left off – and, as has been noted, Mr. Mathis stops short of opining that it would have been inappropriate under FAS 121 to have performed an analysis of WCG's network as a whole as of year end 2000.

It bears repeating that Messrs. Mathis and Mintzer, as retained experts, are not doing "first instance" auditing in this case. Especially where professional judgment is involved (and, as has been seen, the performance of an FAS 121 impairment analysis is a process that is shot through with judgment calls[31]), an expert's opinion as to how *he* would have performed a task is of limited relevance at best unless he has given a reasoned explanation of why the most obvious alternative (in this case, treatment of the fiber network as a unified asset) is inappropriate and should consequently be rejected. Mr. Mathis's selected approach to asset grouping does not, in and of itself, undermine an antipodal approach. In this context, the expert who goes no further than to select and defend his preferred approach leaves the job, at best, half done.

Plaintiffs have not carried their burden of establishing that the proposed expert testimony of Mr. Mathis is the product of reliable principles and methods, reliably applied to the facts of this case. It will be excluded.

---

[31] *See*, In re BellSouth Corp. Securities Litigation, 355 F.Supp.2d 1350, 1376 (N.D. Ga. 2005); Serologicals, 2003 WL 24033694 at *14; Cutsforth, 235 F.Supp.2d at 1260.

4.   Daubert analysis – proposed expert testimony of Andrew M. Mintzer.

Various portions, but not all portions, of Mr. Mintzer's proposed expert testimony have been challenged by the defendants.  Mr. Mintzer's opinion testimony is summarized in paragraph 67 of his report.  The following table, adapted from Mr. Mintzer's paragraph 67, shows the matters as to which Mr. Mintzer opines and identifies the defendants attacking those opinions.

| Mintzer¶ | Opinions stated in Mr. Mintzer's report, per descriptions in ¶ 67of Mintzer report | Motion by: |
|---|---|---|
| | **_WCG's 2000 Fiscal Year Financial Statements_** | |
| 68 | WCG's December 31, 2000 financial statements were materially false and misleading as they were not presented in conformity with GAAP. | (See below) |
| 69-85 | E&Y failed to perform the 2000 audit of WCG while being independent. | no motion |
| 86-171 | Impairment of Network Assets – WCG's network was impaired, yet it failed to record an impairment charge, thereby overstating its assets by approximately $800 million and it failed to disclose that the dark fiber assets subject to its ADP were impaired by approximately $100 million. | E&Y |
| 172-223 | Debt Covenant Violations – WCG was, in reality, in violation of its debt covenants, thereby exposing its debt to being called by the lenders. | WCG |
| 224-268 | Going Concern Uncertainties – There was significant uncertainty about WCG's ability to continue as a going concern, yet E&Y failed to disclose the "going concern" doubts in its audit report. | no motion |
| 269-280 | Equipment Impairment – WCG's equipment inventory was impaired, yet it failed to record an impairment charge, thereby overstating its assets. | E&Y |
| 281-294 | E&Y ignored clearly evident Fraud Risk Factors and did not exercise Professional Skepticism. | no motion |
| 295-301 | WCG published quarterly financial statements at March 31, 2001, June 30, 2001 and September 30, 2001 which were materially misstated and not in conformity with GAAP. | WCG |
| | **_[WMB]'s Financial statements_** (Referred to by Mintzer as TWC) | |
| 302 | [WMB] failed to record its share of WCG's impairment charges, as of December 31, 2000 and March 31, 2001, while WCG was its subsidiary. | WMB |
| 303-305 | [WMB] failed to record in its June 30 and September 30, 2001 financial statements a contingent liability for its guarantees of certain the WCG transactions. | WMB |

a.   Qualifications.

Mr. Mintzer's expertise is attacked by the WCG defendants and by E&Y.  *See,*
Doc. No. 1437 at 4 - 6 and Doc. No. 1436 at 8 - 9.  The WCG defendants attack Mr.
Mintzer's expertise only as to his opinion that WCG was in violation of the
EBITDA-related provisions of its debt covenants.   E&Y attacks Mr. Mintzer's
qualifications only as to his opinion on network impairment.   Because the court's
exclusion of Mr. Mathis's opinion testimony on that subject is fatal to the
admissibility of Mr. Mintzer's opinion testimony on the same subject, the court need
not address E&Y's attack on Mr. Mintzer's qualifications.

As to Mr. Mintzer's qualification to give expert testimony with respect to debt
covenant violations, the WCG defendants argue that:

> EBITDA is a non-GAAP term which is defined on a case-by-case basis
> by contracting parties.   Here, the Credit Agreement provides the
> controlling definition of EBITDA.  Thus, Mintzer's fundamental opinion
> – that certain revenues were improperly included in the calculation of
> EBITDA – depends not on his analysis of the requirements of GAAP,
> but on a legal interpretation of the Credit Agreement, i.e. the intent of the
> contract between WCG and its Bank Group.  Mintzer, a CPA, can offer
> no expertise, special or otherwise, regarding the intent of the parties to
> a contract.  Nor can he seek to opine on the interpretation of a unique,
> contractual non-GAAP term, substituting his intent for that of the parties
> themselves.

Doc. No. 1437 at 5.

The WCG defendants conclude by asserting that:

> Mintzer's opinion relating to debt covenants is not founded upon any
> expertise in accounting, generally, or GAAP, specifically, but rather his
> personal lay interpretation of the parties' intent regarding a contractually
> negotiated EBITDA definition. It is not, therefore, proper expert
> testimony and should be excluded.

*Id.* at 6.

The court disagrees.  Although EBITDA was a term which was contractually
defined between WCG and its lenders, the beginning point for calculation of EBITDA

was GAAP net income.  *See,* Exh.  5916 and EY-WCG-00-001534 - 1537.  The adjustments to GAAP net income, to calculate EBITDA, consist of items which can be expected to be well-understood by a Certified Public Accountant with Mr. Mintzer's experience.  Judgment is involved (especially with respect to the adjustment for "non-cash extraordinary or non-recurring charges"), but the requisite judgment is accounting judgment, not legal judgment.   The fact that the EBITDA calculation required the auditor to read, understand and apply contractual terms did not take the EBITDA calculation outside of the realm in which CPA's with Mr. Mintzer's experience commonly work.  Auditors read and apply contractual documents all the time.  In a complex business organization like WCG, the calculation of EBITDA could certainly be a complex task, but it was, at base, an accounting task, as is amply demonstrated by the relevant portion of Mr. Mintzer's report (¶¶ 172 - 223).  The court concludes that Mr. Mintzer was well-qualified to render his opinion as to debt covenant violations.

> b.    Reliability.

Paragraphs 86 - 171 and 269 - 280: Impairment.  Mr. Mintzer's opinions as to impairment under FAS 121 are wholly dependent on the excluded expert testimony of Mr. Mathis as to  FAS 121 Steps 2 and 3.  "Under Daubert, any step that renders the analysis unreliable renders the expert's testimony inadmissible." Goebel II, 346 F.3d at 992. *See also,* J.B. Hunt Transport, Inc. v. General Motors Corp., 243 F.3d 441, 444  (8th Cir. 2001) (excluding expert testimony that is "inextricably linked" to the excluded testimony of another expert).[32]  Moreover, as to equipment impairment (to be distinguished from network impairment), Mr. Mintzer has not, either himself or in tandem with Mr. Mathis, undertaken any semblance of an FAS 121 impairment

---

[32] As plaintiffs' counsel acknowledged at argument: "It is absolutely correct, as defendants point out, if Mr. Mathis can't get through the gate, Mr. Mintzer's reliance on him is inappropriate." Hrg. transcript, Oct. 31, 2006 at 131.

analysis. Mintzer Rpt., ¶ 277; Mintzer deposition at 302 - 03.  That alone suffices to preclude testimony from Mr. Mintzer as to equipment impairment, because the expert must tie the relevant principles "reliably to the facts of the case."  Rule 702, Fed. R. Evid.; Goebel II, 346 F.3d at 991.

Paragraphs 172 - 223: Debt covenant violations.  Aside from the WCG defendants' unsuccessful challenge to Mr. Mintzer's qualifications to opine as to debt covenant violations, there is no Daubert challenge to Mr. Mintzer's proposed opinion testimony with respect to violations of debt covenants.  That testimony will accordingly not be excluded under Daubert and Rule 702.

Paragraphs 295 - 301: March, June and September, 2001 financial statements.  Mr. Mintzer opines that, aside from the FAS 121 triggering events that were evident at year end 2000, additional triggering events were evident in 2001.  Mintzer Rpt., ¶ 296.  He proceeds to describe those events, then concludes that: "The financial statements of WCG included in its Forms 10Q at March 31, 2001, June 30, 2001 and September 30, 2001 were not prepared in accordance with GAAP as a result of the GAAP violations discussed above; specifically WCG's failure to disclose the network impairment charge."  Id. at ¶ 301.

The WCG defendants point out that Mr. Mintzer has not performed an FAS 121 Step 1 trigger analysis for any date after year end 2000.  (It is also clear from Mr. Mathis's report that his FAS 121 analysis stops at year end 2000.  Mathis Rpt. at 2 - 4.)  Consequently, the WCG defendants argue, in essence, that Mr. Mintzer's comments about triggering events in 2001 are apropos of nothing and should be excluded because they are irrelevant and confusing.  Doc. No. 1437 at 7.  In response, plaintiffs assert (claiming that Mr. Mintzer "clarified" the matter in his deposition testimony) that all Mr. Mintzer really meant to do in paragraphs 295 - 301 was to provide additional evidence "to support and amplify his opinion that an impairment was necessary at YE 2000."  Doc. No. 1499 at 11.

Aside from the fact that this temporizing explanation squarely contradicts the opinion proffered in paragraph 301 of Mr. Mintzer's report (*viz.* that WCG's March, June and September, 2001 financial statements were not prepared in accordance with GAAP "as a result of the GAAP violations discussed above"), the opinions set forth in paragraphs 295 - 301, as explained and clarified, must be excluded.

First, taking plaintiffs at their word that the expert testimony embodied in paragraphs 295 - 301 is merely intended to generally support, or amplify, Mr. Mintzer's proposed testimony that an impairment charge should have been taken at year end 2000, the court has determined that Mr. Mintzer's opinion about impairment at year end 2000 must be excluded. Paragraphs 295 - 301 are, on that basis, irrelevant.

Second, testimony about additional triggering events in 2001, as set forth in paragraphs 295 - 301, is inadmissible because there is no showing, or even a claim, that plaintiffs' experts have performed an FAS 121 analysis for any date after year end 2000. Gratuitous testimony about asserted FAS 121 triggering events in 2001 would be confusing and prejudicial, especially when considered in light of the fact that criticism of the defendants' failure to report network impairment as of year end 2000 (even if otherwise admissible) cannot be supported on the basis of facts which were unavailable to the defendants at the time the relevant auditing judgments were made.

Paragraph 302: WMB's year end 2000 and March, 2001 financial statements. Paragraph 302 of Mr. Mintzer's report states as follows:

> During fiscal year 2000 and the first quarter of fiscal year ended December 31, 2001, WCG was a subsidiary of [WMB]. The financial results of WCG were included in the consolidated financial statements of [WMB]. Under GAAP [WMB] consolidated WCG's financial position and results of operations in its financial statements. As a result of the unrecorded impairment charges described previously, [WMB's] financial statements for the periods ended December 31, 2000 and March 31, 2001 are materially misstated.

The "unrecorded impairment charges" referred to in this paragraph are the year end 2000 impairment charges as to which plaintiffs' proposed expert testimony has been excluded.  Consequently, if for no reason other than that, the opinion testimony embodied in paragraph 302 must be excluded.  Aside from that, Mr. Mintzer provides no materiality analysis to support his opinion that WMB's statements were materially misstated.[33]  This violates the expert report requirements of Rule 26 (a)(2)(B), Fed.R.Civ.P., which requires that the report of a retained expert disclose "the basis and reasons" for all of his opinions, as well as "the data or other information considered" by the expert and precludes a showing by plaintiffs, consonant with their burden under Rule 104(a), Fed.R.Evid. (*see,* Ralston , 275 F.3d at 970, n. 4), that this proposed opinion testimony passes muster under Rule 702 and Daubert and its progeny.

Paragraphs 303 - 305: WMB's failure to record a contingent liability.  In the final numbered paragraphs of his report, paragraphs 303 - 305, Mr. Mintzer opines that WMB should have recorded a charge on its June and September, 2001 financial statements[34] for its contingent liability as a guarantor of more than $1 billion in WCG debt.

Paragraphs 303 - 305, which are presented by Mr. Mintzer under their own heading, represent a discrete piece of analysis and opinion by Mr. Mintzer.  His contention as to WMB's obligation to take a charge related to its contingent liability on WCG's debt is a conclusion which is, both as an accounting matter and as a legal matter, distinct from his opinions about WCG's financial statements and about WMB's failure to take impairment charges relating to WCG's assets.

---

[33]  The absence of a materiality analysis from Mr. Mintzer's report is not a mere oversight.  His conclusion as to materiality is not documented anywhere.  Mintzer deposition at 375 - 76.

[34]  It is not necessary, in this memorandum, to address the relevance of WMB's post-spin off financial statements to the claims of the holders of WCG securities.

In its Daubert motion, WMB provides arguments, at least facially well supported, as to why this opinion should be excluded.  Doc. No. 1446 at 9 - 13.  In their 13-page response to the WMB's Daubert motion with respect to Mr. Mintzer, plaintiffs did not respond at all to WMB's challenge to paragraphs 303 - 305 of Mr. Mintzer's report.  The burden of establishing the admissibility of Mr. Mintzer's proposed expert testimony rests with the plaintiffs.  <u>Ralston</u>, 275 F.3d at 970, n. 4; <u>Mitchell</u>, 165 F.3d at 781.  This portion of Mr. Mintzer's proposed expert testimony will be excluded because plaintiffs have made no attempt to demonstrate its admissibility.

E.     <u>Daubert analysis – proposed expert testimony of Dr. Blaine Nye</u>.

Blaine F. Nye, Ph.D., was retained on behalf of plaintiffs to "provide expert opinions in this class action on the issues of market efficiency, loss causation, materiality, and the damages incurred by purchasers of" WCG common stock and unsecured notes. Nye Rpt., ¶ 3.  Ignoring the voluminous exhibits to his report for the moment, the substantive portion of Dr. Nye's 107-page Rule 26(a)(2)(B) report includes sections addressing causation, analysis of common stock damages, analysis of WCG notes damages and  market efficiency.  His report is dated February 3, 2006, nine months after the Supreme Court's decision in <u>Dura</u>.

A significant portion (¶ ¶ 24 - 104) of Dr. Nye's report consists of a meticulous summary, mostly unflattering to  WMB and WCG managers, contrasting WMB's and WCG's increasingly pessimistic internal discussions with their consistently rosy public pronouncements between mid-2000 and late 2001 (and even into early 2002). This portion of Dr. Nye's report is relevant and essentially accurate.  It contains little information not documented elsewhere in the record.

A major premise underlying Dr. Nye's opinions in this case is the assumption that senior management of WMB and WCG, as well as E&Y,  misrepresented WCG's financial condition and prospects, specifically including assumptions (i) that WCG

should have taken a charge in excess of $750 million, not later than year-end 2000, for impairment of long-lived assets and inventory (*i.e.*, the asset impairment addressed by the excluded testimony of Messrs. Mathis and Mintzer), (ii) that the asset impairment should have been publicly disclosed "no later than in early 2001," and (iii) that if the impairment had been recognized and disclosed on a timely basis, investors would likely have understood that WCG would not be able to generate revenue sufficient to pay its debts.   Nye Rpt., ¶ 6(d) - (e).  Dr. Nye thus assumed the correctness of the work of Messrs. Mathis and Mintzer – including assumptions that "they [WCG] weren't making any money, they couldn't fund their business plan, they couldn't raise any more money; therefore, they had no basis for projecting any value to their equity."  Nye deposition at 169 - 70.  Dr. Nye also assumed "that as of that day, [July 23, 2000, the day before the class period began] that WCG either knew or should have known that it had zero expected value for its equity, zero projected value for its equity."  Nye deposition at 272.  *See also, id.* at p. 168 (on July 24, 2000, "the value of the equity was zero.  Zero.  And [the stock] was priced at 28.50."),  and p. 186 (on July 24, 2000, "the company knew the value of the equity was zero").  Thus, in Scenario 1 (his preferred damage scenario), Dr. Nye concluded that on day one of the class period, July 24, 2000, when the stock closed at $28.50 per share, that price consisted of $27.94 (98%) by way of fraud-related price inflation and 56 cents of actual value.  Nye Rpt., Exh. 3A.[35]

The defendants' Daubert challenges to Dr. Nye's proposed expert testimony encompass matters other than the issue of loss causation.  The WCG defendants challenge Dr. Nye's opinions with respect to materiality.  The WMB defendants challenge Dr. Nye's opinions with respect to his aggregate damages trading model and with respect to market efficiency.  However, all defendants challenge Dr. Nye's

---

[35] Dr. Nye also testified that "I have no information about" whether the stock was inflated on July 23, 2000 or on any prior day.  Nye deposition at 189.

methodologies with respect to loss causation and the closely related issues as to identification of compensable losses.  For present purposes, it is not necessary to address the defendants' challenges other than those relating to loss causation and identification of compensable losses.  These latter issues are thoroughly developed in the briefs, they lend themselves to analysis under a well-developed body of law, and they affect all of plaintiffs' claims.[36]

    1.  Dr. Nye's three damage scenarios.

     a. Scenario 1.

      (i) General description of Scenario 1.

As described by Dr. Nye, he calculated plaintiffs' damages under three scenarios, consisting of Scenario 1, Scenario 2, and an alternative version of Scenario 2.  He described his first scenario as follows:

> Scenario 1:  Inflation in the prices of WCG stock and WCG Notes is measured as the difference between the price paid and the true value of each security as measured by the settle-out price for the relevant security after announcement of WCG's bankruptcy filing on April 23,[37] 2002, adjusted for intervening market and industry movements.  I have been asked to commence damage calculations at several potential starting dates, *i.e.*, July 24, 2000, November 16, 2000, February 5, 2001, March 13, 2001, and April 24, 2001.  Damages are calculated as price inflation at purchase less price inflation at sale.

---

[36] Because Dr. Nye's proposed expert testimony presupposes the validity of the conclusions reached in the excluded testimony of Messrs. Mathis and Mintzer, the court's analysis of the challenges to the admissibility of Dr. Nye's testimony perhaps needs to go no further than to state the obvious conclusion that Dr. Nye's testimony is inadmissible simply because the testimony of Messrs. Mathis and Mintzer does not survive Daubert scrutiny.  However, the issues as to Dr. Nye's testimony which are addressed in this portion of this memorandum go to the heart of plaintiffs' case and are throughly developed in the briefs.  For that reason, and in the interest of minimizing the possibility of shuttling between this court and the Court of Appeals, the court will address Dr. Nye's proposed expert testimony independently of its disposition of the challenges to the testimony of Messrs. Mathis and Mintzer.

[37] The date of the bankruptcy filing was April 22, 2002.  *See,* In re Williams Communications Group, et al., BK-02-11957, Bankr. S.D.N.Y.

Nye Rpt., ¶ 7.

The class period in this case begins on July 24, 2000, the day WMB issued a press release announcing the spin off of WCG and extolling the benefits of the spin off strategy. The class period ends on April 22, 2002, the day of the bankruptcy filing. Under all three scenarios, damages are available to class members who purchased WCG common stock or notes at any time during the class period.[38]  Scenario 1, which benefits all class members without regard to whether or when they sold their WCG securities,[39] posits that there was "leakage" of the "relevant truth" during the class period and that "the leakage of WCG's true financial condition and prospects during the Class Period revealed the risks that had been concealed by the prior misrepresentations . . . ."  Nye Rpt.,  ¶¶ 109, 110.  Plaintiffs assert that corrective information "slowly leaked into the market during the Class Period, through various sources of information" (Doc. No. 1376 at 7; Doc. No. 1378 at 1), gradually removing the fraud premium from the price of a share of the stock.

As has been noted, Dr. Nye concludes in Scenario 1 that fraud accounted for ninety-eight percent of the value of a common share of WCG on July 24, 2000 ($27.94 of the $28.50 closing price).  Otherwise stated, during the 21-month class period in which the per-share price of WCG stock declined from $28.50 to six cents, the "true" value of the stock, exclusive of the fraud premium, was "*56 cents* going down to 6 cents."  Nye deposition at 278 (emphasis added).  Dr. Nye's starting point to arrive at that conclusion was the per-share closing price (just under six cents) on the trading day following WCG's bankruptcy filing – April 23, 2002.  To determine the

---

[38]  Apparently for analytical and illustrative purposes, Dr. Nye used a total of five starting dates: July 24, 2000, November 16, 2000, February 5, 2001, March 13, 2001 and April 24, 2001. Nye Rpt., ¶ 7.

[39]  As is discussed below, one of the main differences between Scenario 1 and Scenario 2 is that, under Scenario 2, no recovery is available to any class member who sold before January 29, 2002.

"true value" of WCG's common stock, Dr. Nye took WCG's six-cent closing price on April 23, 2002 "and incorporated the movements of the market and industry on each day[40] from April 23, 2002, back to each starting date, such that WCG's common stock's expected value on those dates would have been $0.56 [July 24, 2000], $0.33 [Nov. 16, 2000], $0.28 [Feb. 5, 2001], $0.19 [March 13, 2001], and $0.17 [April 24, 2001], respectively" in the absence of the fraud-related inflation of the per-share price. Nye Rpt., ¶ 108.  This, in Scenario 1, is described by Dr. Nye as the "predicted price of WCG stock *absent the alleged fraud*." *Id.* (emphasis added).  Thus, short of the very end of the class period, Dr. Nye attributes virtually all of the market value of WCG common stock to fraud.  Under Scenario 1, the amount of the damage per share is the amount of the calculated fraud-related inflation per share.[41] *Id.*

For purposes of evaluating the defendants' Daubert challenge to Dr. Nye's Scenario 1, it is important to bear in mind the price trends for WCG stock and for telecommunications stocks generally during the class period.  The following graph shows the changes in the per-share price of WCG's common stock before and during the class period:[42]

---

[40]  Dr. Nye started with the "daily return" on the share price. Nye Rpt., ¶ 88l, n. 118. The daily return is the percentage change from the previous day (whether positive or negative).  The "residual return" is the portion of the daily return remaining after removal of "market and industry effects."  *Id.*  The residual return thus reflects "the effect of new, unexpected, company-specific information on share price."  *Id.*

[41]  Dr. Nye recognizes that his damage calculations are subject to the 90-day lookback provision of PSLRA, 15 U.S.C. § 78u-4(e). *See, e.g.*, Nye Rpt., ¶ 108. For discussion purposes, this adjustment, which is not in controversy, is disregarded (unless otherwise noted) in this memorandum.

[42]  The two graphs (WCG closing prices and Nasdaq telecommunications index) which follow appear in Doc. No. 1103 (WCG  Daubert motion, p. 26).  Their accuracy has not been challenged by plaintiffs.



During the same period, the trajectory of the share prices for the companies represented in the Nasdaq telecommunications index was remarkably similar:



It bears repeating that Dr. Nye attributes 56 cents of the decline in WCG's stock from $28.50 to six cents during the class period to industry-wide difficulties and other non-fraud effects.

(ii) <u>Corrective disclosures – Scenario 1</u>.

<u>Dr. Nye's positions as to timing of corrective disclosures</u>.  As is discussed below, the applicable law requires a securities fraud plaintiff in a "fraud on the market" case to identify compensable losses by separating the compensable fraud-related losses from losses attributable to general economic conditions, broad market trends, industry-specific stresses, management incompetence, bad luck and other non-fraud factors.  As compared to Scenario 2, which posits that there were no corrective disclosures until the first of four major disclosures that occurred over the eleven week period preceding WCG's bankruptcy filing in April, 2002, Dr. Nye's Scenario 1 proceeds on the basis that corrective disclosures, which had the effect of draining the fraud premium out of the stock price, "gradually came out over the Class Period" (approximately 21 months).  Nye deposition, p. 264.  *See also*, *id.* at p. 53 ("Throughout that period different things came out to the market and the inflation went down.").  As will be discussed in Parts (E)(3)(a) and (b), below, because Dr. Nye's Scenario 1 is premised on leakage of the truth throughout the class period (thus enabling class members who sold throughout the class period to recover under Scenario 1, unlike Scenario 2), the viability of Scenario 1 depends on whether Dr. Nye has identified corrective disclosures (or, as discussed below, "materialization of the risk") occurring during the relatively long interval which was within the class period but before the final denouement of WCG in 2002.

As has been noted, Scenario 1, asserting (or presupposing) gradual leakage of the relevant truth throughout the class period, is Dr. Nye's (and plaintiffs') preferred damage scenario.  The development of Scenario 2, in contrast, was plainly driven by concerns as to whether corrective disclosures, cognizable under <u>Dura</u> and its progeny,

occurred before the final few months preceding the bankruptcy filing in April, 2002.[43]
Dr. Nye's report is in some respects at odds with his deposition testimony with respect
to the timing of corrective disclosures.  Dr. Nye's deposition testimony favors the
gradual leakage theory more than his report does.

Building on the work of Messrs. Mathis and Mintzer (postulating the creation
of the fraud premium by failure to disclose asset impairment), Dr. Nye's focus, in all
of his scenarios, is on the subsequent draining of that premium from the value of
WCG's securities.  Dr. Nye's report concisely summarized his (and plaintiffs')
inflation/deflation prototype as follows:

> Thus, the misrepresentations and omissions in defendants' disclosures
> to investors regarding its true financial condition could and did have an
> effect on WCG stock price and served to inflate the price of WCG stock
> throughout the Class Period.  The corrective disclosures *later in the
> Class period* caused the WCG stock price to decline.

Nye Rpt., ¶ 26 (emphasis added).

Later in his report, although stating that "the truth about WCG's financial
performance and prospects had begun to leak into the market during the Class Period,"
Dr. Nye cites January 29, 2002 as the date of the first "specific partial corrective
disclosure."  *Id.* ¶ 86.

Given the ambiguities in Dr. Nye's report, as to the timing of corrective
disclosures, it is not surprising that at his deposition, Dr. Nye was pressed as to the
dates of the corrective disclosures that would have removed the fraud-related inflation
from the per-share price of WCG's common stock.  He asserted that corrective
disclosures occurred *each day* during the class period.  Nye deposition, p. 51 ("Q: And
on what days were there corrective disclosures under Scenario 1? A: Scenario 1, every

---

[43]   As plaintiffs' counsel candidly acknowledged at argument: "[Mr. Turner:] And I will
acknowledge, Your Honor, up front, that there are tensions between some interpretations of Dura
and Dr. Nye's Scenario 1."  Hrg. transcript, Nov. 1, 2006 at 232.

day.  In other words, the whole thing is a manipulated period."); p. 279 ("Q: [W]hat are the dates of corrective disclosure for Scenario 1 and where can I find them in your report?  A: As far as I'm concerned, I've answered it.  Q: What are the days?  A: All of them.").  When pressed to describe some association between misstatements and corrective disclosures, Dr. Nye responded by broadening the concept of corrective disclosure to encompass essentially anything negative about the prospects of the company:

> Q.     Is it your view, sir, that it's one big scheme and it's – and it's hard to separate – separate out the various parts?
>
> Mr. Graziano:  Objection, vague.
>
> A.     I think that there is one big overlying theme, and that's they never had a projected way to make any money on this business.  As that comes out to all these details, that's what happens.
>
> Q.     (By Mr. Busch)  But you haven't attempted to determine which corrective disclosure goes with which particular misrepresentation, have you?
>
> A.     The representation?
>
> Q.     You've listed lots –
>
> A.     *I haven't sorted anything out in the components.  That was all basically revelation of the initial problem.*
>
> Q.     So you haven't attempted to tie particular misrepresentations to particular corrective disclosures; is that true?
>
> A.     Well, the initial misrepresentation is they can make money and pay off their debt.  All these disclosures are linked directly to that.  They're just basically eventually telling the market they can't pay their bills.  They're not going to make any money.

*Id.* at 135 - 36 (emphasis added).

Dr. Nye's approach to corrective disclosures raises the question of whether the "leakage" into the market, destroying the value of a share of WCG stock, consisted of actual corrective disclosures which drained off a fraud premium, or was, instead,

leakage of the gradual realization of the increasingly grim prospects for the telecommunications sector as a whole.  Responding to defendants' contentions as to the merits of the leakage theory, the plaintiffs argued, citing paragraphs 28 - 104 of his report, that "Dr. Nye identifies numerous examples of corrective information that leaked into the market during the Class Period."  Doc. No. 1376 at 7.  Plaintiffs also asserted that Dr. Nye's massive (more than 1300-page) compendium of news articles, reports and SEC filings would reveal "numerous instances of leakage of corrective information concerning WCG's true financial condition, providing the basis for Dr. Nye's opinion that the market ultimately learned the truth about WCG that was previously concealed by defendants."  *Id.* at 8.  The compendium was Exhibit 13 to Dr. Nye's report, but, due to its size, it was not filed.

The seventy-six paragraphs of Dr. Nye's report cited by plaintiffs as identifying corrective disclosures (which, by definition, would have to consist of negative information) reflect, with almost no exceptions before late 2001, a continuous litany of upbeat announcements by WCG management.  For that reason, the court, being concerned about a possible divergence of views as to what would constitute a corrective disclosure, directed plaintiffs to file Dr. Nye's compendium, as they had offered (Doc. No. 1376, p. 8) to do.  The order directed that:

> The filing of the copy of Exhibit 13 [the compendium] shall be accompanied by the filing of a statement over the signature of counsel for plaintiffs, citing the pages of Exhibit 13 (by Bates number) which plaintiffs assert represent or reflect "corrective information that leaked into the market during the Class Period" (*see,* Doc. No. 1376 at 7), but before January 29, 2002.

Doc. No. 1650, filed March 14, 2007.

Plaintiffs filed the compendium and the statement required by the court.  Doc. Nos. 1652 - 54 (March 21, 2007).  The items designated by plaintiffs within the compendium consist predominantly of news that was generally applicable to the telecommunications industry as a whole, or, if specific to WCG, consist mostly of

comments about industry-wide conditions affecting WCG.  The pre-January, 2002 compendium items designated by plaintiffs which were most pointedly negative[44] were not cited  by Dr. Nye in his report, likely because, although negative, they were not discernibly corrective.[45]

The earliest impairment-related disclosure cited by Dr. Nye in his report is the November 1, 2001 disclosure of a $150 million write down of inventory.  Nye Rpt., ¶ 83.  On October 31, WCG stock closed at $1.67.  Before November 1, it had lost 94 percent of the value it had at the beginning of the class period.  By November 19, the per-share closing price had risen to $3.00.  In terms of corrective disclosures with associated  movements in the per-share price of WCG's common stock, the record is as uninformative now as it was after Dr. Nye gave his deposition.

Using a starting date of July 24, 2000, the first day of the class period, Dr. Nye calculates that, under Scenario 1, $1.96 billion would be recoverable with respect to WCG stock and $940 million would be recoverable with respect to WCG notes.

b.  Scenario 2.

Dr. Nye described his second scenario as follows:

Scenario 2:  Damages incurred by purchasers of WCG stock and WCG Notes are calculated based on the percentage inflation in the security as measured by the Company-specific percentage returns (*i.e.*, net of market and industry effects) in the security's value upon the disclosures of information allegedly withheld from the market, on January 29, 2002, February 4, 2002, February 25, 2002 and April 23, 2002.  Selling damages are limited to those shares purchased in the Class Period and held through one or more of these dates.  The same five starting dates are used for this scenario as for Scenario 1, *i.e.*, July 24, 2000, November 16, 2000, February 5, 2001, March 13, 2001, and April 24, 2001.

---

[44] Specifically, a Moody's Investor Service Release on March 14, 2001 (WGC-NYE13-524), and  Knight Ridder Articles on March 13, 2001 (*id.* at 577),  April 4, 2001 (*id.* at 592),  June 5, 2001 (*id.* at 762) and August 29, 2001 (*id.* at 972).

[45]  As has been discussed, Dr. Nye took a more expansive view of what constituted a corrective disclosure when he gave his deposition,

Nye Rpt., ¶ 7.

The Scenario 2 starting dates and corrective disclosure dates are illustrated as follows (not to scale):

| Starting Dates – 2000 and 2001 | | | | Corrective Disclosure Dates – 2002 | | | |
|---|---|---|---|---|---|---|---|
| | | | | 1/29 | 2/4 | 2/25 | 4/23 |
| 7/24/00 | | | | | | | |
| | 11/16/00 | | | | | | |
| | | 2/5/01 | | | | | |
| | | | 3/13/01 | | | | |
| | | | 4/24/01 | | | | |

The four corrective disclosure dates are key to Dr. Nye's Scenario 2, because, in Scenario 2, Dr. Nye is "measuring share price inflation by the effect of specific disclosures on January 29, 2002, February 4, 2002, February 25, 2002 and April 23, 2002." Nye Rpt., ¶ 116.  The operation of Scenario 2 in and after January, 2002 is graphically illustrated below.  The data for the graph are from Exhibit 3B to Dr. Nye's report.



Scenario 2

Date (Wednesday of Each Week)

As can be seen, Dr. Nye's data show that WCG stock comes into 2002 at a price above $2.00 per share, consisting almost entirely of the postulated fraud premium. At the beginning of January, 2002, the fraud-related inflation is 90.8 percent of the per-share price. Exh. 3B, p. 8. As the graph shows, that inflation percentage remains constant until January 29, the date of the first of the four corrective disclosures. The inflation percentage drops slightly on January 29, and slightly more on February 4, followed by a substantial drop on February 25, finally plummeting to zero on April 23.

Under this second scenario, damages are recoverable only by security holders who bought during the class period and held the security at least until January 29, 2002. Security holders who sold on or before January 28 would get no recovery. Nye deposition at 113, 275. The price decline that occurred before January 29, 2002 is "not a claimable loss."[46]  *Id.* at 114. Dr. Nye acknowledged that he could give no

---

[46] Likewise, damages are not available under Scenario 2 with respect to shares that were both bought and sold between any two consecutive dates of the four disclosure dates. Nye Rpt., ¶ 120.

"economic or logical reason" why a shareholder who sold on January 29 would have a claim and a shareholder who sold on January 28 would not have a claim, *id.* at 115, explaining that Scenario 2 "was produced to meet some sort of legal definition of damages." *Id.* at 124. Dr. Nye acknowledged that, in the causation section of his report, he has "not tied those four things [the disclosures on the four corrective disclosure dates] specifically to allege[d] misrepresentations." *Id.* at 140.

Dr. Nye used a "constant percentage inflation" approach in Scenario 2. Nye Rpt., ¶ 111. His use of this approach is noteworthy when viewed in light of the fact that, in Scenario 2, the corrective disclosures occur in a relatively compressed time period at the end of a relatively long class period – a class period in which the stock lost almost all of its value before the first corrective disclosure date. The most prominent effect of Dr. Nye's use of the constant percentage inflation method in Scenario 2 is that the declines in per-share value, beginning on the first corrective disclosure date, are cast back, on a percentage basis, to the beginning of the class period. The result, as is discussed further in Part V(E)(3)(c), below, is that a small loss in share value (on or after January 29) in dollar terms translates into a large dollar recovery per share for shares bought early in the class period – a recovery in dollars per share that is attributable mostly to share price declines that occurred *before* the first corrective disclosure.

### c. Alternative Scenario 2.

Correctly anticipating some of the defendants' challenges, Dr. Nye proffers, but does not endorse, a constant dollar alternative to the constant percentage approach of his second scenario, as applied to common stock (but not as applied to the notes).[47] This alternative version of Scenario 2 quantifies damages on the basis of the dollar

---

[47]  Plaintiffs' counsel likewise do not endorse Alternative Scenario 2. They state that it is offered for use "in the event that the Court or the Tenth Circuit adopts the view that the constant percentage approach is improper as a matter of law." Doc. No. 1376 at 22.

decline (rather than the percentage decline) in per-share prices associated with each of the four dates  in early 2002 on which plaintiffs assert that corrective disclosures occurred, described by plaintiffs as "the four specific corrective disclosure events at the end of the Class Period."  Doc. No. 1378 at 10.  Dr. Nye explains this alternative version of Scenario 2 as follows:

> I expect defendants to argue that a constant dollar (as opposed to constant percentage) approach should be used to calculate damages in this case, as I have observed in many other cases.  I do not endorse the use of the constant dollar methodology given the fact pattern in this case. However, at the request of plaintiffs' counsel, I have calculated damages incurred by purchasers of WCG common stock based on the dollar amount of inflation in the security as measured by the company-specific dollar declines in the security's value upon the disclosures of information allegedly withheld from the market, on January 29, 2002, February 4, 2002, February 25, 2002 and April 23, 2002.  The same five starting dates are used for this scenario as for Scenarios 1 and 2, *i.e.*, July 24, 2000, November 16, 2000, February 5, 2001, March 13, 2001, and April 24, 2001.  Selling damages are to be calculated based on the same eligibility requirements for selling damages in Scenario 2. (Note that the constant dollar methodology does not cause any selling damages during a period of like inflation, as the inflation at purchase and inflation at sale are the same on each day within each period between disclosures.)  Also, because the drop in the prices of WCG Notes used to calculate price inflation in the WCG Notes as a percentage of face value is equivalent to the dollar amount, per $100 of face value, there is no alternative calculation under Scenario 2 for the WCG Notes.

Nye Rpt.,  ¶ 7. n. 6.

The constant dollar approach of Alternative Scenario 2 yields results that differ materially from the results which would obtain under Scenario 2, as is shown by a comparison of the graph in Part V(E)(1)(b), above (illustrating the operation of Scenario 2), with the following graph, which illustrates the operation of Alternative Scenario 2:



Data from Ex. 3B Alt. to Nye Rpt.

As is discussed below, with respect to the matters which the court finds to be dispositive in this memorandum, there are no differences between Scenario 2 and Alternative Scenario 2.

        2.    <u>Qualifications</u>.

The defendants do not challenge Dr. Nye's qualifications.

3.      Reliability.

To be admissible, expert testimony must be both relevant and reliable. Daubert, 509 U.S. at 589. Relevance depends in part on whether the proposed expert testimony fits the issues in the case. *Id.* at 591; Bitler, 400 F.3d at 1234. In many cases, such as medical malpractice actions, the substantive legal framework in which expert testimony is offered is painted with a relatively broad brush. Determination of the admissibility of expert testimony in those cases seldom requires extensive consideration and application of substantive legal principles. This case is different. In this case, determination of the admissibility of Dr. Nye's proposed testimony as to loss causation and damages is governed as much by substantive legal principles as it is by principles of economics and finance.[48] In the case at bar, the two sets of principles are tightly intertwined. For that reason, the court's resolution of the Daubert challenges to Dr. Nye's proposed expert testimony begins with an analysis of the relevant substantive legal principles.

a.  The loss causation requirement.

(i)  Loss causation – basic rules.

Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336 (2005), came to the Supreme Court as a pleading case – the issue being what a securities fraud plaintiff who would proceed on a fraud on the market theory must allege with respect to loss causation in order to survive a motion to dismiss. In deciding the pleading issue, the Court explicitly, and unsurprisingly, expounded on what a securities fraud plaintiff must *prove* with respect to loss causation. For that reason, even with a pinched reading, the decision in Dura provides definitive guidance beyond the pleading stage.

---

[48]  This is not an uncommon circumstance. *See, e.g.,* Federal Judicial Center, Reference Manual on Scientific Evidence at 22 (2d ed. 2000) ("[S]ome opinions have held that the 'fit' prong of the *Daubert* test and the helpfulness standard of Rule 702 require courts to exclude a plaintiff's expert testimony that does not satisfy the plaintiff's substantive burden of proof on an issue." Citing Daubert v. Merrell Dow. Pharmaceuticals, Inc., 43 F.3d 1311 (9th Cir. 1995) (Daubert on remand).

In <u>Dura</u>, the Court of Appeals had held that the complaint adequately alleged securities fraud where it averred simply that the plaintiff paid a fraudulently inflated price for the security.  The Supreme Court unanimously held that the Court of Appeals was "wrong, both in respect to what a plaintiff must prove and in respect to what the plaintiffs' complaint here must allege."  *Id.* at 338.  The Court began its analysis by noting that, in a case alleging fraud in connection with the purchase or sale of publicly traded securities, plaintiff must show, among other things: (i) transaction causation, (ii) economic loss and (iii) loss causation.  *Id.* at 341 - 42.  Of significance in the case at bar is the court's statement that, normally, in fraud on the market cases, "an inflated purchase price will not itself constitute *or proximately cause* the relevant economic loss."  *Id.* at 342 (emphasis added).  The Court elaborated as follows:

> For one thing, as a matter of pure logic, at the moment the transaction takes place, the plaintiff has suffered no loss; the inflated purchase payment is offset by ownership of a share that *at that instant* possesses equivalent value.  Moreover, the logical link between the inflated share purchase price and any later economic loss is not invariably strong.  Shares are normally purchased with an eye toward a later sale.  But if, say, the purchaser sells the shares quickly before the relevant truth begins to leak out, the misrepresentation will not have led to any loss.  If the purchaser sells later after the truth makes its way into the marketplace, an initially inflated purchase price *might* mean a later loss.  But that is far from inevitably so.  When the purchaser subsequently resells such shares, even at a lower price, that lower price may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price.

*Id.* at 342 - 43 (emphasis in original).

Having articulated the substantive requirement of proof, the Court then addressed how a securities fraud plaintiff must deal with this requirement at the pleading stage.  As a pleading matter, the Court's formulation was not demanding: the Court said simply that "[it] should not prove burdensome for a plaintiff who has

suffered an economic loss to provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind." *Id.* at 347. This relaxed approach to pleading loss causation does not, of course, undermine the Court's conclusion that loss causation, the "causal connection between the material misrepresentation and the loss," *id.* at 342, is to be established, in a fraud on the market case, by showing that the disclosure of "the relevant truth" resulted in a loss attributable to "the earlier misrepresentation." *Id.* at 342 - 43.

The lower courts have applied <u>Dura</u> with varying degrees of stringency – variations that appear to be largely attributable to the fact that <u>Dura</u> has been applied in a variety of procedural contexts, including motions to dismiss, class certification, settlement approval, Daubert motions, summary judgment and trial. In resolving the Daubert challenges to Dr. Nye's proposed expert testimony, this court applies the law of loss causation, as articulated in <u>Dura</u> and in the lower courts, to Dr. Nye's three scenarios. In so doing, the court focuses principally on: (i) the extent to which Dr. Nye's methodology complies with loss causation doctrine as established in <u>Dura</u> and relevant lower court decisions, (ii) the adequacy of the factual basis for Dr. Nye's application of the methodology underlying his three scenarios, and (iii) the adequacy of his identification of loss-causing corrective disclosures.

As a prerequisite to that analysis, further examination of the lower courts' treatment of loss causation is necessary. As has been seen, <u>Dura</u>, settling a conflict among the circuits, established that loss causation, as defined by the Court, must be shown – pleaded and proven – by a securities fraud plaintiff. Cases from lower courts are equally informative in establishing how that can, and cannot, be accomplished.

Securities fraud claims begin with material misstatements or omissions. *Id.* at 341. The actionable conduct may be a misleadingly favorable representation, or it may be a statement that is deceptive because it suggests that nothing is amiss when something is indeed materially amiss, or it may consist simply of silence,

accompanied by scienter, as to a material matter.  In the case at bar, the alleged fraud consisted predominantly of the defendants' alleged failure to disclose that major assets (the fiber network and related equipment) were worth far less than was shown in WCGs's financial statements, a determination which would have required the reporting of a very large impairment loss as a charge against income under FAS 121. That, in brief, is the *inflation* side of the securities fraud equation in this case.  The cases relevant to analysis of Dr. Nye's work deal with the other side of the equation: loss causation.

Three months before the Supreme Court handed down its decision in Dura, the Second Circuit addressed loss causation in Lentell v. Merrill Lynch & Co., Inc., 396 F.3d 161 (2nd Cir. 2005), *cert. denied*, ___ U.S. ___, 126 S.Ct. 421 (2005), an illuminating decision that is entirely congruent with Dura.[49]  The court in Lentell concluded, albeit as a pleading matter, that a plaintiff had not adequately alleged loss causation where "[t]here is no allegation that the market reacted negatively to corrective disclosure regarding the falsity of" the defendant's misstatements "and no allegation that [the defendant] misstated or omitted risks that did lead to the loss." *Id.* at 175.[50]  *See also,* In re Acterna Corp. Securities Litigation, 378 F.Supp2d 561, 587 (D.Md. 2005).  In a case (such as the case at bar) that presupposes an efficient market, as fraud-on-the-market cases must do, *see,* Basic Inc. v. Levinson, 485 U.S. 224 (1988), the showing of causation which must be made in order to avoid

_____

[49]  The Supreme Court denied certiorari in Lentell in October, 2005, ___ U. S. ___, 126 S.Ct. 421, without vacating and remanding for reconsideration on light of Dura, which had been decided the preceding April.

[50]  *But see,* In re Motorola Securities Litigation, 2007 WL 487738 (N.D. Ill. Feb. 8, 2007), which rejects the Lentell approach as not consistent with Seventh Circuit case law.  The February, 2007 Motorola decision (casting the burden on the defendant, on motion for summary judgment, to negate loss causation as a matter of law, *id.* at *44) appears to have been undermined by the Seventh Circuit's decision two months later in Ray v. Citigroup Global Markets, Inc., 482 F.3d 991 (7th Cir. 2007), affirming summary judgment for the defendants where plaintiffs failed to establish loss causation.

"transform[ing] a private securities action into a partial downside insurance policy," Dura, 544 U.S. at 347 - 48, is a showing that the fraud premium was removed from the price of the stock by way of the efficient market's reaction to a corrective disclosure that was responsive to the misstatement or omission that created the fraud premium in the first instance. Or, as it was concisely put by Judge Scheindlin (who has probably written at least as much as any other judge on loss causation issues): loss causation requires "a false or misleading statement, which caused an artificial inflation of the stock, followed by a dissipation of that inflation after corrective disclosures were made." In re GeoPharma Securities Litigation, 399 F. Supp. 2d 432, 453 (S.D.N.Y. 2005). Thus, if "the logical link between the inflated share purchase price and any later economic loss," Dura, 544 U.S. at 342, is to be shown, the showing is ordinarily made by demonstrating "that the plaintiff suffered an economic loss *fairly attributable to the public airing of the alleged fraud, i.e.*, a significant price decline immediately following the announcement that reveals the fraud to the public." D.E. & J. Ltd. P'shp. v. Conaway, 284 F. Supp. 2d 719, 748 - 49 (E.D. Mich. 2003) (emphasis added), *aff'd*, 133 Fed. Appx. 994 (6th Cir. 2005) (unpublished). For that reason, if "plaintiffs' expert does detail[ed] event studies supporting a finding that [the stock] reacted to the *entire bundle* of negative information . . . this reaction suggests only market efficiency, not loss causation, for there is no evidence linking the *culpable* disclosure to the stock-price movement." Oscar Private Equity Investments v. Allegiance Telecom, Inc., __ F.3d __, 2007 WL 1430225, *8 (5th Cir. May 16, 2007) (emphasis in original).

As has been seen, during the class period, the price of WCG's common stock fell amidst an "entire bundle of negative information" that largely obliterated the value of publicly traded securities throughout the telecommunications sector. "Of course, if the loss was caused by an intervening event, like a general fall in the price of Internet stocks, the chain of causation will not have been established." Emergent

110

Capital Inv. Mgmt, LLC v. Stonepath Group, Inc., 343 F.3d 189, 197 (2nd Cir. 2003). So where there is both an industry-wide debacle (*e.g.*, "a marketwide phenomenon causing comparable losses to other investors," Lentell, 396 F.3d at 174) accompanied by an abundant flow of bad news, unrelated to the fraud, about both the industry and the company in question, the non-fraud "contributing forces must be isolated and removed. This is often done, as it was here, with the help of an expert witness." Robbins v. Koger Properties, Inc., 116 F.3d 1441, 1447, n. 5 (11th Cir. 1997) (rendering judgment as a matter of law for defendant accounting firm).

(ii) Loss causation – limits of the doctrine.

It has been observed, and this court readily concludes, that:

> Dura did not set forth any requirements as to who may serve as the source of the [corrective] information, nor is there any requirement that the disclosure take a particular form or be of a particular quality. Thus, it is the inherent veracity of the information that is of paramount concern in Dura. It is the exposure of the falsity of the fraudulent representation that is the critical component of loss causation.

In re Winstar Communications, 2006 WL 473885 at *14 (S.D.N.Y Feb. 27, 2006). *See also,* In re eSpeed, Inc. Securities Litigation, 2006 WL 880045 at *18 (S.D.N.Y. April 13, 2006) (There is "no requirement that corrective disclosures emanate from the company itself, so long as the truth is disclosed in some fashion."). Nor, as a matter of common sense, is there any requirement that "an alleged corrective disclosure must be the linguistic mirror image of the alleged fraud." In re Bristol-Myers Squibb Securities Litigation, 2005 WL 2007004 at *20 (D.N.J. Aug. 17, 2005).

Moreover, to establish loss causation (which may, for some analytical purposes, be distinguished from quantifying recoverable damages), "the plaintiff need not show that the defendant's act was the sole and exclusive cause of the injury he has suffered; he need only show that it was substantial, *i.e.*, a significant contributing cause." Robbins, 116 F.3d 1441, 1447. Even so, "a plaintiff will be allowed to recover only damages actually caused by the misrepresentation." *Id.* at 1447, n. 4.

(iii)  <u>Loss causation – materialization of the risk</u>.

The Court in <u>Dura</u> pointedly noted that the complaint in that case did not assert that the "share price fell significantly after the truth became known," 544 U.S. at 347. Although this statement can fairly be read as indicating that a reasonably recognizable corrective disclosure is required in a fraud on the market case, the WCG plaintiffs contend that loss causation is present where the concealed risk simply "materialized" in the form of unfavorable developments that caused the market to drive the share price down – a proposition aptly articulated by plaintiffs' counsel at argument as "a revelation of the truth via materialization of the risk that was concealed.  No one ever announced it, no one ever went on the public air waves and said, you know, here is the truth, but the truth was, nonetheless, made evident by virtue of materialization of exactly the risk that had been concealed by the misrepresentations."  Hrg. transcript, Nov. 1, 2006 at 235.  Cases, including <u>Lentell</u>, addressing loss causation in the form of materialization of the risk are collected and analyzed in <u>Glover v. DeLuca</u>, 2006 WL 2850448 at *33 - *37 (W.D.Pa. Sept. 29, 2006), where the court describes the concept as "an alternate way of pleading loss causation." *Id.* at *38.  *See also,* <u>Lentell.</u> 396 F.3d at 172 - 74; <u>In re AOL Time Warner, Inc. Securities Litigation</u>, 2007 WL 1789013 at *8 (S.D.N.Y. Jun. 20, 2007) (Loss causation pleaded "by allegations that a defendant's misstatements or omissions concealed a risk that later materialized to cause the plaintiff's loss."); <u>In re Teco Energy, Inc, Securities Litigation</u>, 2006 WL 2884960 at *6 (M.D.Fla. 2006); <u>Leykin v. AT&T Corp.</u>, 423 F. Supp. 2d 229 at 240, 245 - 46 (S.D.N.Y. 2006); and <u>In re GeoPharma Securities Litigation</u>, 399 F. Supp. 2d at 444 (S.D.N.Y. 2005).

The concept of materialization of the risk, at its apogee, is method of proof of loss causation, not an excuse for lack of evidence of loss causation.  To the extent that plaintiffs assert, as may be inferred from the above-quoted statement at argument, that "materialization of the risk" is a cognizable approach to loss causation where the

112

"relevant truth" gradually leaks out and the effects of the relevant truth (*e.g.*, facts which expose the fraud or are at least indicative of the fraud) cannot be differentiated from bad news unrelated to the fraud, the court concludes that plaintiffs' reliance on materialization of the risk is misplaced.  *See,* Glover, 2006 WL 2850448 at *33 - 34. The suggestion that a fraud premium can be drained off by materialization of the risk (as distinguished from one or more identifiable corrective disclosures) provides no warrant for dispensing with Dura's requirement that plaintiff prove a "causal connection between the material misrepresentation and the loss." 544 U.S. at 342. Although Dura did not address the concept of materialization of the risk as a substitute for corrective disclosure (and, it may be noted, did not even use the term "corrective disclosure"), the Court, in Dura, did recognize the concept that there will be cases in which "the relevant truth begins to leak out." *Id.* Dura's causation requirement would be entirely undermined if, in the context of an overall implosion of shareholders' equity in the relevant industry, a plaintiff could exempt himself from the obligation to separate the effects of fraud-related inflation from the effects of non-fraud risks by asserting simply that he is the victim of materialization of a fraudulently-concealed risk.  Thus, if plaintiff asserts that the fraud surfaced "through disclosure of another event," he "must provide proof that the market recognized a relationship between the event disclosed and the fraud."  McKowan Lowe & Co., Ltd. v. Jasmine, Ltd., 2005 WL 1541062 at *8 (D.N.J. June 30, 2005).

> b.  The *Daubert* challenge as to Dr. Nye's Scenario 1 (common stock).

Dr. Nye's Scenario 1 collides directly with loss causation doctrine and is accordingly rejected.  Dr. Nye does not even purport, in Scenario 1, to have removed the effects of "[n]onfraud company-specific information." Nye deposition at 210.  Nor has he identified any corrective disclosures before January 29, 2002 other than to insist, meaninglessly, that corrective disclosures occurred "every day."   Nye

deposition at 51 (discussed in Part V(E)(1)(a)(ii), above). Thus, remarkably, he has not identified either fraud or non-fraud related news (much less parsed the effects of the two) for the class period through January 28, 2002, *id.*, even though he acknowledges, as he must, that "The market provides a measure of inflation on dates on which the company's misrepresentations and omissions are revealed, in the decline in value of the stock related to the company-specific return attributable to those omissions and misrepresentations." Nye Rpt., ¶ 111.

The court accordingly concludes that Dr. Nye's Scenario 1 methodology is deficient in that his conclusions with respect to loss causation and damages are not supported by identification of any corrective disclosures or "materialization of the risk" cognizable under <u>Dura</u> and its progeny. He fails to differentiate between losses rooted in causes cognizable under loss causation doctrine, on one hand, and, on the other hand, losses attributable to industry-specific stresses, the meltdown in the telecommunications sector, and other negative developments unrelated to the alleged fraud. The consequence of this failure is that Dr. Nye's Scenario 1, viewed as charitably as the record will permit, does not establish loss causation at all, much less enable "a factfinder to ascribe some rough proportion of the whole loss to [the] misstatements." <u>Lattanzio v. Deloitte & Touche LLP</u>, 476 F.3d 147, 158 (2nd Cir. 2007).

The Court's opinion in <u>Dura</u> leaves no room for doubt that even where a securities fraud plaintiff proceeds on a "leakage" theory of corrective disclosure, he must still establish that the lower price reflects the fraud-related inflation and not "changed economic circumstances, changed investor expectations, new-industry-specific facts, conditions or other events, which taken separately or together account for some or all of that lower price." <u>Dura</u>, 544 U.S. at 342 - 43. As a practical matter, Dr. Nye *assumes* leakage of the relevant truth. He identifies no such leakage before January 29. His Scenario 1 methodology is neither "relevant" nor "reliable." *See,*

_Daubert_, 509 U.S. at 589.  In securities litigation, non-fraud causes of a loss in value are "obvious alternative explanations," Rule 702, Fed. R. Evid., Advisory Committee notes to 2002 amendments.  Because Dr. Nye fails to address the obvious alternative explanations as required by the law of loss causation, his Scenario 1 will be excluded.

> c.   The _Daubert_ challenge as to Dr. Nye's Scenario 2 (common stock).

Scenario 2 is described in detail in Part V(E)(1)(b), above.  The Daubert motions will be granted as to Dr. Nye's Scenario 2 for two reasons.  First, Dr. Nye has not demonstrated an adequate factual basis for his assertion of loss causation on the basis of corrective disclosures which are claimed to have occurred on or after January 29, 2002.  Secondly, Scenario 2, premised on a "constant percentage inflation" approach, Nye Rpt., ¶ 111, impermissibly seeks recovery of losses as to which loss causation has not been, and cannot be, established.

> (i)   Corrective disclosures on or after January 29, 2002.

As has been noted, Dr. Nye has testified that Scenario 2 "was produced to meet some sort of legal definition of damages."  Nye deposition at 124.  One of the essential features of Scenario 2 is that it is based on the premise that, as plaintiffs' counsel put it, "the first public corrective disclosure" occurred on January 29, 2002.  Hrg. transcript, Nov. 1, 2006 at 230.  As Dr. Nye puts it, these are "certain corrective disclosures later in the Class Period and at the end of the Class Period." Nye Rpt., ¶ 25.

Under Scenario 2, no recovery is available to an investor who sold his securities before January 29, 2002.  Thus, an investor who bought at $28.50 per share on the first day of the class period and sold his shares at the January 28, 2002 closing price of $1.63, would not, under Scenario 2, recover any of the drop from $28.50 to $1.63.  If he sold on the next day, his per-share recovery, due to the fraud, would be $24.40.  Dr. Nye acknowledged that he could give no "economic or logical reason" why a

shareholder who sold on January 29 would have a claim and a shareholder who sold on January 28 would not. Nye deposition at 115.

Plaintiffs and Dr. Nye assert, for purposes of Scenario 2, that the first corrective disclosure, on January 29, 2002, consisted of the revelatory effect of *WMB's* announcement "that it was delaying the reporting of its fourth quarter and 2001 year-end financial statements while it re-evaluated the status of certain contingent liabilities it had with respect to WCG." Nye Rpt. at ¶ 86. In the relevant passage of his report, Dr. Nye discusses the import of this revelation without mentioning that, on the same day, January 29, the first of the present class actions was filed by the Milberg, Weiss law firm on behalf of these plaintiffs (Cali, et al. v. Williams Companies, Inc, et al No. 02-CV-072, N.D. Okla., Doc. No 1. Herein: Cali Complaint). The Cali Complaint was accompanied by certification from the named plaintiffs, seeking to proceed as representatives of the putative class, dated January 23, 2002. Doc. No. 1, pp. 68 - 71. The January 23, 2002 certifications declared, among other things, that the named plaintiffs had reviewed the complaint.

In terms of negative things that might be said about WCG, its history and its prospects, the Cali Complaint, read together with the Milberg, Weiss press release of the same date, leaves very little to the imagination. The 67-page Cali Complaint can speak for itself, but it provides a detailed compendium of two important categories of matters that were "knowable" before the day the complaint was filed: (i) negative information about WCG that was demonstrably "in the market" during the class period and (ii) misstatements, the falsity of which was known on the basis of publicly available information, before Scenario 2's first corrective disclosure date – January 29, 2002. It is, for that reason, worthy of note that the Cali Complaint alleges that:

> – During the class period, a huge oversupply of fiber-optic capacity was created and that "over the objection of defendants," market analysts warned of the oversupply. ¶ 26.

116

– Defendants consistently, and falsely, denied that WCG had been adversely affected by "the glut of over-supply." ¶ 28.

– The defendants "engineered" the spin-off of WCG so that WMB could rid itself of WCG "before investors came to realize the true impaired condition of WCG." ¶ 29.

– The defendants made false statements about the true reason for the spin-off, which was to "dump WCG" before WMB would have to take a massive charge related to the ownership of WCG. ¶ 38.

– The spin-off was designed to "avoid a massive write-down as WCG's stock price was decimated as its impaired condition slowly became known to investors." ¶ 30.

– The press releases touting the spin-off were false and misleading because WCG was "experiencing declining demand for bandwidth such that its revenue projections were lacking in a reasonable basis," and because they falsely created the impression that WCG would be able to fund its operations with internally-generated cash or by issuing more debt. ¶ 36 (i), (iii).

– At the time the spin-off was executed, there was no disclosure of "the true risks which resulted from guaranteeing WCG's debt as a result of the undisclosed, impaired condition of WCG." ¶ 77.

– In mid-2001, WMB failed to make "adjustments to its balance sheet to account for the WCG loan guarantees, and the fact that now WCG faced a substantial likelihood of a default." ¶ 91.

– A registration statement filed in June, 2001 misleadingly failed to disclose that "as a result of the impaired operational and financial condition of WCG that WMB has a substantial undisclosed risk of loss." ¶ 99 (ii).

– In August, 2001, an analyst opined that "there is a high probability tht they [WCG] are going to have difficulty surviving in their present form." ¶ 104.

– On October 1, 2001, WCG misleadingly announced that "[w]e continue to execute on our financing plan." ¶ 108.

The Milberg Weiss January 29 press release, Doc. 1297, Ex. 4, concisely summarized the Cali Complaint, including the allegations about impairment of WCG's assets and the misstatements which concealed the likelihood that WCG would default on its debt.

Regardless of what might have been said before January 29, Dr. Nye's testimony and report make three things clear: First, that by the end of the day on January 29, a reasonable investor could not but conclude that there was an overwhelming likelihood that WCG had run out its string: "WCG was not making any money; that it couldn't fund its business plan; that it couldn't get any more capital to fund its business plan and, therefore, the projected value of its equity was virtually nil." Nye deposition at 118 (discussing January 29 press release). Second: that Dr. Nye's Scenario 2 is premised on his assertion that "the 'relevant truth' is that WCG likely would not be able to repay its debt as scheduled and, therefore, its assets likely would not provide a return to its equity investors." Nye Rpt., ¶ 109. And third: that the efficient market, in which "the market price reflects all publicly available information," Nye deposition at 39, knew what Milberg Weiss knew when it wrote the Cali Complaint. *Id.* at 38 - 40.[51] Moreover, although Dr. Nye's deposition testimony (pp. 122 - 23) qualifies this statement, he opined in his report that the movement in WCG's share price on January 29, 2002 was not significant[52] in light of declines in "the market" and "the industry" on that day. Nye Rpt., ¶ 88.[53]

------

[51] The court thus agrees with E&Y that "It is disingenuous for Plaintiffs to now argue that the truth had not been disclosed until January 29 (or worse yet, April 23), when Plaintiffs used the same publicly available information to file this lawsuit relating to the same issues (which given its lengthy and detailed treatment simply could not have been prepared after the announcement) on the same day." Doc. No. 1393 at 8.

[52] *Cf.*, In re Acterna Corp. Securities Litigation, 378 F.Supp.2d 561, 588 (D.Md. 2005) ("[T]he price declined only one penny (or 3%), to $.32, on the day Acterna announced its goodwill impairment, October 30, 2002.")

[53] It is noteworthy that Dr. Nye *opines*, presumably on the basis of his regression analysis as to the common stock, that, on the four corrective disclosure dates in 2002, WCG stock "declined in amounts in excess of market and industry effects" Nye Rpt., ¶ 104, but he only *assumes* ("Plaintiffs allege") that these partial disclosures "revealed the risks that had been concealed by the prior misrepresentations and omissions." *Id.*, ¶ 121. In his words, he "h[as] not tied those four things specifically to allege[d] misrepresentations." Nye deposition at 140. Under Dura, a "causal connection between the material misrepresentation and the loss," 544 U.S. at 342, cannot be shown simply by pointing to company-related bad news (called "firm-specific facts" by Justice Breyer, *id.*

118

The record undermines any assertion – crucial to Dr. Nye's Scenario 2 – that any material, new, company-specific and fraud-related information became available to the efficient market on January 29, 2002 or on the three subsequent corrective disclosure dates proposed by plaintiffs.

(ii)   The constant percentage inflation approach.

As has been noted, under Dr. Nye's Scenario 2, an investor who sold on January 28, 2002 gets no recovery, while an investor who sold on January 29 recovers for all of his loss of per-share value *for the entire class period* (nearly $25 per share for an investor who bought at the beginning of the class period) even though the price of the stock had already declined 94 percent, to $1.60 before (as postulated in Scenario 2)  "the relevant truth" emerged.  Dura, 544 U.S. at 342.  The drop from January 28 to January 29 was 29 cents.

A loss in value occurring before the first corrective disclosure "cannot be considered causally related to [defendant's] fraudulent accounting methods because before the revelations began in August, 1998, the true nature of [defendant's] financial condition had not yet been disclosed."  In re Daou Systems, Inc. Securities Litigation, 411 F.3d 1006, 1027 (9th Cir. 2005).  *See also,* In re Redback Networks, Inc, Securities Litigation, 2007 WL 963958 at *6 (N.D. Cal. March 30, 2007) ("[T]he stock price began to fall in June 2001 when the "truth" began coming out.  However, at that time the stock *already had fallen to less than $12 per share.* Based on Plaintiffs' own allegations, the fall from $150 to $12 cannot be attributed to the alleged fraud." (emphasis in original)).  Where, as in the case at bar, the value of a common share is driven down to the penny stock range by forces unrelated to revelation of the fraud (as must be assumed for purposes of Dr. Nye's Scenario 2, Nye Rpt., ¶ 86), the

--------------------------------------------------

at 343) if that bad news is not tied to the fraud.  *Cf.*, D.E. & J. Ltd. P'shp. v. Conaway, 133 Fed. Appx. 994, 1000 - 01 (6th Cir. 2005) ("But the observation that a stock price dropped on a particular day, whether as a result of a bankruptcy or not, is not the same as an allegation that a defendant's fraud caused the loss.").

application of the constant percentage inflation approach would give the equity investor the "partial downside insurance policy" which <u>Dura</u> counsels that the securities law should not provide. 544 U.S. at 348.[54]

Dr. Nye's Scenario 2 does not satisfy the requirements of Rule 702 and <u>Daubert</u> and its progeny, and will accordingly be excluded.

> d.  The *Daubert* challenge as to Dr. Nye's Alternative Scenario 2 (common stock).

Anticipating objections to the constant percentage inflation approach which the court has rejected, Dr. Nye developed a "constant dollar" variation of Scenario 2. As is discussed in more detail in Part V(E)(1)(c), above, this version of Scenario 2 quantifies damages on the basis of the dollar decline (rather than the percentage decline) in per-share prices on the four corrective disclosure dates in early 2002. This modification eliminates the defendants' objection to use of the constant percentage inflation approach.

Pointing out that Dr. Nye himself insists that Alternative Scenario 2 is inappropriate "economically and logically," Nye deposition at 227, defendants argue that Alternative Scenario 2 should be rejected out of hand. The court does not agree. Alternative Scenario 2 represents nothing more than a mathematical variation on Scenario 2, designed to conform plaintiffs' trial presentation to the law as the court may find it to be. The reason for which Alternative Scenario 2 was developed is clear, and the basis on which plaintiffs and Dr. Nye assert that they ought not to be subjected to the limitations of Alternative Scenario 2 is equally clear. Dr. Nye's disagreement with Alternative Scenario 2 is no more disqualifying than would be an accountant's

---

[54] The court can conceive of a case, involving a short class period, in which the constant percentage inflation approach would at least clear the Daubert hurdle, leaving the final determination of the merits of the matter to be resolved by the finder of fact. But, given the tortured history of WCG's securities in the 18 months before the first asserted corrective disclosure January 29, 2002, this is not that case.

preparation of two alternative lost profit scenarios (and disagreement with one of them) for a plaintiff seeking to recover lost profits.

Although Dr. Nye's disagreement with Alternative Scenario 2's constant dollar approach is not fatal to its admissibility, Alternative Scenario 2 is identical to Scenario 2 in that it is not supported by a showing of material, new, company-specific and fraud-related information that became available to the efficient market on January 29, 2002 or on the three subsequent corrective disclosure dates proposed by plaintiffs. Alternative Scenario 2 will, for that reason, be excluded.

e. The *Daubert* challenge with respect to the notes.

Dr. Nye's work with respect to the notes is in some ways similar to, and in some ways different from, his work with respect to the common stock. The Daubert challenges with respect to Dr. Nye's proposed expert testimony relating to the notes may be resolved by examining his opinions as to the notes, the bases for those opinions, and the matters that are not disclosed by his analysis.

Dr. Nye's report points out that the weighted average price of the WCG notes was 97.8 percent of face value at the beginning of the class period and 16 percent of face value after the bankruptcy filing. Nye Rpt., ¶ 23. He concludes that:

> [T]he price of the WCG Notes reacted to news about the Company and to changes in WCG's perceived financial condition. Thus, the misrepresentations and omissions in defendants' disclosures to investors regarding its true financial condition could and did have an effect on the WCG Notes' prices and served to inflate the prices of the WCG Notes during the Class Period. The corrective disclosures later in the Class Period caused the WCG Notes' prices to decline.

Nye Rpt., ¶ 27.

Later in his report, Dr. Nye elaborates on this point:

> As with WCG stock, WCG Notes prices responded to information about the declining fortunes at WCG. Thus, the alleged fraud, including the failure to timely write down the value of certain assets, directly caused the inflated prices of the WCG Notes throughout the Class

121

Period.  News of WCG's true financial condition in 2001 and 2002 caused the prices of WCG Notes to decline and, consequently, caused investors who purchased WCG Notes during the Class Period to incur losses.

*Id.,* ¶ 101.

Dr. Nye's Scenarios 1 and 2, analyzed as to the common stock in Part V(E)(3)(b) - (d), above, are turned out in slightly different livery as applied to the notes.  Dr. Nye's Scenario 1 assigns to the notes, *on every day of the class period*, "true values" equal to the market value of the notes when WCG filed for bankruptcy. *Id.,* ¶ 138(a).  He then posits that "[t]he price inflation is equal to the difference between the actual price and the true value." *Id.*  Lest there be any confusion:  Dr. Nye's Scenario 1 makes no pretense of differentiating between fraud and non-fraud losses in value, as was made clear at his deposition:  "Q: So, if I understand, then, under Scenario 1, no other fact would be significant other than the price of the notes in terms of damages?  A: That's how you calculate it, right."  Nye deposition at 233. By way of example, because Dr. Nye's Scenario 1 does not separate fraud from non-fraud losses, defendants are chargeable, under Scenario 1, with the entire drop in the value of the notes that occurred on the first trading day after September 11, 2001. *Id.* at 234; Doc. No. 1092, Ex. 4 (E) (p. 11) to Ex. 2.  They are thus impermissibly held to account for "the entire bundle of negative information," Oscar Private Equity Investments, __ F.3d __, 2007 WL 1430225 at *8 (5th Cir. 2007), with no identification of any "causal connection between the material misrepresentation and the loss," Dura at 342.

In Scenario 2, as to the notes as with the stock, an investor who sold on January 28 (by which time the notes had fallen to about 40 percent of face value) has no recovery. *Id.,* ¶ 139.  Scenario 2 uses the same four corrective disclosure dates

(January 29, February 5 and 25, and April 23).  Dr. Nye explains the operation of Scenario 2,[55] as applied to the notes, as follows:

> From the start of the damages period (July 24, 2000, November 16, 2000, February 5, 2001, March 12, 2001, or April 23, 2001) through January 28, 2002, inclusive, the price inflation in the WCG Notes is a constant value and is equal to the sum of the drops in the prices of each of the WCG Notes from the four days used to measure the price inflation.  From January 29, 2002 through February 4, 2002, inclusive, the price inflation is equal to the sum of the drops on February 5, February 25, and April 23, 2002.  From February 5 through February 24, 2002, inclusive, the price inflation is equal to the sum of the drops on February 25 and April 23, 2002.  From February 25 through April 23, 2002, inclusive, the price inflation is equal to the drop on April 23, 2002.

*Id.*, ¶ 138 (b).

Dr. Nye calculates Scenario 2 damages as the sum of the price declines on the four disclosure dates in early 2002[56] (as applicable, depending on the date of sale), and assumes that the sum of all four drops would have been reflected in the prices of the notes on day one of the class period.  *Id.,* ¶¶ 10, 138(b), 139.  With respect to his Scenario 2 approach as applied to the notes, Dr. Nye performed no regression analysis,[57] or even an analysis of statistical significance, to differentiate fraud-related effects from forces unrelated to the fraud, Nye deposition at 147- 50, 235, all of which is acknowledged by plaintiffs in their briefs.  Doc. No. 1376 at 23; 1378 at 13 - 14.

---

[55]  As to the notes, there is no equivalent of Alternate Scenario 2 which Dr. Nye developed with respect to the stock, "because the drop in the prices of WCG Notes used to calculate price inflation in the WCG Notes as a percentage of face value is equivalent to the dollar amount, per $100 of face value."  *Id.*, ¶ 7, n. 6.

[56]  Subject to PSLRA's 90-day lookback requirement.  See note 41, above.

[57]  "Multiple regression analysis is a statistical tool for understanding the relationship between two or more variables [such as fraud- and non-fraud related effects on the price of a security]. Multiple regression involves a variable to be explained – called the dependent variable – and additional explanatory variables that are thought to produce or be associated with changes in the dependent variable."  Federal Judicial Center, Reference Manual on Scientific Evidence at 181 (2d ed. 2000).

He does, however, claim to have performed an event study with respect to the notes under Scenario 2. *Id.* at 231. This deserves some discussion.

> An event study is a statistical regression analysis that examines the effect of an event on a dependent variable, such as a corporation's stock price. This approach assumes that the price and value of the security move together except during days when disclosures of company-specific information influence the price of the stock. The analyst then looks at the days when the stock moves differently than anticipated solely based upon market and industry factors-so-called days of "abnormal returns." The analyst then determines whether those abnormal returns are due to fraud or non-fraud related factors.... [E]vent study methodology has been used by financial economists as a tool to measure the effect on market prices from all types of new information relevant to a company's equity valuation.

In re Enron Corp. Securities Litigation, 2006 WL 4381143 at *54 (S.D. Tex. June 5, 2006) (quoting from Jay W. Eisenhofer, Geoffrey C. Jarvis, and James R. Banko, Securities Fraud, Stock Price Valuation, and Loss Causation: Toward A Corporate Finance-Based Theory of Loss Causation, 59 Bus. Law. 1419, 1425 - 26 (August 2004).

An event study can play a pivotal role in a securities fraud case: "Because of the need to distinguish between the fraud-related and non-fraud related influences of [sic] the stock's price behavior, a number of courts have rejected or refused to admit into evidence damages reports or testimony by damages experts in securities cases which fail to include event studies or something similar." In re Imperial Credit Industries, Inc. Securities Litigation, 252 F. Supp. 2d 1005, 1015 (C.D.Cal. 2003) (collecting cases; citation and quotation marks omitted). *See also,* Gordon Partners v. Blumenthal, 2007 WL 1438753 at *1 (S.D.N.Y. May 16, 2007); Id. v. Id., 2007 WL 431864 at *13 (S.D.N.Y. Feb. 9, 2007) and Carpe v. Aquila, Inc., 2005 WL 1138833 at *3 – *4 W.D. Mo. March 23, 2005). "Event study" is thus "a term of art in the relevant economic literature that refers to a regression analysis that examines the effect of an event on some dependent variable, such as a corporation's stock price."

124

RMED International, Inc. v. Sloan's Supermarkets, Inc., 2000 WL 310352 at *6 (S.D.N.Y. March 23, 2000).

The obvious purpose of an event study, in the present context, is to isolate fraud-related effects so that the finder of fact may determine "what the causal connection might be between [the notes' loss of value] and the misrepresentation." Dura at 347.  When questioned at his deposition about his failure to perform an event study to support his Scenario 2[58] with respect to the notes, Dr. Nye responded that: "Under Scenario 2, I looked at the change in the price of the bonds on the date information was released.  That's an event study."  Nye deposition at 231.  This declaration cannot be reconciled with any accepted definition of an event study, or with the fact that, as E&Y put it, Dr. Nye "does not do any independent analysis to determine whether the Notes price movements on these four dates were statistically significant based on the price movements or in any way causally linked to disclosure of the fraud," Doc. No. 1297 at 14 - 15.   Thus, Dr. Nye's lame assertion notwithstanding, it is clear that he did not conduct an event study in any sense in which that term is used in his profession.  If his version of an event study for Scenario 2 is to be thought of at all as an "event study" then it is a "step [which] completely changes a reliable methodology," Mitchell, 165 F.3d 778 at 782, (quoting In re Paoli R.R. Yard PCB Litigation, 35 F.3d 717, 745 (3d Cir.1994), because what he calls an event study does not even purport to differentiate between forces related to the fraud and those not related to the fraud.

In response to defendants' assertions as to the deficiencies in Dr. Nye's work as to the notes, plaintiffs argue, somewhat contradictorily, that (i) "Dr. Nye's event study for the Notes reasonably parallels his event study for WCG common stock,"

---

[58]  It should be borne in mind that the absence of an event study is immaterial with respect to Scenario 1, because, with respect to that scenario,  Dr. Nye does not claim to have identified, much less analyzed, the effect of "[n]onfraud company-specific information."  Nye deposition at 210.  Under Scenario 1, "every decrease in inflation is damage."  Id.

Doc. No. 1378 at 13, (ii) he did not "perform a separate, independent regression analysis for the Notes" because to have done so would only have increased damages, *id.*, and (iii) defendants fail to point out how an event study could have been performed as to the notes. Doc. No. 1376 at 23. The court will address these responses in turn.

Plaintiffs support their argument that Dr. Nye's event study for the notes paralleled his event study for the common stock by pointing out that, just as was the case with the stock, there were, indeed, negative price movements for the notes on the four disclosure dates posited by Scenario 2, and that these movements were among the largest movements in the entire class period. Doc. No. 1378 at 14. This echoes Dr. Nye's testimony that he looked at the prices and found that the prices went down, Nye deposition at 231, which is essentially the same as an accountant, in a lost profits case, excusing his failure to measure lost net profits by arguing that, after all, he did calculate lost gross receipts. Dr. Nye simply did not perform an event study with respect to the notes, and no assertion that "yes, he found that note prices dropped on the disclosure dates" can change that fact.

The second argument, that performing a regression analysis (*e.g.*, at a component of an event study) would have been unnecessary because a regression analysis would only have increased damages, has two premises. Plaintiffs and Dr. Nye argue, first, that the only non-company specific information that would have been factored out by an event study as to the notes would have been the steady decline in interest rates during the relevant period, and, secondly, that adjusting for the decline in interest rates would only have increased damages. As to the contention that prevailing interest rates would have been the only exogenous influence on the price of the notes, Dr. Nye's testimony is contradictory. At one point, Dr. Nye suggested that bond (note) prices are influenced only by interest rates and default risk, which is company-specific. *Id.* at 147 - 48. Later, he testified that "the market" can affect

default risk, *id.* at 231, which would lead inexorably to the conclusion that those influences must be factored out.  However, there is no need to consider whether Dr. Nye's explanation is undermined by the seemingly common-sense proposition that the default risk component of note values certainly could be affected by a perception that an industry-wide meltdown is in progress.  The reason is that, even as to news affecting perceptions of *company-specific* default risk (*i.e*, assuming that there *were* no exogenous factors other than the trend in interest rates), Dr. Nye did nothing to differentiate between fraud-related bad news and bad news unrelated to the fraud.

As to plaintiffs' third argument, questioning whether an event study *could* have been performed as to the notes, the court notes that this contention is apparently bottomed on the problematic proposition that note prices would not have been found to have been affected by non-company specific influences other than interest rates. Doc. No. 1376 at 23 - 24.  There is no need, however, to resolve that issue, nor is there any need to determine whether plaintiffs' view of the matter is undercut by a very cogent showing that an event study could have been performed as to the notes.  Doc. No. 1297, Ex. 7 (Affidavit of David Tabak, Ph.D.).  The reason is that it does not fall to the defendants, in support of their Daubert challenge, to prescribe a method by which plaintiffs and Dr. Nye either might or must carry their burden of establishing the admissibility of Dr. Nye's proposed expert testimony as to loss causation.  What is required is an event study "or something similar."  Imperial Credit, 252 F. Supp. 2d at 1015.[59]   This court assays, within the confines of Daubert and Rule 702, the methodology the expert chose to use, Bitler, 400 F.3d at 1233; it need not select the appropriate methodology.  "Thus, Judge Peck did not say that summary judgment was

---

[59] There is no single template for event studies. *See, generally*, A.Craig MacKinlay, Event Studies in Economics and Finance, XXXV Journal of Economic Literature 13 (1997).  "In the majority of applications, the focus [of an event study] is the effect of an event on the price of a particular class of securities of the firm, most often common equity.  . . .  However, event studies can be applied using debt securities with little modification."  *Id.* at 13.

appropriate because plaintiffs had not submitted an event study.  He said that it was appropriate because plaintiffs had submitted *no evidence* on the issue of loss causation."  <u>Gordon Partners</u>, 2007 WL 1438753 at *2 (emphasis in original). Because he did *nothing* to differentiate between fraud and non-fraud effects on note prices, it is not necessary to determine what methodology would have sufficed if Dr. Nye had done *something*.

Viewing Dr. Nye's proposed expert testimony as to the notes in light of the combined demands of <u>Daubert</u> and <u>Dura</u>, it is plain that he expounds conclusions that are greater than the sum of their factual and analytical parts.  "[T]here is simply too great an analytical gap between the data and the opinion proffered," <u>Joiner</u>, 522 U.S. 136 at 146. His work with respect to the notes does not address, in any manner that lends itself to reasoned analysis, the question of "what the causal connection might be between [the notes' loss of value] and the misrepresentation." <u>Dura</u> at 347.  Having offered no analysis that differentiates between the effects of fraud-related and non-fraud news and events, Dr. Nye's declaration that corrective disclosures caused the notes' prices to decline represents, at best, an opinion "connected to existing data only by the *ipse dixit* of the expert."  <u>Joiner</u>, 522 U.S. at 146.

———————————————————————————

All of Dr. Nye's causation-related opinions, including his damage scenarios, have been analyzed to determine whether they square with the law of loss causation, applied through the prism of <u>Daubert</u> and Rule 702.  Dr. Nye's proposed opinion testimony does not square with the law of loss causation, principally because his approaches to causation fail to differentiate, by means sufficient to pass muster under <u>Daubert</u>, between losses attributable to fraud and losses attributable to other forces that caused the historic debacle in the telecommunications industry.  Implicit in Dr. Nye's work is the supposition that virtually none of the market value of WCG's stock at the beginning of the class period  (or at any time until the telecom chickens had all

come home to roost) was attributable to inflated investor expectations for the telecom industry as a whole – and the concomitant proposition that virtually none of the decline in the value of the stock is attributable to the industry-wide debacle.

The defendants' Daubert motions with respect to the proposed opinion testimony of Dr. Blaine F. Nye are **GRANTED** with respect to his opinions as to loss causation and his damage scenarios, both as to the common stock and as to the notes. This partial granting of the Daubert motions with respect to Dr. Nye, in combination with the granting of the Daubert motions as to Messrs. Mathis and Mintzer, is, as set forth in part VI, below, dispositive of all of the claims asserted by the plaintiffs in the WCG class action. Accordingly, the court does not reach, and denies as moot,[60] the defendants' Daubert motions as to Dr. Nye, to the extent that they challenge his proposed expert testimony as to matters other than loss causation and his damage scenarios.

VI.   The Motions for Summary Judgment.

The court's rulings on the Daubert motions will, as discussed below, result in summary judgment in favor of *all* defendants on the WCG Subclass plaintiffs' claims because plaintiffs cannot establish the elements of loss causation and damages. The defendants' motions for summary judgment and partial summary judgment raise other issues. They have been fully briefed and argued. As has been noted, the briefs and exhibits supporting and opposing the motions run to nearly 23,000 pages. The motions thus present live issues that are ripe for determination by the court even though the court could, in its discretion, proceed no further than to render summary judgment on the basis of its resolution of the Daubert motions. Accordingly, having thoroughly reviewed the briefs and the voluminous record, and for substantially the

---

[60] *Cf.*, Carpe, 2005 WL 1138833 at *2, n. 6 ("Because the Court is able to reach its decision on other grounds, the Court takes no position on these alleged deficiencies with Mr. Marek's expert report.")

same reasons as have been discussed in note 36, above (as to the court's consideration of the Daubert motions with respect to Dr. Nye), the court will proceed to address the other issues raised by the WMB defendants' motion for partial summary judgment, E&Y's motion for summary judgment, and the WCG Defendants' motion for summary judgment.

A.   The Williams Companies, Inc. and Keith E. Bailey's Motion for Partial Summary Judgment on Alleged Misstatements and Omissions Made *Before* WCG's Spin-Off from Williams.

The WMB defendants move for partial summary judgment as to the WCG Subclass plaintiffs' claims relating to alleged misstatements or omissions made before the spin-off of WCG from WMB on April 23, 2001. The WMB defendants assert that plaintiffs cannot establish the requisite elements of materiality or scienter in support of their claims.

Initially, the WMB defendants challenge plaintiffs' claims which focus on WCG's purported failure to disclose that certain of its employees, including defendant Matthew Bross, had received "directed" or "friends and family" shares and options to purchase shares in the initial public offerings of certain companies that were WCG's strategic partners. WMB defendants assert that the alleged omissions occurred before the class period began. Because liability can be imposed only for statements or omissions made during the class period, the WMB defendants contend the alleged pre-class period omissions are not actionable as a matter of law. In addition, they contend that the alleged omissions are immaterial as a matter of law because they related to matters that were publicly known. The WMB defendants contend that the details of the "directed" or "friends and family" shares programs were publicly disclosed and thoroughly discussed in the national press, such as *Fortune* magazine, before the beginning of the class period. Moreover, WCG, in response to that publicity, adopted a policy in April of 2000 specifically prohibiting the WCG

130

employees from engaging in such transactions.  In light of these facts, the WMB defendants argue that plaintiffs cannot establish the materiality element of their claims based upon alleged omissions relating to the "directed" or "friends and family" shares and options to purchase shares.

The WMB defendants challenge the plaintiffs' contention that pre-class period events resulted in the purchase of inferior equipment by WCG from companies (such as Sycamore Networks) which had to be written off during the class period.  The WMB defendants contend that the equipment was of superior quality and is still functioning on the network, arguing that the only identified problem with the equipment was WCG's inability to get the equipment delivered when it was needed.

In response, plaintiffs do not dispute that certain of the "friends and family" transactions were adversely reported in the press, and that, consequently, WCG sought to restrict the ability of its employees to engage in such transactions prior to the class period.  Doc. No. 1225 (plaintiffs) at 54.  Rather, plaintiffs argue that the evidence relating to the transactions is relevant to their claim that defendants, in violation of GAAP, failed to take any inventory write-downs for excess or impaired equipment that was acquired in transactions associated with employee "friends and family" benefits until late in the class period,  significantly after WCG had placed restrictions on employee participation in the "friends and family" programs.  Plaintiffs contend that what the WMB defendants seek, in effect, is an order *in limine* precluding plaintiffs from offering any evidence regarding these transactions.

Plaintiffs have conceded in their briefing that information relating to the "directed" or "friends and family" programs was publicly disclosed prior to the start of the class period.  Accordingly, the court concludes that plaintiffs cannot establish[61]

---

[61] Of course, plaintiffs need not actually "show" or "prove" or "establish" anything to defeat the summary judgment motions.  They must merely demonstrate the existence of a genuine issue of material fact.  Although this order sometimes uses the quoted terms because they are used in the case law, the court has consistently judged plaintiffs' claims by the lesser standard which is

the element of materiality as to their claims based upon alleged omissions involving the "directed" or "friends and family" programs.  *See*, *e.g.*, Baron v. Smith, 380 F.3d 49, 57 (1st Cir. 2004) ("It is not a material omission to fail to point out information of which the market is already aware."); Smith v. Circuit City Stores, Inc., 286 F. Supp. 2d 707, 721-22 (E.D. Va. 2003) (an omitted fact is immaterial as a matter of law where "the relevant information was already publicly available" at the time of the purported omission).  Therefore, the court concludes that the WMB defendants are entitled to summary judgment on those claims.[62]

At this stage of the proceedings, the court need not determine the admissibility of any evidence relating to the "directed" or "friends and family" share transactions. The court, however, would note that during oral argument on the motion, defendants' counsel stated that based upon representations of plaintiffs' counsel, plaintiffs would not have an expert to address the issue of  impairment of network equipment or inventory (not to be confused with impairment of dark fiber) and that they did not plan to pursue a claim related to impairment of network equipment or inventory. Moreover, as previously discussed, the court has specifically determined that Mr. Mintzer's testimony as to the equipment impairment is inadmissible under Daubert. Plaintiffs cannot, without expert testimony, establish their claims relating to any alleged misstatement in the financial statements of WCG at year-end 2000 dealing with impairment of network equipment or inventory.  This issue will receive more attention in the court's ruling on E&Y's summary judgment motion.  The evidence as to the "friends and family" transactions would likely be highly potent at a jury trial –

_____

appropriate at this stage. Goodwin v. General Motors Corporation, 275 F.3d 1005, 1011 at n.7 (10th Cir. 2002).

[62]  The court notes that during oral argument on the WMB defendants' motion, defendants' counsel represented to the court that plaintiffs' counsel had advised defendants' counsel that plaintiffs were not going to pursue an omissions claim against the WMB defendants based on the "directed" or "friends and family" transactions.  Plaintiffs' counsel, during his presentation, did not contradict that representation.

and quite properly so.  Those transactions strongly suggest, at a minimum, flaccid ethical standards among members of WCG's senior management.   However, at this juncture, the admissibility of that decidedly unflattering evidence need not be determined.

The WMB defendants next challenge plaintiffs' claims as to alleged misstatements about the reasons for the spin-off which were made in the press releases of July 24, 2000,[63]   November 16, 2000[64] and March 30, 2001.[65]   The WMB defendants assert that the alleged misstatements are not actionable as a matter of law

---

[63]  The July 24, 2000 WMB press release quoted Bailey as stating:

> We believe these steps [leading to the separation of WMB from WCG] are *the best way to ensure that both our energy and communications businesses have the efficient and effective access to the capital necessary to pursue the substantial growth opportunities that each enjoys* . . . Obviously, the ability to do that is consistent with the *best long-term interest of our shareholders*.

Ex. 27, KB Decl. (emphasis added).

[64]  The November 16, 2000 WMB press release quoted Bailey as stating:

> This important step continues a process that we believe remains in the best long-term interests of our shareholders . . . *Our energy and communications businesses have tremendous opportunities before them.  Creating the most effective and efficient access to capital will help fuel that growth, and we believe that can best be achieved by creating two independent businesses.*

Ex. 84, KB. Decl. (emphasis added).

[65]  The March 30, 2001 WCG press release quoted Janzen as stating:

> [T]his spinoff is the natural evolution of a business strategy begun in 1998, when we re-entered the telecommunications space . . . The spinoff gives [WCG] the best opportunity to strengthen its industry leadership and the ability to attract investors who value the vast potential of broadband.

Complaint, ¶ 75.

because they can only be classified as statements of "corporate optimism" or "mere puffing." Such statements, the WMB defendants maintain, are typically forward-looking statements or are generalized statements of optimism that are not capable of objective verification. The WMB defendants argue that vague, optimistic statements are not actionable because they are not statements relied upon by reasonable investors when making investment decisions. Mustering just a bit of chutzpah, or admirable modesty, or both, they argue in essence that public pronouncements about WMB's subjective motives for the spin-off would not be relied upon by reasonable investors in making their decisions to buy or sell stock. Asserting that the alleged misstatements are immaterial as a matter of law, the WMB defendants contend that partial summary judgment should be entered as to plaintiffs' claims based on those statements.

In response, plaintiffs contend that the court should not dismiss the claims based on the asserted misstatements because the court, per the Honorable Sven Erik Holmes, has ruled (in the order addressing defendants' motions to dismiss the Complaint) that "statements concerning the reasons for WCG's spin-off, WCG's business condition and prospects, and WCG's capitalization" should not be dismissed as immaterial. In re Williams Securities Litigation, 339 F. Supp. 2d at 1224-1233. Plaintiffs argue that Judge Holmes' ruling is the law of this case and that, in any event, the challenged statements concern facts that defendants, themselves, recognized as critical. Plaintiffs contend that defendants' own act of repeatedly making the statements about the reasons for WCG's spin-off, about WCG's condition and prospects, and about WCG's capitalization, increased the likelihood that investors would have found those matters to be important, with the natural result that they would have relied upon the statements in making their investment decisions. Plaintiffs also assert that the alleged misstatements should not be dismissed because there are issues of fact as to the materiality of the misstatements.

Only "material" false or misleading statements or omissions are actionable under § 10(b).  17 C.F.R. § 240.10b-5(b).  "'[A] statement or omission is only material if a reasonable investor would consider it important in determining whether to buy or sell stock,' and if it would have 'significantly altered the total mix of information available' to current and potential investors."  Fleming Companies, Inc., 264 F.3d at 1267-68 (quoting Grossman v. Novell, Inc., 120 F.3d 1112, 1119 (10th Cir. 1997)).  Materiality is a mixed question of law and fact.  TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 450 (1976).  The question of materiality can be resolved as a matter of law only when the information is so obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality.  Connett v. Justus Enterprises of Kansas, Inc., 68 F.3d 382, 384 (10th Cir. 1995); Manavazian v. Atec Group, Inc., 160 F. Supp. 2d 468, 478 (E.D.N.Y. 2001) ("Dismissal due to immateriality is not warranted unless the misstatement or omission is so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.") (quotations omitted).  Forward-looking statements can be material.  Grossman, 120 F.3d at 1120, n. 6.  A statement as to beliefs or opinions may be actionable if the statement is known by the speaker at the time it is expressed to be untrue or to have no reasonable basis in fact.  Id.

The court finds it unnecessary to address the issue of whether the previous ruling on the issue of materiality must be left untouched as the law of the case. Reviewing the summary judgment record in a light most favorable to plaintiffs, the court is  convinced  that summary judgment is not appropriate on the issue of the materiality of the challenged statements.   The plaintiffs have proffered sufficient evidence to raise a triable issue of fact as to the falsity of the statements.  They have also presented evidence sufficient, by a significant margin,  to raise an issue of fact as to whether the alleged statements, at the time they were made, were known to Bailey or Janzen to be untrue or without reasonable basis in fact and thus the product

135

of sheer duplicity on the part of those executives.  Grossman, 120 F.3d at 1120, n. 6. The court accordingly concludes that reasonable minds could differ on the materiality question.   Therefore, the court concludes that partial summary judgment is not appropriate as to the issue of materiality on the challenged misstatements relating to the reasons for the spin-off.

The WMB defendants next challenge alleged misstatements as to the quality of WCG's network and technology, as made in the October 25, 2000 press release.[66]  To the extent that plaintiffs rely upon the "friends and family" transactions to support their claim, the WMB defendants' arguments in response are those that have been previously discussed in this memorandum.  As to plaintiffs' remaining arguments as to the falsity of the statements,[67] the WMB defendants contend that plaintiffs' contentions have not been borne out in discovery and that the facts relied upon by plaintiffs do not contradict the statements.  The WMB defendants also contend that the statements in the press release are classic examples of "vague corporate optimism" routinely held to be immaterial and that the statements, by their nature, would not be relied upon by investors in making investment decisions.

---

[66]  The October 25, 2000 WCG press release quoted Bross as stating:

> Through our unique Technology Farm System, [WCG] continues to test and deploy leading-edge optical technologies that split the spectrum of light to increase capacity and improve quality of service . . . By combining these emerging technology [sic] with our industry-leading ability to expand and provision customer demand for recurring capacity, [WCG] is executing on its stated strategy to drive network utilization and accelerate the decline in unit costs.

Complaint, ¶ 62.

[67]  Described by defendants (paraphrasing the Complaint) as follows: That (1) WCG had pared down its budget for equipment, maintenance and upgrades for the year 2001; (2) WCG eliminated its allocation of funds to a "remote access project," which would have made problems on the network easier to detect; (3) WCG did not have or maintain route diversity; and (4) WCG had difficulty meeting the needs of some of its customers.  See, Doc. No. 1061 (WMB) at 23.

The court concludes that partial summary judgment is not appropriate as to the alleged false and misleading statements relating to the October 25, 2000 press release. The summary judgment record, viewed in a light most favorable to plaintiffs, is sufficient to raise triable issues as to whether these statements are actionable under § 10(b) and Rule 10b-5.

The WMB defendants further challenge plaintiffs' claims predicated on the alleged misstatements about WCG's financial results and expectations, as made in the July 27, 2000 press release,[68] the November 16, 2000 press release,[69] the February 5, 2001 press release,[70] the February 15, 2001 *The Street. com* Report[71] and the March 15, 2001 press release.[72] The WMB defendants contend that the statements constitute mere corporate puffing incapable of objective verification. In addition, the WMB defendants contend that the forward-looking, optimistic statements were accompanied

---

[68] The July 27, 2000 WCG press release quoted Janzen as stating: "We have continued to see a dramatic ramp-up in overall industry demand for bandwidth." Complaint, ¶ 61.

[69] The November 16, 2000 WCG press release stated: "WCG is superbly positioned to achieve our goals." Complaint, ¶ 65.

[70] The February 5, 2001 WCG press release stated: "[WCG] expects to be EBITDA-positive on an operational basis by the end of 2001 . . . ." In the press release, Janzen also cited:

> [WCG's] success in both attracting new customers and meeting growing demand from established customers as proof of its broad-band-enablement strategy and leadership in delivery of data, voice, Internet and media services.

Complaint, ¶ 67.

[71] The February 15, 2001 *The Street.com* Report quoted Schubert as stating: "We believe we are on a clear path to profitability . . . We have a sound funding strategy in place." Complaint, ¶ 68.

[72] The March 15, 2001 WCG press release quoted Janzen as stating: "Closing [the $1.4 billion structured notes] transaction enhances our overall liquidity and positions us well in anticipation of the proposed spinoff." Complaint, ¶ 73.

by cautionary statements regarding the risks of WCG's business and are inactionable as a matter of law under the "bespeaks caution" doctrine.

The court disagrees. The record is clearly adequate to raise triable issues as to the materiality of the challenged statements; most prominently the issue of whether the speakers, at the time the statements were made, knew or had very good reason to know that the statements were untrue or had no reasonable basis in fact. Grossman, 120 F.3d at 1120 n.6. In light of the evidence in the record, the court also concludes that partial summary judgment is not appropriate based on the "bespeaks caution" doctrine. Gabriel Capital, L.P. v. NatWest Finance, Inc., 122 F. Supp. 2d 407, 419 (S.D.N.Y. 2000) ("The 'bespeaks doctrine,' [ ] does not apply where a defendant knew that its statement was false when made.").

The WMB defendants also contend, in their reply brief, that the plaintiffs, in responding to the WMB defendants' motion, have referred to statements not previously pled in the Complaint. The WMB defendants assert that plaintiffs seek, belatedly, to rely on the statements made by Bailey as to the reasons for the spin-off in the July 28, 2000 conference call,[73] the statements made by Bailey about WCG's funding situation during the October 25, 2000 conference call,[74] the statements made by Bailey and other officers on the reasons for the spin-off during the January 2001

_____

[73] In the July 28, 2000 conference call, Bailey stated:

> As stated in the press release, we believe this course of action, if successful, is *the best way to assure that every part of our company can enjoy the optimal growth as a result of the opportunities that are available to us* and that continue to become available to us and *it enables us to fund those opportunities in an efficient and an effective way*.

Ex. 28 at 1-2, KB Decl. (emphasis added).

[74] In the October 25, 2000 conference call, Bailey stated that WCG was "pre-funded for their capital needs in this time of more unsettled capital markets, to carry them to that point of EBITDA positive." Ex. 53 at WMB.00227224, KB Decl.

road show,[75] the statements by Bailey about the reasons of the spin-off in the March 30, 2001 press release[76] and the statements made by certain WMB executives as to the reasons for the spin-off during the April 2001 road show.[77]   The WMB defendants contend that plaintiffs should not be permitted to amend their complaint at the summary judgment stage, after discovery has closed, and that plaintiffs have offered no justification for their delay.   Defendants maintain that most of the new allegations are based on public statements that have always been accessible.   Defendants contend that they will be seriously prejudiced if plaintiffs are permitted to amend, arguing, among other things, that they have been denied their opportunity to challenge the sufficiency of the allegations by way of a motion to dismiss.   The WMB defendants also assert that even if the plaintiffs are granted leave to amend, the new allegations nevertheless fail as a matter of law because plaintiffs cannot show falsity, materiality and scienter.

Although the WMB defendants are correct that the cited statements are not specifically pleaded in the Complaint, the court concludes that plaintiffs should be permitted to rely upon them.[78]   *See*, Rule 15(a), Fed. R. Civ. P. (leave to amend "shall be freely given when justice so requires.").   The alleged misstatements are similar to those previously pled, which survived dismissal.   No new discovery is required to

---

[75]   During the January 2001 roadshow, Bailey and other senior WMB executives described the spin-off of WCG as something that: "Better enables each company to execute its respective business plan;" "Optimizes access to capital;" "Facilitates pursuit of growth opportunities" and "Creates a 'Win-Win' for WMB and WCG shareholders."   Ex. 85 at ML 070978, KB Decl.

[76]   In the March 30, 2001 press release, Bailey stated that the separation of WMB and WCG "would best enable each to reach its full potential and to most efficiently access capital markets. . . ."   Ex. 92 at LB 066355, KB Decl.

[77]   During the April 2001 roadshow, senior WMB executives described the spin-off as something that "Better enables each company to execute its respective business plan;" "Optimizes access to capital;" "Facilitates pursuit of growth opportunities;" and "Creates a 'Win-Win' for WMB and WCG shareholders."   Ex. 94 at WCG-HJ-E000015845.

[78]   The new allegations would be required to be included in any final pretrial order.

address these additional matters.  The defenses to these allegations, at least in the present procedural context, are the same as those raised as to other matters which have been pleaded.  The court specifically rejects defendants' bare, conclusory statement that they will suffer substantial prejudice if plaintiffs are allowed to rely upon these alleged misstatements.[79]  As to the merits of the new allegations, the court concludes that there is sufficient evidence in the record to survive a challenge under Rule 56 on the issues of falsity, materiality and scienter.

The WMB defendants also contend that they are entitled to partial summary judgment on plaintiffs' § 10(b) and Rule 10b-5 claims relating to the alleged misstatements as to the reasons for WCG's spin-off, WCG's network quality and WCG's financial results and expectations because plaintiffs do not have sufficient evidence that the WMB defendants acted with the requisite scienter.   The WMB defendants argue that plaintiffs have produced no competent evidence that defendants knew that the purported misstatements were false or misleading when made or that they made the statements recklessly.  They further argue that plaintiffs have no significant "motive and opportunity" evidence.

The scienter element in a securities fraud case requires "a mental state embracing intent to deceive, manipulate, or defraud."  Fleming Cos., 264 F.3d at 1258 (quotations  omitted).   It  includes  "knowing  or  intentional  conduct"  and "recklessness," which is "conduct that it is an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it."  Id.  "One of the classic fact patterns giving rise to a strong inference of scienter

---

[79]   The court specifically finds no prejudice as to the July 28, 2000 conference call allegations.  In motion briefing, the WMB defendants recognize that plaintiffs have made such allegations: "Plaintiffs claim that the statements made by Keith Bailey regarding the reasons for the spin-off were false and misleading, citing quotes . . . during the July 28, 2000 Williams Earnings Call. . . ."  See, Doc. No. 1061 (WMB) at 34.

is that defendants published statements when they knew facts or had access to information suggesting that their public statements were materially inaccurate." Florida State Bd. of Admin. v. Green Tree Financial Corp., 270 F.3d 645, 665 (8th Cir. 2001) (citing Novak v. Kasaks, 216 F.3d 300, 311 (2nd Cir.), *cert. denied*, 531 U.S. 1012 (2000)); *see also*, Fleming Cos., 264 F.3d at 1260-61(in case of omissions, scienter proved by knowledge of the omitted fact plus knowledge that the omission is likely to mislead investors).   Evidence of motive and opportunity may also be relevant to the issue of scienter.   Fleming Cos., 264 F.3d at 1263.   Furthermore, the scienter of senior controlling officers of a corporation may be attributed to the corporation itself to establish liability under § 10(b) and Rule 10b-5 when those senior officials act within the scope of their apparent authority.   Adams v. Kinder-Morgan, Inc., 340 F.3d 1083, 1106 (10th Cir. 2003).

Reviewing the summary judgment record and the inferences reasonably drawn therefrom in the light most favorable to plaintiffs, the court concludes that genuine issues of fact exist as to the scienter element as challenged by the WMB defendants. The evidence before the court shows that defendants knew facts or had access to non-public information contradicting the challenged public statements.   Moreover, there is   evidence in the record, easily sufficient to raise an issue of fact, that defendants knew of undisclosed material facts and that failure to reveal such facts would likely mislead investors.   The court is persuaded that this evidence, if credited by the trier of fact, would establish recklessness as defined by relevant case law.   The court also concludes that evidence in the record, viewed favorably to plaintiffs, raises an issue of fact as to defendants' motive and opportunity to commit the alleged fraud. The court therefore concludes that, for summary judgment purposes, a sufficient showing of scienter has been made as to the claims relating to the WMB defendants'

statements about the reasons for the spin-off, WCG's network quality and WCG's financial results and expectations.[80]

The WMB defendants further contend that the plaintiffs' assertion of scienter, as to the claimed GAAP violations, fail as a matter of law.   Specifically, the WMB defendants attack plaintiffs' contentions (i) that WCG violated GAAP in that impairment charges should have been taken earlier as to WCG's inventory, international assets and Winstar assets, as well as the dark fiber and conduit assets, and (ii) that WCG improperly booked revenues in connection with purported dark fiber "swaps" which in reality had no business purpose.   At oral argument on the motion, the WMB defendants' counsel represented to the court, without contradiction from plaintiffs' counsel, that plaintiffs were not pursuing the issues relating to Winstar assets and the fiber swaps.   On the basis of this representation (among others made at oral argument), taken together with the court's exclusion of the proposed expert testimony of Mr. Mintzer, there are several aspects of plaintiffs' GAAP-related claims that would not ultimately be submitted to a jury as this matter now stands.   But, as to the scienter element[81] of the GAAP claims against the WMB defendants, there are genuine issues of fact which preclude summary judgment.[82]

---

[80]   The court notes that several of the challenged statements are not made by Bailey.  Rather, they are made by Bross, Janzen, Schubert and WCG.  Plaintiffs have alleged a § 20(a) claim against the WMB defendants.  For the WMB defendants to be held liable under § 20(a), the plaintiffs need not show that the WMB defendants were actual or culpable participants in the primary violation.  Adams, 340 F.3d at 1109 ("[W]e have expressly rejected those decisions that may be read to require a plaintiff to show the defendant actually or culpably participated in the primary violation . . . Section 20 of the Exchange Act contains no requirement that plaintiffs must prove a control person's state of mind.") (internal quotations omitted).

[81]   Again, the court notes that plaintiffs have alleged a § 20(a) claim as to the accounting fraud allegations.  Under Tenth Circuit law, plaintiffs need not show that the WMB defendants actually or culpably participated in the primary violation to hold defendants liable under § 20(a).  Adams, 340 F.3d at 1109.

[82]   The court notes that in footnote 11 of their brief in support of their motion for partial summary judgment, the WMB defendants specifically join in E&Y's motion for summary judgment challenging the alleged GAAP violations.

B.   Motion of the Williams Companies, Inc. and Keith E. Bailey for Partial Summary Judgment on Alleged Misstatements or Omissions Made *After* WCG's Spin-Off from Williams

The WMB defendants move for partial summary judgment as to the WCG Subclass plaintiffs' claims relating to alleged misstatements or omissions made by WCG or its officers and directors after the spin-off of WCG from WMB on April 23, 2001.[83]  The WMB defendants argue that they cannot be held liable under § 20(a) for these alleged post-spin-off misrepresentations and omissions and that, in any event, plaintiffs have no evidence to show that the WMB defendants conspired with unspecified persons at WCG, or that they were "control persons" of WCG after the spin-off.  Arguing that Supreme Court and Tenth Circuit law plainly establish that third parties such as the WMB defendants cannot be held liable for alleged misrepresentations and omissions made by WCG after the spin-off, the WMB defendants contend that partial summary judgment is appropriate.

In response, plaintiffs concede that the WMB defendants did not control WCG after the spin-off and agree that those defendants cannot have any § 20(a) control person liability for WCG's primary violations after the spin-off.  They also do not challenge any of the WMB defendants' arguments relating to the alleged conspiracy. The court therefore concludes that partial summary judgment is appropriate on plaintiffs' § 20(a) claims as to alleged misrepresentations and omissions made by WCG or its officers and directors after the spin-off of WCG from WMB on April 23, 2001 and as to any claims relating to the alleged conspiracy.

However, plaintiffs do argue that Bailey (as distinguished from WCG) made three additional false and misleading statements after the spin-off.  These false and misleading statements were made, plaintiffs contend, in the April 26, 2001 conference

_____

[83]  Plaintiffs, according to defendants, seek to proceed on the basis of at least 28 statements made by WCG or its management after the spin-off.

call,[84] the May 17, 2001 WMB shareholder meeting[85] and the October 31, 2001 e-mail to Janzen. The WMB defendants protest that none of these alleged false and misleading statements were pleaded in the Complaint and that plaintiffs should not be allowed, at this stage, to proceed on the basis of these allegations.

As to the allegations relating to the April 26, 2001 conference call and the May 17, 2001 WMB shareholder meeting, the court disagrees with the defendants. The alleged false and misleading statements relating to WCG's financing and reasons for the spin-off are similar to those previously pled, which survived a motion to dismiss. The court again rejects the WMB defendants' bare, conclusory statements of prejudice. The court also concludes that plaintiffs have demonstrated triable issues of fact as to materiality and scienter with respect to these allegations. However, plaintiffs will not be permitted to proceed on the basis of the October 31, 2001 e-mail. In that e-mail to Janzen, Bailey stated: "I gave a fire breathing endorsement of WCG and the strategy that underpinned it (a bandwidth machine-low cost/high quality)

---

[84] During the April 26, 2001 conference call, Bailey stated:

> [*B]ecause their financing is in place* and their performance we believe is good and will continue to be good, we think that there's significant upside in that stock as well as soon as it reaches a new ownership equilibrium.

Ex. 115 at WMB.00032222, KB Decl. (emphasis added).

[85] During the May 17, 2001 shareholder meeting, Bailey stated:

> [W]e were ultimately successful, and in a way that we believe best assures the long-term health and prosperity of both companies . . . . [WCG] is strongly positioned for success. Its core network asset is in place. It has a demonstrated history of technical leadership. It has been and should be the standard-setter in operational performance. And, *it has the financial resources in place* to enable it to deliver on the promise of a very bright future.

Ex. 116 at WMSE005813519, KB Decl. (emphasis added).

during our analysts meetings yesterday." Ex. 117, KB Decl.  There is no evidence in the record as to the actual statement made by Bailey to the analysts.  The actionability of the statement to the analysts, for that reason, defies analysis.  Consequently, it would be futile to allow plaintiffs to rely on this allegation and to include it in any pretrial order because it would not survive a test of its legal sufficiency.  *See*, Foman v. Davis, 371 U.S. 178, 182 (1962) (court need not grant leave to amend if amendment would be futile).[86]

Plaintiffs also contend that the WMB defendants made false and misleading statements post-spin-off as a result of their failure to take any WCG-related charges on WMB's own books until January 29, 2002.[87]  In response, defendants argue that plaintiffs lack standing to complain about WMB's accounting and that WMB did disclose its contingent liabilities relating to WCG in November of 2001 –  as plaintiffs' accounting expert, Mr. Mintzer, suggested should have been done.  The WMB defendants also point out that the disclosure, when made, had no negative effect on WCG's stock price, indicating that the disclosure was immaterial.  Summary judgment is not specifically sought as to this claim and will not be granted, because there are triable issues of materiality and scienter.[88]  The standing issue is more

---

[86]  As to the "fire breathing endorsement" statement made by Bailey to Janzen, the court notes that defendants cannot be held liable for a private statement.  *See*, Basic, Inc. v. Levinson, 485 U.S. 224, 247 (1988) (a plaintiff using the fraud on the market theory must point to "public material misrepresentations").  It should be borne in mind, though, that, with the present disposition of this case, the court has no occasion to address the evidentiary admissibility of Bailey's statement to Janzen about his fire breathing endorsement.  That is a matter entirely distinct from the substantive actionability of this private comment.  If this case were ever to go to trial, there is more than a passing likelihood that Bailey would be required to eat his fire.

[87]  As previously discussed, Mr. Mintzer opined that WMB should have recorded a charge on its June and September 2001 financial statements for its contingent liability as guarantor of more than $1 billion in WCG debt.

[88]  The court has excluded Mr. Mintzer's proposed expert testimony relating to WMB's failure to record a contingent liability.  *See*, Part V(D)(4)(b), above (discussing paragraphs 303 - 305 of Mr. Mintzer's report).  It therefore appears that plaintiffs may not have sufficient evidence to

complex and has not been adequately briefed. It will receive no further attention at this stage.

C.    Defendant Ernst & Young LLP's Motion for Summary Judgment.

E&Y moves for summary judgment on the WCG Subclass plaintiffs' § 10(b) and Rule 10b-5 claim, relating to E&Y's March 12, 2001 audit opinion on WCG's year-end 2000 financial statements. In the challenged audit opinion, E&Y stated that the audit was "conducted in accordance with [GAAS]," and that "the financial statements . . . present fairly, in all material respects" WCG's financial position. E&Y asserts that plaintiffs cannot establish that there was a materially false statement because the evidence does not establish that the audit was not conducted an accordance with  GAAS and that WCG's financial statements violated GAAP. In addition, E&Y contends that plaintiffs cannot prevail because the evidence fails to show that E&Y acted with the requisite scienter. Specifically, E&Y argues that the evidence fails to show that its auditing practices were so deficient that the audit amounted to "no audit at all" or that "no reasonable accountant would have made the same decisions if confronted with the same facts."

1.    Material misstatements or omissions.

Plaintiffs allege that WCG violated GAAP in its financial statements by: (i) "improperly failing to record required write-downs for impairment on the value of WCG's excess fiber and conduit of approximately $1.9 billion;" and (ii) "improperly failing to record required write-downs for impairment in the value of WCG's excessive inventory on a timely basis of approximately $336 million."[89] Complaint

---

establish that any misrepresentation or omission occurred. The court, however, declines to address that matter *sua sponte*.

[89] In the Complaint, plaintiffs also allege that WCG violated GAAP regarding the treatment of WCG's 2000 broadband transactions, WCG's international equity investments and fiber assets and WCG's Winstar assets. During oral argument on the motion, E&Y's counsel represented that plaintiffs' counsel had conceded plaintiffs' claim as to these allegations and such representation was not contradicted by plaintiffs. It appears from the court's review of the record that plaintiffs have

¶ 157.  As previously discussed, FAS 121, which, during the periods relevant in the case at bar, governed accounting for the impairment of long-lived assets, requires a three-step analysis before a company takes an impairment charge.  E&Y argues that plaintiffs cannot demonstrate that any of the three sequential steps in the FAS 121 analysis at year-end 2000 indicated that an impairment charge was required, contending that plaintiffs cannot prove that  (i) there were impairment indicators or triggering events as of December 31, 2000; (ii) a cash flow analysis conducted on WCG's network would have shown an impairment; or (iii) a material charge would have resulted.  On this basis, E&Y maintains that plaintiffs cannot establish that either the network or the network equipment were materially impaired at year-end 2000 – hence no GAAP violation occurred and there was not a material misstatement.  The court agrees.

The court has excluded the report and testimony of plaintiffs' expert, H. Sean Mathis, and has excluded the report and testimony of plaintiffs' expert Andrew M. Mintzer as to the impairment issues.  Without this testimony, plaintiffs cannot establish a genuine issue of fact as to whether WCG failed all three steps of the impairment analysis and that, consequently, a material impairment existed as to WCG's network and  network equipment at year-end 2000.  For that reason, plaintiffs cannot establish that WCG violated GAAP by failing to record impairments in the year-end 2000 financial statements.  Plaintiffs are accordingly unable to establish the essential element of material misrepresentation or omission in support of their claim of impairment under FAS 121.

Because plaintiffs cannot show that WCG's year-end 2000 financial statements were inaccurate with respect to application of FAS 121, the court concludes, with

---

no material facts to support such allegations, and thus, no genuine issue of fact exists as to whether WCG fairly presented its financial statements in these areas and as to whether E&Y's auditing of these areas complied with GAAS.  The court concludes that E&Y is entitled to summary judgment as to plaintiffs' claim relating to these allegations.

respect to impairment, that plaintiffs also cannot succeed on their claim that E&Y made a material misstatement in reporting that it had performed its audit in accordance with GAAS.   To succeed on this issue, plaintiffs must show a "material" misrepresentation or omission.   Dura, 544 U.S. at 341.   However, an auditor's statement that it conducted an audit in compliance with GAAS, even if untrue, is not "material" if the company's financial statements do not materially violate GAAP because "it is difficult to imagine how a reasonable investor could conclude," under those circumstances, that the purported misstatement of the auditor "significantly altered the total mix of information available."   *See*, New Jersey and its Div. of Investment v. Sprint Corp., 314 F. Supp. 2d 1119,1147 (D. Kan. 2004).

Plaintiffs also allege that at year-end 2000 WCG was in violation of its debt covenants and failed – thus violating GAAP – to disclose the violations in its financial statements.   They also allege that E&Y failed to modify its report as to the debt covenant violations, in violation of GAAS.   The debt covenants required WCG to satisfy several financial measurements, including the Total Leverage Ratio (of no more than 18) and the Minimum EBITDA (of $120 million).   Plaintiffs contend that WCG met its Total Leverage Ratio (calculated to be 17.07) by resorting to four improper items, which if properly accounted for, would have caused the ratio to exceed 18.[90]   They also argue that WCG satisfied its EBITDA requirement by using

---

[90]These items are:

> 1.  The Solutions unit's bad debt expense of $30 million (excluded from EBITDA).
>
> 2.  Cash of $70 million received on the sale of XOXO securities (included in EBITDA for covenant purposes).
>
> 3.  Known accounting error which net to a $4.5 million decrease to the income reported in WCG's income statement (excluded from EBITDA for covenant purposes).

two improper items, which, if excluded, would have caused WCG to miss the EBITDA mark by about $60 million.[91]

The court has not excluded Mr. Mintzer's proposed expert testimony with respect to WCG's violations of the debt covenants.  Paragraphs 172 through 223 of Mr. Mintzer's expert report specifically discuss the debt covenant violation asserted by plaintiffs.  Ex. 8, CM Decl.  Based upon the report and the other evidence in the summary judgment record, viewed in a light most favorable to plaintiffs, the court concludes that genuine issues of fact do exist as to whether WCG failed to disclose that it was in violation of its debt covenants and as to whether E&Y failed to ascertain and report the asserted violation.  Summary judgment must therefore be denied as to the element of material misrepresentation with respect to the alleged debt covenant violations.

Plaintiffs also contend that E&Y failed to modify its audit opinion language, thus departing from GAAS, to indicate that there was substantial doubt that WCG could continue as a "going concern" for twelve months beyond December 31, 2000. According to AU § 341, one of AICPA's professional standards, E&Y, in conducting an audit of WCG's financial statements in accordance with GAAS, was required to evaluate whether there was substantial doubt as to WCG's ability to continue as a

---

4.  Special adjustments to GAAP net income of $5.8 million made only for purposes of computing debt covenant compliance.

Ex. 8, para. 182, p. 60,  CM Decl.

[91]These two items are:

1.  The Solutions unit's bad debt expense of $30 million (excluded from EBITDA for covenant purposes).

2.  Cash of $70 million received on the sale of the XOXO securities (included in EBITDA for covenant purposes).

Ex. 8, para. 220, p. 72, CM Decl.

going concern for a reasonable period of time, not to exceed one year from the date of the financial statements. Ex. 61 at AU § 341.01 and AU § 341.02, CM Decl. Continuation of an entity as a going concern is assumed in the absence of significant information to the contrary. Information that significantly contradicts that assumption relates to the entity's inability to continue to meet its obligations as they become due without substantial disposition of assets outside of the ordinary course of business, restructuring of debt, externally forced revisions of its operations, or similar actions. *Id*. at AU § 341.01. Plaintiffs contend that the evidence establishes the existence of factors clearly indicating that substantial doubt existed about WCG's ability to continue as a going concern as of December 31, 2000. These factors, plaintiffs argue, portended that WCG would have needed to restructure its debt, dispose of assets and restructure its operations in order to meet its obligations in 2001. In support of this claim, plaintiffs point out that less than seven days after the April, 2001 spin-off, WCG began working with The Blackstone Group to look at strategies to restructure its balance sheet. Less than two months later, in June of 2001, WCG attempted a capital spending freeze to control expenditures and announced a 10 percent lay off of its work force. Subsequently, in August of 2001, WCG bought back some of its long term debt in an attempt to restructure its balance sheet. Plaintiffs contend that these attempts at restructuring, shortly after the spin-off, show that WCG was not a going concern as defined by GAAS as of year-end 2000.

E&Y contends that during the audit, it reviewed WCG's liquidity position, considered WCG's specific characteristics within the telecom industry and obtained a management representation letter from WMB confirming its financial support of WCG. As a result of this review and based upon its professional judgment, it concluded that there was no substantial doubt about WCG's ability to continue as a going concern for twelve months beyond December 31, 2000. Based upon the evidence in the record, including WMB's assurance of funding for WCG in 2001 as

long as the spin-off did not occur, and Lehman Brothers' opinion that if the spin-off occurred it would not materially impair WCG's ability to fund its future capital needs, E&Y contends that plaintiffs' claim that there was substantial doubt about WCG's ability to continue as a going concern as of year-end 2000 is untenable.  In addition, E&Y argues that plaintiffs' going concern argument is undermined by the indisputable fact that WCG did indeed continue as a going concern beyond December 31, 2001.

E&Y also challenges plaintiffs' argument that WCG's  "restructuring,"which occurred months after the audit, shows substantial doubt that WCG was a going concern, contending that there is no evidence in the record to show that, to stay in business, WCG was forced to sell assets to meet its obligations as they became due.

The court concludes that plaintiffs have not presented evidence sufficient under the minimal Rule 56 standard to show a material misrepresentation or omission by E&Y as to WCG's status as a going concern.  There is no dispute that WCG did continue as a going concern past December 31, 2001.  For that reason, E&Y's failure to include a going concern qualification cannot constitute a "material" misrepresentation or omission.  *See,* Pew v. Cardarelli, 2005 WL 3817472, *9 (N.D.N.Y. March 17, 2005) (citing In re Integrated Resources Real Estate, Ltd. Partnerships Securities Litigation, 815 F. Supp. 620, 670 (S.D.N.Y. 1993) and Schick v. Ernst & Young, 808 F. Supp. 1097, 1102-03 (S.D.N.Y. 1992)).  Moreover, as did the court in Pew, the court notes that the AICPA's professional standards specifically state that "the absence of reference to substantial doubt in an auditor's report should not be viewed as providing assurance as to an entity's ability to continue as a going concern."  *Id.*; *see also*, Ex. 61 at AU § 341.04, CM Decl.  Consequently, the court concludes that plaintiffs cannot establish a material misrepresentation or omission as to WCG's ability to continue as a going concern as of year-end 2000.

2.     Scienter as to E&Y.

The court has concluded that as to as to the material misrepresentation or omission element of plaintiffs' § 10(b) and Rule 10b-5 claim against E&Y, genuine issues of fact exist only with respect to the alleged debt covenant violations.  E&Y also moves for summary judgment on the basis that plaintiffs cannot establish the scienter element of their claim.

Although recklessness can satisfy the requirement of scienter in a securities fraud action against an accountant, "recklessness," for purposes of a securities fraud claim against an outside auditor, has persuasively been defined as:

> highly unreasonable [conduct], involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.  That standard requires more than a misapplication of accounting principles.  [Plaintiffs] must prove that the accounting practices were so deficient that the audit amounted to no audit at all, or 'an egregious refusal to see the obvious, or to investigate the doubtful," or that the accounting judgments which were made were such that no reasonable accountant would have made the same decisions if confronted with the same facts.

Sprint Corp., 314 F. Supp. 2d at 1148 (quoting S.E.C. v. Price Waterhouse, 797 F. Supp. 1217, 1240 (S.D.N.Y. 1992)).

Applying that standard and viewing the evidence most favorably to the plaintiffs, the court concludes that plaintiffs cannot meet this exacting standard as to the alleged debt covenant violations.  Although plaintiffs have shown that another accountant, Mr. Mintzer, would have handled the matter differently and reached different audit conclusions, they have not shown that E&Y's accounting practices were so deficient that the audit amounted to no audit at all or that the accounting judgments made were such that no reasonable accountant would have made the same decision if confronted with the same facts.  Moreover, they have not shown an egregious refusal by E&Y to see the obvious or to investigate the doubtful.  At best,

152

plaintiffs have shown negligence by E&Y – not reckless conduct.  Recklessness, however, is "a mental state apart from negligence and [is] akin to conscious disregard."  In re Comshare Inc. Securities Litigation, 183 F.3d 542, 550 (6th Cir. 1999); see also, In re Cardinal Health Inc. Securities Litigation, 426 F. Supp. 2d 688, (S.D. Ohio 2006) ("Recklessness on the part of an independent auditor entails a mental state so culpable that it approximate[s] an actual intent to aid in the fraud being perpetrated by the audited company.") (internal quotations and citations omitted).

GAAP and GAAS violations, standing alone, are not sufficient to establish scienter.  Zucker v. Sasaki, 963 F. Supp. 301, 307 (S.D.N.Y. 1997).  The GAAP or GAAS violations must be coupled with evidence that the violations were the result of the auditor's fraudulent intent to mislead investors.  Fleming Cos., 264 F.3d at 1261.  The court's careful review of the substantial summary judgment record in this case convinces the court that plaintiffs cannot make the required showing as to E&Y.  Plaintiffs' proffered evidence that E&Y lacked independence is insufficient to raise a genuine issue of fact as to scienter.  The mere fact that E&Y had an interest in continued employment by WCG after the spin-off and to continue to receive substantial auditing fees is likewise not sufficient.  Sprint Corp., 314 F. Supp. 2d 1148, n. 26.  Accordingly, because plaintiffs have failed to show by competent evidence that E&Y acted with scienter as to the alleged debt covenant violations, the court concludes that summary judgment is appropriate.

The court further concludes that even if plaintiffs could establish material misrepresentations or omissions as to the impairment of WCG's network and network equipment and as to WCG's ability to continue as a going concern as of year-end 2000, plaintiffs have failed to raise genuine issues of fact as to whether E&Y's treatment of those matters was reckless.  The summary judgment record in this case does not establish that E&Y's audit amounted, effectively, to no audit at all.  The plaintiffs' primary argument is that because only two sentences in the 17,000 pages

of work papers mention the FAS 121 impairment analysis, E&Y's year-end 200 audit amounted to "no audit at all."  The evidence clearly shows that E&Y evaluated whether FAS 121 impairment indicators existed and concluded that they did not. E&Y documented this conclusion in the work papers.  Plaintiffs' contentions on this point boil down to an argument with E&Y's professional judgment as to FAS 121 impairment indicators.   But plaintiffs have not made a showing, sufficient for summary judgment purposes, that "no reasonable accountant would have made the same decisions" E&Y made.  Moreover, the summary judgment record shows that none of WCG's competitors took a network or equipment impairment charge at year-end 2000.  This substantially undercuts plaintiffs' contention that E&Y reached a conclusion that no reasonable accountant would have reached.  Furthermore, as to scienter with respect to the going concern qualification, at least one court has held that scienter is not demonstrated as to status as a going concern when the company survives for twelve months. *See*, Fidel v. Farley, 2001 U.S. Dist. LEXIS 9461, at *32, n.21 (W.D. Ky. June 27, 2001).  Accordingly, the court concludes that E&Y is entitled to summary judgment as to the scienter element.

      D.    WCG Defendants' Motion for Summary Judgment.

          1.    WCG's contentions.

The WCG defendants move for summary judgment on the ground that the WCG Subclass plaintiffs cannot, as a matter of law, establish loss causation, an element of their § 10(b) and Rule 10b-5 claims.  Defendants argue that under the Supreme Court's decision in Dura, plaintiffs must show that their claimed losses were caused by the revelation of the fraud to the market  ("the corrective disclosure") and not by "changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events . . . ." Dura, 544 U.S. at 342-43.  The WCG defendants contend that plaintiffs cannot show that their losses were caused by the fraud.  Defendants contend that the Complaint (not to be

confused with Dr. Nye's report) alleges only two corrective disclosures as to WCG common stock and none as to WCG's notes.[92]

The earliest of the two disclosures alleged in the Complaint was February 25, 2002, the date WCG announced in a press release that it was considering bankruptcy as an option to restructure its debt.   Defendants contend, however, that this announcement was not a corrective disclosure – pointing out that WCG had warned the investing public in its February 4, 2002 press release, as well as in a February 13, 2002 earnings conference call, that bankruptcy might be an option.   In addition, defendants assert that by the time the February 25th announcement as made, WCG's stock had lost more than 98 percent of its value from the beginning of the class period. Indeed, the price of WCG's stock had declined from $28.50 to $0.51 per share. Because the value of the WCG stock had fallen so far before the announcement, defendants contend that the market clearly knew WCG was in dire financial straits. Thus, defendants maintain that there was nothing corrective, at least in a causal sense, about the February 25th announcement.

Defendants also argue that even if WCG's announcement could be treated as a corrective disclosure, a price decline of only an additional one percent (based on its price on the first day of the class period) after the per-share price had fallen more than 98 percent, taken together with the fact that the Telecom Index had declined more than 81 percent during the same period, precludes any finding of loss causation.

Defendants also assert that the second disclosure pleaded in the Complaint, WCG's actual bankruptcy filing on April 22, 2002, likewise cannot be treated as a corrective disclosure for loss causation purposes.   Defendants point out that WCG disclosed on February 4, 2002, February 13, 2002, February 25, 2002 and April 1,

---

[92] Because the Complaint fails to give any idea of plaintiffs' losses in regard to the notes and the causal connection of the losses, defendants contend that plaintiffs cannot establish loss causation with regard to the notes.

2002, that bankruptcy was a possibility.  Defendants also contend that WCG had not fraudulently claimed to the investing public that it would not file for bankruptcy. Consequently, defendants contend that while the bankruptcy filing disclosed negative news, it cannot be said to have disclosed corrective news.

Defendants also point out that before the bankruptcy announcement, the price of WCG's stock was $0.17 per share – representing a decline of 99.4 percent from the first day of the class period, substantially tracking the overall decline in the value of securities in the telecommunications sector.

The WCG defendants further argue that plaintiffs cannot salvage their case through evidence offered by their damages and loss causation expert, Dr. Nye.  First, defendants contend that Dr. Nye's opinion testimony is inadmissible under <u>Daubert</u>. Defendants next argue that Dr. Nye's theory of loss causation, "leakage" or gradual disclosure of the "relevant truth" as to WCG's financial condition throughout the class period, runs contrary to the allegations of the Complaint.  Defendants insist that plaintiffs should be held to the  theory of loss causation stated in their amended pleading (that WCG's financial condition was concealed from the investing public until February 25, 2002).  Because plaintiffs did not seek leave to plead any "leakage" theory of loss causation, defendants contend that they should not be permitted to rely on the "leakage" theory to support their case at this juncture.  Defendants also contend that the "leakage" theory collides with the holding in <u>Dura</u>.  On this point, defendants argue that while courts have allowed plaintiffs to establish loss causation by showing that the truth leaked out through a series of  partial corrective disclosures, the courts have not excused plaintiffs from identifying those disclosures.  Nor, say the defendants, are the plaintiffs excused from showing statistically significant market reactions to the leaked truth.  Defendants argue that Dr. Nye has presented no evidence or analysis showing any corrective disclosures prior to January 29, 2002. Because Dr. Nye's "leakage" opinion does not identify the emergence of corrective

information on an identifiable date, with an associated drop in the price of the stock, defendants contend that plaintiffs cannot establish loss causation by way of Dr. Nye's "leakage" opinion.

Defendants acknowledge that in his report, Dr. Nye has identified four specific partial corrective disclosure dates.  Dr. Nye proffers corrective disclosures on January 29, February 4,  February 25, and April 22, 2002.  But defendants argue that the identified disclosures do not constitute corrective disclosures.  The defendants' arguments as to the February 25 and April 22 announcements are summarized above. As to the January 29, 2002 disclosure (WMB's announcement that it was delaying the fourth quarter and 2001 year-end financial statements while it re-evaluated the status of its contingent liabilities relating to WCG), defendants assert that the disclosure did not directly expose any fraud by WCG and that if an announcement does not directly expose the fraud, the plaintiffs' expert may not be permitted to speculate, without evidence, that the market recognized a relationship between the announcement and the fraud.  Defendants assert that Dr. Nye's work has not shown, on any acceptable basis, that the market recognized a relationship between WMB's announcement and WCG's alleged concealment of its "true" financial condition, thus precluding any attempt, through Dr. Nye or otherwise, to speculate that the market recognized a relationship between the announcement and fraud.   Defendants also contend that Dr. Nye's own economic analysis refutes any claim that the January 29, 2002 announcement operated as a corrective disclosure, pointing out that his event study shows that the price decline following the announcement was not statistically significant, and concluding that in the absence of a statistically significant price decline following the corrective disclosure, there can be no loss causation.

As to the February 4, 2002 disclosure (WCG's announcement that the bank group had informed WCG that it may be in default under its credit facility and that WCG was performing a review of possible impairment of long-lived assets),

defendants assert that, at best, the disclosure was in part corrective and in part merely negative and that Dr. Nye has wholly failed to differentiate between the effects of the two categories of information, thus precluding the use of Dr. Nye's proposed testimony on this point to support loss causation. Doc. No. 1092 (WCG defendants) at 33.

Aside from their contentions as to loss causation, the WCG defendants move for summary judgment on the basis of a related (but not identical) contention that plaintiffs cannot establish either the fact of their damages or the means of calculating their damages, both of which failures are fatal to plaintiffs' securities fraud claims, asserting that Dr. Nye's three proposed damage scenarios (Scenario 1, Scenario 2 and Alternative Scenario 2) are so inadequate as to render them useless. Defendants argue that each of the scenarios would permit plaintiffs to recover losses which either preceded disclosure of the alleged fraud or were the result of market factors unrelated to the alleged fraud, or both. Because plaintiffs are unable to either prove the fact of damages or present a reliable method for calculating legally cognizable damages, defendants contend that they are entitled to summary judgment.

2.    Plaintiffs' response to WCG's motion.

Plaintiffs argue that the "leakage" theory is not inconsistent with the allegations of the Complaint. They contend that their amended pleading contains numerous examples of the market's gradual realization of WCG's poor financial condition during the class period, as well as defendants' efforts to rebut the market's realization. The allegations, plaintiffs maintain, provide sufficient notice of plaintiffs' assertion that negative information concerning WCG slowly leaked into the marketplace, gradually revealing WCG's true financial condition and gradually dissipating the artificial inflation in WCG's stock price. Plaintiffs also suggest that even if the leakage theory has not been pleaded, the court should consider the issue at this stage by treating it as an amendment to their pleading.

Aside from pleading issues, plaintiffs also contend that the leakage theory is consistent with Dura. Plaintiffs assert that in the Dura opinion, the Supreme Court explained that a loss may be caused if the purchaser sells after "the relevant truth begins to leak out," Dura, 544 U.S. at 342, thus recognizing that some cases may involve a gradual, fraud-related stock price decline. Plaintiffs contend that their leakage theory in this case is not precluded simply because they cannot specifically identify each piece of corrective information that leaked out into the market during the class period. It is noteworthy, and telling, that they assert that *any* information that allowed investors to understand WCG's true financial condition and prospects for success is "leakage of the relevant truth." Doc. No. 1210 (plaintiffs) at 23. They maintain that the very nature of the leakage theory makes it impossible to identify each and every piece of information that revealed the true state of WCG's financial condition because a statistical analysis of WCG's stock price movements will not necessarily identify the "bits and pieces" of corrective information which cause the stock price to imperceptibly but inexorably decline to its true value. They contend, in substance, that it should be sufficient for them to show that by the end of the class period, the market knew the truth about WCG's previously-misrepresented financial condition and prospects for success.

Plaintiffs also contend that they have shown, with Dr. Nye's Scenario 2 and Alternative   Scenario 2, that the truth about WCG's financial condition and its prospects for success was revealed to the investing public, at the very least, through the four specific corrective disclosures on January 29, 2002, February 4, 2002, February 25, 2002 and April 22, 2002 and that their assertion of the January 29 and February 4 disclosures is not inconsistent with the allegations of the Complaint.

Plaintiffs contend that the January 29, 2002 announcement (about WMB's assessment of its contingent liabilities) was a corrective disclosure because that announcement partially revealed believable negative information in the possession of

159

WMB, previously concealed,  about WCG's financial condition and prospects for success.  Plaintiffs also challenge defendants' argument that the disclosure was not corrective because the resulting stock price movement was not statistically significant, arguing that defendants' argument is based on an incorrect interpretation of "statical significance" and its meaning in relation to the materiality of a stock price drop.

Plaintiffs contend that the February 4, 2002 disclosure was a corrective disclosure because it revealed to the market material risks that had been fraudulently concealed, specifically (i) that WCG had been overloaded with debt and would be unable to service that debt while maintaining its business plan and (ii) that WCG's long-lived assets were materially impaired.  Plaintiffs argue that it was not necessary for Dr. Nye to separate corrective bad news from garden-variety bad news on February 4 as long as some portion of WCG's stock price drop on that day was caused by investors' reaction to the fraud-related information.

Next, plaintiffs argue that the February 25, 2002 announcement was a corrective disclosure because it disclosed the substantial likelihood that WCG would not be able to survive as a viable standalone entity after the spin-off, which had previously been concealed by defendants.  Noting that bankruptcy is always a possibility for any corporation, plaintiffs contend that  prior to February 25, 2002, the market was not made aware that it was "highly likely" that WCG would be forced to declare bankruptcy, Doc. No. 1210, at 33, pointing out that one of the defendants' experts (Dr. Tabak) admitted that the February 25, 2002 announcement revealed to investors a heightened risk of WCG's bankruptcy.

As to the final disclosure date, plaintiffs argue that the bankruptcy filing on April 22, 2002 was a corrective disclosure because it finally revealed the truth, previously undisclosed, as to the "magnitude" of the likelihood that WCG would be forced to declare bankruptcy.  Plaintiffs maintain that the bankruptcy filing can constitute a corrective disclosure because the defendants' prior misrepresentation had

concealed that it was foreseeable that a company would declare bankruptcy in the near future, pointing out again that Dr. Tabak acknowledged in deposition that if plaintiffs' allegations concerning defendants' awareness of the likelihood of bankruptcy were proven, loss causation is associated with the April 22nd bankruptcy filing.

Finally, plaintiffs contend that their damage theories are legally and economically sound, at least for summary judgment purposes. They contend that Dr. Nye's proposed expert testimony on the related issues of loss causation and damages satisfies Daubert and Kumho. Pointing out that the Court, in Dura, did not address the measure of damages in a securities fraud case, plaintiffs argue that the traditional method, the out-of-pocket rule,[93] is still the law and that their case passes muster under the out-of-pocket rule, both as to the common stock and as to the notes.

The court need not determine whether Dr. Nye's leakage theory is fatally inconsistent with the Complaint. The court has concluded, in Part V(E) of this memorandum, that Dr. Nye's causation-related opinions, including his damage scenarios, do not square with the law of loss causation, applied through the prism of Daubert and Rule 702. The court has granted defendants' Daubert motions with respect to Dr. Nye's proposed expert testimony with respect to loss causation and his damage scenarios. That discussion and analysis need not be repeated here. Loss causation is an essential element of plaintiffs' § 10(b) and Rule 10b-5 claim and is an issue on which plaintiffs have the burden of proof at trial. Dura, 544 U.S. at 342; Gordon Partners v. Blumenthal, 2007 WL 1438753, at *2. Confronted with defendants' motions, plaintiffs are obliged to come forward with evidence which, if credited, would be sufficient to support a finding in their favor on the issue of loss causation. Gordon Partners, 2007 WL 1438753 at *2.

---

[93]The out-of-pocket measure of damages is "'the difference between the fair value of all that the [plaintiff] received and the fair value of what he would have received had there been no fraudulent conduct.'" Randall v. Loftsgaarden, 478 U.S. 647, 661-62 (1986) (quoting Affiliated Ute Citizens v. United States, 406 U.S. 128, 155 (1972)).

The court has carefully reviewed the summary judgment record for competent evidence, aside from the excluded expert testimony, to support such a finding. Having done so, the court concludes that plaintiffs have failed to present evidence sufficient to raise a triable issue as to loss causation. The plaintiffs have not made a showing, sufficient for summary judgment purposes, that defendants' alleged misrepresentations or omissions were the cause of plaintiffs' actual losses. Dura, 544 U.S. at 342 (defining loss causation as a "causal connection between the material misrepresentation and the loss"). "[A]n inflated purchase price will not itself constitute or proximately cause the relevant economic loss." Dura, 544 U.S. at 342. With or without Dr. Nye's proposed expert testimony, the summary judgment record provides no basis upon which a finder of fact could reasonably determine, consistent with loss causation doctrine established by Dura and its progeny, that plaintiffs' claimed losses were caused by defendants' alleged misrepresentations or omissions and not by "changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events . . . ." Dura, 544 U.S. at 342-43. Having failed to provide admissible expert or lay evidence sufficient to raise a genuine issue of fact as to the causal nexus between defendants' misrepresentations or omissions and plaintiffs' alleged losses, the court concludes that all defendants are entitled to summary judgment on the issue of loss causation.[94]

"Economic loss," in the words of the Court in Dura, 544 U.S. at 342 (citing 15 U.S.C. § 78u-4(b)(4)), is an essential element of these plaintiffs' securities fraud claim. Plaintiffs asserting claims under § 10(b) and Rule 10b-5 case generally rely on expert testimony to establish the fact of damages and the recoverable amount of damages. Sowell v. Butcher & Singer, Inc., 926 F.2d 289, 301 (3d Cir. 1991). The

---

[94]The court notes that E&Y, in its opening brief for summary judgment, incorporated the WCG defendants' arguments as to causation and damages. Although the WMB defendants did not specifically adopt or join in the WCG defendants' motion, the court still concludes that summary judgment is appropriate as to plaintiffs' claims for the reasons now and hereinafter stated.

court has excluded Dr. Nye's expert testimony as to each of his damage scenarios. The conclusion follows that plaintiffs cannot satisfy their burden of establishing the fact of damages and the means of calculating damages.  Summary judgment should consequently be granted in favor of all defendants on the issue of damages.  <u>Carpe</u>, 2005 WL 1138833 at *8 (granting summary judgment in defendants' favor as to plaintiffs' § 10(b) and Rule 10b-5 claims based upon a failure to establish the fact of damages and the means of calculating damages).

Because  summary judgment is appropriate on the issues of loss causation and damages, plaintiffs cannot establish the essential elements of  their § 10(b) and Rule 10b-5 claim and therefore cannot prevail on their claims against any of the defendants. This conclusion is fatal to plaintiffs' § 20(a) claim.  As has been discussed, the basic elements of a control person liability claim under § 20(a) are (i) a primary violation of the securities laws and (ii) "control" over the primary violator by the alleged controlling person.  <u>Fleming Companies</u>, 264 F.3d at 1270-71.  Because plaintiffs are unable to establish their § 10(b) and Rule 10b-5 claim, they cannot establish the first element of their § 20(a) claim.  The court therefore concludes that summary judgment is appropriate on the § 20(a) claim against the defendants.  <u>Id</u>. at 1271 (§ 20(a) claim properly dismissed upon dismissal of § 10(b) and Rule 10b-5 claim).

VII.   <u>Conclusion</u>.

Based upon the foregoing, the court **ORDERS** as follows:

1.   Defendant Ernst & Young LLP's Motion to Exclude H. Sean Mathis' Testimony & Evidence Under the Standards Established in Daubert & Kumho Tire, filed August 4, 2006 (doc. no. 1433), is **GRANTED**.

2.   WCG Defendants' Motion to Exclude the Report and Testimony of Plaintiffs' Expert H. Sean Mathis, filed August 4, 2006 (doc. no. 1451), is **GRANTED**.

3.     Defendant Ernst & Young LLP's Motion to Exclude Portions of the Testimony & Report of Plaintiffs' Expert Andrew Mintzer Under the Standards Established in Daubert & Kumho Tire, filed August 4, 2006 (doc. no. 1436), is **GRANTED**.

4.     WCG Individual Defendants' Motion to Exclude Portions of Andrew Mintzer's Expert Testimony and Report, filed August 4, 2006 (doc. no. 1437), is **GRANTED IN PART AND DENIED IN PART**.

5.     The Williams Companies, Inc. and Keith E. Bailey's Motion to Exclude Portions of the Testimony and Report of Plaintiffs' Expert Andrew Mintzer, filed August 4, 2006 (doc. no. 1445), is **GRANTED**.

6.     The Williams Defendants' Joinder to Motions and Supporting Briefs filed by Ernst & Young, LLP and the WCG Individual Defendants,  filed August 4, 2006 (doc. no. 1453), to the extent defendants seek to join the motions, briefs and declarations relating to the exclusion of the reports and testimony of experts H. Sean Mathis and Andrew Mintzer, is **GRANTED**.

7.     The Williams Defendants' Joinder to Reply Briefs filed by Ernst & Young LLP and the WCG Individual Defendants, filed September 8, 2006 (doc. no. 1529), to the extent defendants seek to join the reply briefs relating to the exclusion of the reports and testimony of experts H. Sean Mathis and Andrew Mintzer, is **GRANTED**.

8.     WCG Defendants' Motion to Exclude the Report and Testimony of Plaintiffs' Expert Blaine F. Nye, filed April 14, 2006 (doc. no. 1103), to the extent defendants seek to exclude the report and testimony of Dr. Nye regarding loss causation and damage scenarios, is **GRANTED**.  In all other respects, the motion is **DENIED as MOOT**.

9.     Defendant Ernst & Young LLP's Motion to Exclude the Testimony and Report of Plaintiffs' Expert Blaine F. Nye, filed May 16, 2006 (doc. no. 1297), to the extent defendant seeks to exclude the testimony and report of Dr. Nye regarding loss

causation and damage scenarios, is **GRANTED**.  In all other respects, the motion is **DENIED as MOOT**.

10. The Williams Companies, Inc. and Keith Bailey's Motion to Exclude Testimony of Plaintiffs' Expert Blaine F. Nye, filed May 18, 2006 (doc. no. 1316), to the extent defendants seek to exclude the testimony of Dr. Nye regarding loss causation and damage scenarios, is **GRANTED**.  In all other respects, the motion is **DENIED as MOOT**.

11. The Williams Companies, Inc. and Keith E. Bailey's Joinder in WCG Defendants' Motion to Exclude the Report and Testimony of Plaintiffs' Expert Blaine F. Nye, filed May 18, 2006 (doc. no. 1317), is also **GRANTED**.

12. Defendant Ernst & Young LLP's Motion for Summary Judgment, filed April 14, 2006 (doc. no. 1027), is **GRANTED**.

13. The Williams Companies, Inc. and Keith E. Bailey's Motion for Partial Summary Judgment on Alleged Misstatements or Omissions Made *After* WCG's Spin-Off from Williams, filed April 14, 2006 (doc. no. 1050), is **GRANTED in part** and **DENIED in part**.

14. The Williams Companies, Inc. and Keith E. Bailey's Motion for Partial Summary Judgment on Alleged Misstatements and Omissions Made *Before* WCG's Spin-Off from Williams, filed April 14, 2006 (doc. no. 1060), is **GRANTED in part** and **DENIED in part**.

15. WCG Defendants' Motion for Summary Judgment, filed April 14, 2006 (doc. no. 1092), is **GRANTED**.

In light of the court's rulings on the motions listed above, the court also **ORDERS** as follows:

1. Defendant Ernst & Young LLP's Joinder in WCG Defendants' Motion to Exclude the Report and Testimony of Plaintiffs' Expert Rick Lawrence, filed August 4, 2006 (doc. no. 1447), is **DENIED as MOOT**.

165

2.      WCG Plaintiffs' Motion to Exclude the Reports and Testimony of Defendants' Expert Eric P. Evans, filed August 4, 2006 (doc. no. 1448), is **DENIED as MOOT**.

3.      WCG Plaintiffs' Motion to Exclude the Reports and Testimony of Defendants' Expert William W. Holder, filed August 4, 2006 (doc. no. 1450), is **DENIED as MOOT**.

4.      The Williams Defendants' Joinder to Motions and Supporting Briefs filed by Ernst & Young LLP and the WCG Individual Defendants, filed August 4, 2006 (doc. no. 1453), to the extent defendants seek to join the motions and briefs relating to the exclusion of the report and testimony of expert Rick Lawrence, is **DENIED as MOOT**.

5.      WCG Plaintiffs' Motion to Exclude the Reports and Testimony of Defendants' Expert Thomas J. Mangold, filed August 4, 2006 (doc. no. 1455), is **DENIED as MOOT**.

6.      WCG Defendants' Motion to Exclude Certain Portions of the Report and Testimony of Plaintiffs' Expert Rick Lawrence, filed August 4, 2006 (doc. no. 1456), is **DENIED as MOOT**.

7.      WCG Plaintiffs' Motion to Exclude the Reports and Testimony of Defendants' Expert Paul A. Gompers, filed August 4, 2006 (doc. no. 1457), is **DENIED as MOOT**.

8.      The Williams Defendants' Joinder to Reply Briefs filed by Ernst & Young LLP and the WCG Individual Defendants, filed September 8, 2006 (doc. no. 1529), to the extent defendants seek to join the reply briefs relating to the exclusion of the report and testimony of expert Rick Lawrence, is **DENIED as MOOT**.

9.      Defendant Ernst & Young LLP's Motion in Limine to Exclude Evidence and Argument Relating to the Audit Quality Review Program, filed November 7, 2006 (doc. no. 1561), is **DENIED as MOOT**.

10.     Defendant Ernst & Young LLP's Motion in Limine to Exclude Evidence and Argument Relating to Dismissed, Abandoned &

Unpled Claims, filed November 7, 2006 (doc. no. 1563), is **DENIED as MOOT**.

11.   Defendant Ernst & Young LLP, WCG Defendants and Williams Defendants' Motion in Limine to Exclude Certain Irrelevant or Overly Prejudicial Evidence, filed November 7, 2006 (doc. no. 1566), is **DENIED as MOOT**.

12.   Defendant Ernst & Young LLP's Motion in Limine to Exclude Plaintiffs' Use of Trading Models to Estimate Aggregate Damages, filed November 7, 2006 (doc. no. 1567), is **DENIED as MOOT**.

13.   WCG Defendants' Motion in Limine to Exclude References to Executive Loan Forgiveness, Key Employee Retention Program, filed November 7, 2006 (doc. no. 1569), is **DENIED as MOOT**.

14.   The Williams Companies, Inc. and Keith E. Bailey's Motion in Limine No. 1 to Exclude Improper Expert Testimony, filed November 7, 2006 (doc. no. 1570), is **DENIED as MOOT**.

15.   The Williams Companies, Inc., Keith E. Bailey and Ernst & Young LLP's  Motion in Limine No. 2 to Exclude Evidence or Reference to "Corrective Disclosures" on Dates Where the Stock Price Did Not Move in a Statistically Significant Fashion, filed November 7, 2006 (doc. no. 1571), is **DENIED as MOOT**.

16.   The Williams Companies, Inc., Keith Bailey and Ernst & Young LLP's Motion in Limine No. 3 to Preclude Evidence or Argument Regarding The Williams Companies, Inc.'s Financial Statements, filed November 7, 2006 (doc. no. 1575), is **DENIED as MOOT**.

17.   The Williams Companies, Inc., Keith Bailey and Ernst & Young LLP's Motion in Limine No. 4 to Preclude Evidence or Argument Regarding Alleged Uses of the Word "Junk" to Describe WCG, filed November 7, 2006 (doc. no. 1577), is **DENIED as MOOT**.

18.   WCG Defendants and Ernst & Young LLP's Motion in Limine to Exclude References to Directed Shares Transactions and Related

167

Issues, filed November 7, 2006 (doc. no. 1578), is **DENIED as MOOT**.

19.     WCG Defendants and Ernst and Young LLP's Motion in Limine to Exclude Plaintiffs' Inadmissible Lay Witness Testimony, filed November 7, 2006 (doc. no. 1583), is **DENIED as MOOT**.

20.     WCG Subclass' Amended Omnibus Motion in Limine, filed November 7, 2006 (doc. no. 1585), is **DENIED as MOOT**.

21.     The Joinder of the Williams Defendants to Motions and Supporting Materials Filed by Ernst & Young LLP and the WCG Individual Defendants, filed November 10, 2006 (doc. no. 1590), is **DENIED as MOOT**.

Judgment shall enter forthwith.  The court **DIRECTS** the clerk of the court to enter this order and the judgment in the following cases which were consolidated with this case:

| | |
|---|---|
| 02-cv-00077-SPF-FHM | Weisz v. Williams Co., Inc., et al. |
| 02-cv-00078-SPF-FHM | Matcovsky, et al. v. Williams Companies, et al. |
| 02-cv-00080-SPF-FHM | Hansbro v. Williams Companies, et al. |
| 02-cv-00081-SPF-FHM | Rovner v. Williams Co., Inc., et al. |
| 02-cv-00083-SPF-FHM | Clavin v. Williams Co., Inc., et al. |
| 02-cv-00093-SPF-FHM | Berger, et al. v. Williams Co., Inc., et al. |
| 02-cv-00095-SPF-FHM | BC Invest. Club v. Williams Co., Inc., et al. |
| 02-cv-00097-SPF-FHM | Kosseff, et al. v. Williams Co., Inc., et al. |
| 02-cv-00107-SPF-FHM | Cohen v. Williams Co., Inc., et al. |
| 02-cv-00113-SPF-FHM | Shook v. Williams Co., Inc., et al. |
| 02-cv-00120-SPF-FHM | Goldstein v. Williams Companies, et al. |
| 02-cv-00124-SPF-FHM | Armezzani, et al. v. Williams Companies, et al. |
| 02-cv-00130-SPF-FHM | Cottrell v. Williams Co., Inc., et al. |
| 02-cv-00132-SPF-FHM | Market Street Sec. v. Williams Co., Inc., et al. |
| 02-cv-00135-SPF-FHM | Querci v. Williams Co., Inc., et al. |
| 02-cv-00139-SPF-FHM | Ackerman v. Williams Co., Inc., et al. |
| 02-cv-00161-SPF-FHM | Sheniak v. Williams Co., Inc., et al. |

| 02-cv-00162-SPF-FHM | Miller v. Williams Co., Inc., et al. |
| 02-cv-00184-SPF-FHM | Omar v. Williams Co., Inc., et al. |
| 02-cv-00189-SPF-FHM | Wilkinson v. Williams Co., Inc., et al. |
| 02-cv-00190-SPF-FHM | Jordan, et al. v. Williams Co., Inc., et al. |
| 02-cv-00204-SPF-FHM | Harman v. Williams Co., Inc., et al. |
| 02-cv-00205-SPF-FHM | Teamster Local 854 Pension Fund, et al. v. Williams Co. Inc., et al. |
| 02-cv-00206-SPF-FHM | Katz v. Bailey, et al. |
| 02-cv-00218-SPF-FHM | Watkins v. v. Williams Co., Inc., et al. |
| 02-cv-00231-SPF-FHM | Vaughan v. Williams Co., Inc., et al. |
| 02-cv-00235-SPF-FHM | Cohen, et al. v. Williams Co., Inc., et al. |
| 02-cv-00303-SPF-FHM | Local 710 Pension Fund, et. al. v. Williams Co., Inc., et al. |
| 02-cv-00319-SPF-FHM | Hoffman, et al. v. Williams Co., Inc., et al. |

ENTERED this 6th day of July, 2007.

_____
STEPHEN P. FRIOT
UNITED STATES DISTRICT JUDGE

02-0072p162  FINAL (PUB).wpd

169